## WESTERN DISTRICT OF MISSOURI WESTERN DIVISION

| | | |
|---|---|---|
| MICHAEL TISIUS, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| vs. | § | No. 4:17-cv-00426-SRB |
| | § | |
| CINDY GRIFFITH | § | CAPITAL HABEAS |
| | § | |
| Respondent | § | |

### PETITION FOR WRIT OF HABEAS CORPUS
### PURSUANT TO 28 U.S.C. § 2254
### IN A CAPITAL CASE

/s/ Laurence E. Komp
LAURENCE E. KOMP
Capital Habeas Unit, Chief
Federal Public Defender
Western District of Missouri
818 Grand Blvd, Ste 300
Kansas City, MO 64106
(816) 471-8282
laurence_komp@fd.org

/s/ Keith O'Connor
Keith O'Connor
Keith O'Connor LLC
PO Box 22728
Kansas City, MO 64113
Mo Bar No. 63134
Phone: 816-225-7771
E-Mail: Keith@keithoc.com

/s/ Daniel E. Kirsch
Daniel E. Kirsch
Assistant Federal Defender
Capital Habeas Unit
Federal Public Defender
Western District of Missouri
818 Grand Blvd, Ste 300
Kansas City, MO 64106
(816) 471-8282
daniel_kirsch@fd.org

/s/ Elizabeth Unger Carlyle
Elizabeth Unger Carlyle
Carlyle Parish LLC
6320 Brookside Plaza #516
Kansas City, MO 64113
Mo. Bar No. 41930
(816) 525-6540
elizabeth@carlyleparishlaw.com

ATTORNEYS FOR PETITIONER

# TABLE OF CONTENTS

Introductory Statement. ................................................................................... 1

    Offense facts.................................................................................................. 2

    Jury resentencing facts. ............................................................................... 4

    Procedural background................................................................................ 4

    Factual background. .................................................................................... 6

Grounds for relief. ........................................................................................... 23

Habeas Ground for Relief No. 1 ...................................................................... 26

        Mr. Tisius was denied his constitutional right to conflict-free and effective counsel when trial counsel at his resentencing trial were paid a flat fee of $10,000 a piece

Habeas Ground for Relief No. 2 ...................................................................... 30

        Trial counsel's failure to call lay mitigation witnesses violated Mr. Tisius' constitutional rights to effective assistance of counsel, due process, and freedom from cruel and unusual punishment

Habeas Ground for Relief No. 3 ...................................................................... 46

        Mr. Tisius was deprived of his right to the effective assistance of counsel under the Sixth, Eight, and Fourteenth Amendments when counsel failed to adequately and properly investigate, develop, and present significant expert mitigating evidence.

Habeas Ground for Relief No. 4 ...................................................................... 66

        Resentencing counsel's failure to submit all relevant portions of Dr. Peterson's prior testimony and omission of testimony supporting two additional mental-state statutory mitigating circumstances not otherwise presented to the jury— that Mr. Tisius acted under the influence of extreme mental or emotional disturbance and that Mr. Tisius' capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired— violated Mr. Tisius' rights to effective assistance of counsel, due process, and freedom from cruel and unusual punishment at his resentencing.

Habeas Ground for Relief No. 5 ...................................................................... 78

Case 4:17-cv-00426-SRB   Document 38   Filed 11/02/18   Page 2 of 228

Mr. Tisius was denied his constitutional right to effective assistance of counsel when trial counsel failed to prepare their expert witness, Dr. Shirley Taylor, by informing her of evidence that would be offered at trial concerning statements and conduct of Mr. Tisius while he was in jail before his resentencing hearing.

Habeas Ground for Relief No. 6 ............................................................................................ 80

Trial counsel were ineffective for failing to investigate, prepare, and rebut known aggravation being presented by the State in violation of Mr. Tisius' rights as guaranteed by the First, Sixth, and Fourteenth Amendments.

Habeas Ground for Relief No. 7 ............................................................................................ 92

Trial counsel were ineffective for failing to investigate and rebut Mr. Tisius' boot shank conviction used by the state as aggravating evidence at his resentencing in violation of Mr. Tisius' rights as guaranteed by the Fifth, Sixth and Fourteenth Amendments.

Habeas Ground for Relief No. 8 .......................................................................................... 105

Mr. Tisius was denied effective assistance of counsel when trial counsel failed to present evidence that Mr. Tisius was under the substantial domination of Roy Vance when the offense was planned and committed.

Habeas Ground for Relief No. 9 .......................................................................................... 112

The trial court erred in allowing the improper cross-examination of the defense expert, psychologist Dr. Shirley Taylor, over objection in violation of Mr. Tisius' rights to due process, trial by a fair and impartial jury, and freedom from cruel and unusual punishment, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments.

Habeas Ground for Relief No. 10 ....................................................................................... 126

Counsel's failure to object to the prosecution's closing arguments urging that (1) the jury had an obligation to sentence Mr. Tisius to death to protect the law enforcement community from Mr. Tisius; (2) death was appropriate because that was what the victims' families desired and (3) Mr. Tisius did not have the right to ask for mercy violated Mr. Tisius' constitutional rights to effective assistance of counsel, due process, and freedom from cruel and unusual punishment.

Habeas Ground for Relief No. 11 ....................................................................................... 133

Case 4:17-cv-00426-SRB   Document 38   Filed 11/02/18   Page 3 of 228

Mr. Tisius was denied his constitutional rights to due process of law and to be free from cruel and unusual punishment due to improper jury instructions at the resentencing hearing.

Habeas Ground for Relief No. 12......................................................................... 138

Mr. Tisius was denied effective assistance of counsel when trial counsel failed to offer modified jury instructions that properly set forth the federal constitutional requirements for a death sentence.

Habeas Ground for Relief No. 13......................................................................... 140

Resentencing counsel were ineffective for failing to move to prohibit the death penalty because Mr. Tisius' mental age was less than 18.

Habeas Ground for Relief No. 14......................................................................... 143

Mr. Tisius was denied his constitutional rights to due process of law and confrontation of witnesses when documents concerning his prison contraband conviction were admitted into evidence at his resentencing.

Habeas Ground for Relief No. 15......................................................................... 145

Mr. Tisius was denied his constitutional right to effective assistance of counsel when trial counsel failed to investigate and present evidence concerning Mr. Tisius' conviction for possession of a prohibited object in prison at his resentencing.

Habeas Ground for Relief No. 16......................................................................... 150

First trial counsel's failure to adequately investigate and present a diminished capacity or involuntary intoxication defense violated Mr. Tisius' constitutional rights to effective assistance of counsel, due process, and freedom from cruel and unusual punishment.

Habeas Ground for Relief No. 17......................................................................... 154

Trial counsel were ineffective for not investigating and calling a handwriting expert to testify that Roy Vance had written a letter addressed to "Karl" to support an asserted defense in violation of the Sixth and Fourteenth Amendments.

Habeas Ground for Relief No. 18......................................................................... 160

Mr. Tisius was denied his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution to present a defense when the trial court sustained an objection excluding a letter from the co-defendant Vance soliciting assistance in breaking Vance out of jail at Mr. Tisius' first trial.

Habeas Ground for Relief No. 19 ........................................................................ 165

Mr. Tisius was denied due process of law when the trial court at his first trial permitted cameras in the courtroom.

Habeas Ground for Relief No. 20 ........................................................................ 168

Counsel's failure to object properly to the state's knowing presentation of false and misleading guilt-phase argument suggesting that Mr. Tisius obtained the gun by stealth and therefore deliberated violated Mr. Tisius' constitutional rights to effective assistance of counsel, due process, and freedom from cruel and unusual punishment.

Habeas Ground for Relief No. 21 ........................................................................ 175

Mr. Tisius was denied due process of law because he was convicted upon legally insufficient evidence of deliberation, an element of first- degree murder under Missouri law.

Habeas Ground for Relief No. 22 ........................................................................ 177

Mr. Tisius was denied effective assistance of counsel in his first trial when trial counsel failed to failed to question prospective jurors about the distinction between first- and second-degree murder and failed to object to the verdict directors for first- and second-degree murder.

Habeas Ground for Relief No. 23 ........................................................................ 186

Mr. Tisius was denied his constitutional right to the effective assistance of counsel, due process of law, and to be free from cruel and unusual punishment when trial counsel failed to object to improper prosecutorial closing arguments during Mr. Tisius' first trial.

Habeas Ground for Relief No. 24 ........................................................................ 196

Mr. Tisius was denied effective assistance of counsel when trial counsel failed to object to the assistant attorney general's statement that Mr. Fusselman, the elected prosecutor, had requested his assistance because "Randolph County has not had the misfortune of having that many murders so it is not something with which he comes into contact with [sic] regularly.".

Habeas Ground for Relief No. 25 ........................................................................ 197

Counsel's failure to prevent the jury from seeing inflammatory evidence of brain matter of the victims on the floor of the scene of the crime—which the jury otherwise would not have seen and considered— violated Mr. Tisius' constitutional rights to effective assistance of counsel, due process, and freedom from cruel and unusual punishment.

Habeas Ground for Relief 26 ........................................................................ 199

Appellate counsel was constitutionally ineffective for not challenging on appeal the admission and display on a movie-screen of autopsy photos of the deceased men thereby denying Mr. Tisius due process, a fundamentally fair trial, and effective assistance of counsel, guaranteed by the Sixth and Fourteenth Amendments

Habeas Ground for Relief No. 27....................................................................... 230

Trial counsel were ineffective for failing to object at the instruction conference to Instruction No. 4, the reasonable doubt instruction, in violation of the Sixth and Fourteenth Amendments provided to the jury at the first trial.

Habeas Ground for Relief No. 28....................................................................... 231

Trial counsel were ineffective for not objecting to references to and the admission of Mr. Tisius' t-shirt, which depicted and bore the legend "Guardians of Paradise," because this denied Mr. Tisius' due process, freedom of speech and association, a fundamentally fair trial, and effective assistance of counsel, guaranteed by the First, Sixth, and Fourteenth Amendments.

Habeas Ground for Relief No. 29....................................................................... 237

The state suppressed favorable exculpatory evidence in violation of Mr. Tisius' right to due process of law.

Habeas Ground for Relief No. 30....................................................................... 240

Mr. Tisius was denied proper proportionality review as required by Missouri law in violation of his constitutional right to due process of law under the Fourteenth Amendment.

Habeas Ground for Relief No. 31....................................................................... 247

Mr. Tisius was denied his right to effective assistance of counsel by trial counsel's failure to adequately question prospective jurors pertaining to the death penalty.

CONCLUSION.............................................................................................. 251

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

MICHAEL TISIUS,     )
           )
   Petitioner,     )
           )
   v.        )   No. 4:17-cv-00426-SRB
           )
CINDY GRIFFITH, WARDEN,  )
           )
   Respondent.    )

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

### Introductory Statement.

Neglect. Mr. Tisius' life defines that term. Neglect at the hands of his father, his mother, and his extended family. Those few that tried to ameliorate the neglect were rare; and they could not make an appreciable impact. If only his brother had just ignored him instead of beating him on a daily basis. If only there was not a multigenerational history of addictions, mental illness, and suicides cemented firmly in both sides of the family. If only Mr. Tisius had not had to suffer such abandonment and impoverished circumstance.

Neglect. Mr. Tisius' attorneys throughout this case also define that term. Neglect by trial counsel, post-conviction counsel, and resentencing counsel. Sins of omission. Charged with saving his life, counsel failed to investigate, prepare, and present available evidence that could have secured at minimum a life sentence and quite possibly conviction of a lesser offense. Available evidence that would have led to the retention of experts to explain the organic brain damage and the interplay of that

brain damage with Mr. Tisius' post-traumatic disorder, long standing depression, and dependent personality disorder.

Neglect is the story of this case.

*Offense facts.*

In early June of 2000, 19-year-old Michael Tisius and 27-year-old Roy Vance were cellmates at Randolph County Jail in Huntsville, Missouri. Mr. Tisius was serving a 30-day probation violation sentence for theft. Vance told Mr. Tisius that he (Vance) was facing a fifty-year jail sentence. Vance, who had known Mr. Tisius briefly before they both went to jail, asked Mr. Tisius to help him escape after Mr. Tisius' release. Vance had previous escape attempts.

The Randolph County Jail was a two-story brick structure. The building had once housed the sheriff and his family along with the jail, but by the time of the offense, it was simply the jail. The front door of the jail, an ordinary door, was kept locked. When a visitor rang the doorbell, the officers on duty could remotely open the door. Inside the front door was a small waiting area, with a counter to the right. The jailers were stationed behind the counter. A hall led from the front office area to the jail cells in the rear of the building. There were cells on both the first and second floors.

Mr. Tisius was released June 13, 2000. He returned to St. Louis, where he had spent most of his life. However, homeless and with nowhere to turn, he shortly contacted Vance's girlfriend, Ms. Bulington. Mr. Tisius made his way to Columbia, Missouri, where Ms. Bulington and her friend Heather Douglas met him. They stayed at Ms. Douglas' home for several days.

During the time Mr. Tisius and Vance were jailed together, Vance formulated a plan on how Mr. Tisius and Ms. Bulington could assist in Vance escaping. The idea was that Mr. Tisius and Ms. Bulington would enter the jail, threaten the jailers with a gun, and obtain keys to free Vance. Ms. Bulington stole a .22-caliber pistol from her parents' home to facilitate the escape.

At 12:15 a.m. on June 22, 2000, Mr. Tisius and Ms. Bulington arrived at the Randolph County Jail, rang the doorbell, and were admitted. Mr. Tisius carried the pistol in his pants. The jailers on duty were Leon Egley and Jason Acton. Mr. Tisius spoke with Mr. Acton for a number of minutes. Mr. Tisius then raised his arm with the pistol drawn and shot Mr. Acton in the forehead above his left eye, from close range, killing him instantly. As Mr. Egley approached Mr. Tisius, Mr. Tisius shot Mr. Egley until Mr. Egley fell to the ground.

Mr. Tisius removed keys from behind the counter, ran to Vance's cell, and attempted to unlock it. Mr. Tisius was unable to do so, so he returned to the front of the building where he found that Mr. Egley had grabbed Ms. Bulington's leg. He then shot Mr. Egley again. Mr. Tisius and Ms. Bulington left in her car. After crossing into Kansas, Ms. Bulington's car broke down. The two walked for several hours and eventually surrendered to police near a Pizza Hut in Wathena, Kansas.

At trial, the prosecution contended that the killings were intentional and deliberate. The defense theory was that Mr. Tisius was guilty of second-degree murder because there was no deliberation. Trial counsel did not submit any evidence in support of his mental-state defense. The jury agreed with the prosecution theory and convicted Mr. Tisius of first-degree murder. After a sentencing phase, the jury imposed

two death sentences, which the trial court accepted.

The post-conviction trial court vacated the death sentence due to misconduct related to the presentation of inaccurate evidence at Mr. Tisius' penalty phase. The court vacated the death sentence and ordered that a resentencing occur.

*Jury resentencing facts.*

The state again sought the death penalty. The state's evidence focused on victim impact and future dangerousness.[1] The defense presentation was unfocused. Resentencing counsel presented some evidence of Mr. Tisius' deprived and chaotic upbringing. However, they ignored much evidence that post-conviction counsel previously had developed. Resentencing counsel failed to present any evidence concerning Mr. Tisius' neurological disorder and brain dysfunction. In addition, resentencing counsel failed to present available mitigation witnesses who would have provided a far more complete and coherent picture of the nightmare that was Mr. Tisius' early life.

## Procedural background.

Mr. Tisius' case has a long history. This proceeding begins 18 years after the original offense in June 2000.

1.    Mr. Tisius was convicted in 2001 of two counts of first-degree murder. His conviction and sentence were affirmed on direct appeal. *State v. Tisius*, 92 S.W.3d 751 (Mo. banc 2003). Certiorari was denied on June 9, 2003. *Tisius v. Missouri*, 539 U.S 920 (2003).

---

[1] The discussion here refers to the jury resentencing proceeding, which is currently before this Court.

2.     Meanwhile, Mr. Tisius filed a petition for Missouri post-conviction relief on April 24, 2003. After an evidentiary hearing, the motion court granted penalty phase relief. During the penalty phase of Mr. Tisius' trial, the prosecutors had introduced into evidence a cassette tape they said was played in the car on the night of the shootings. That was a lie. The actual tape was still in the car at the time of trial. Mr. Tisius' counsel did not look for it. After Mr. Tisius' trial, Vance's lawyer discovered the inaccuracy regarding the tape when he examined the car in preparation for Vance's trial. After Vance's lawyer informed Mr. Tisius' first post- conviction lawyer Gregory Mermelstein that a cassette was still in the car tape deck, Mr. Mermelstein retrieved it. The State played only a song downloaded by an intern that was different from the actual tape from the car. Because of this prosecutorial misconduct and trial counsel's failure to discover it before trial, the post-conviction court ordered a new penalty phase. The state did not timely appeal this determination. However, Mr. Tisius appealed the denial of guilt phase relief. That appeal resulted in an affirmance of the motion court's ruling determining that no guilt phase error occurred. *Tisius v. State*, 183 S.W.3d 307 (Mo. banc 2006).

3.     At the resentencing proceeding, Mr. Tisius was again sentenced to death. This time, the state relied on new evidence: Mr. Tisius' conviction for possession of a dangerous object in prison (a "boot shank" in his radio). The conviction occurred during a group plea with four other defendants. Mr. Tisius entered an *Alford* plea. The Washington County public defender represented him despite the fact that his capital resentencing proceeding remained pending and he had counsel for that proceeding. The prosecutor argued that the boot shank conviction foretold future dangerousness. The

sentences were affirmed on appeal. *State v. Tisius*, 362 S.W.3d 398 (Mo. banc 2012).

Certiorari was denied on October 1, 2012. *Tisius v. Missouri*, 568 U. S. 868 (2012).

    4.    Mr. Tisius filed another post-conviction motion on July 27, 2012, before certiorari was denied on his direct appeal. After an evidentiary hearing, the circuit court denied relief. The denial was affirmed in *Tisius v. State*, 519 S.W.3d 413 (Mo. banc 2017), *rehearing denied* June 27, 2017. The Supreme Court denied certiorari on March 5, 2018. *Tisius v. Missouri*, 138 S. Ct. 1263 (2018).

## Factual background.

The facts relevant to each stage of the case are summarized below. Additional facts are included in the sections concerning the grounds for relief.

*Pretrial.*

Mr. Tisius was appointed counsel through the Missouri State Public Defender System. His initial trial counsel were Mr. David Kenyon and Mr. Jeff Estes.

Mr. Tisius made oral statements to Kansas officers and oral and written statements to Missouri officers. Trial counsel moved to suppress evidence of these statements based on the lack of voluntariness. Counsel also moved to suppress evidence seized from the car in which Mr. Tisius rode. The trial court denied the motions after an evidentiary hearing. Venue was changed from Randolph County, where the offense occurred, to Boone County, about fifty miles south.

*First trial: Guilt phase.*

The following evidence was presented at Mr. Tisius' trial. In June 2000, Mr. Tisius were incarcerated in the Randolph County Jail. Trial 1 Tr. Pp. 794-795.[2] Vance

---

[2] References to the first trial transcript will be "Trial 1 Tr. P. ##." References to the first trial exhibits will

was manipulative. *Id.* p. 804. Vance concocted a plan, which began as a joke, calling for Mr. Tisius, after his release, to acquire a gun, return to the jail, and order the guards into a cell. *Id.* p. 835. Mr. Tisius was then to give the gun to Vance, and Vance would "take over." *Id.* Vance discussed this plan with Mr. Tisius at least ten times while Mr. Tisius was still in jail. *Id.* Before Mr. Tisius was released on June 13, 2000, he told Vance that he would get him out of jail. *Id.* pp. 795, 797.

On the night of June 22, 2000, Mr. Tisius and Ms. Bulington arrived at the jail, Mr. Tisius briefly chatted with Mr. Jason Acton. Then he "put the gun over the counter" and shot him. Mr. Tisius first shot Mr. Acton and then shot Mr. Leon Egley. Trial 1 Tr. Pp. 835- 836. Mr. Tisius grabbed jail and ran to the back of the jail where the cells were located to attempt to free Vance. Mr. Tisius could not get the keys to work. *Id.* p. 836. When Mr. Tisius returned to the front of the jail, Mr. Egley grabbed Ms. Bulington's leg, and Mr. Tisius panicked and shot him again. *Id.*

Randolph County Deputy Sheriff Wilburt White worked that early morning. Trial 1 Tr. P. 595-597. He arrived at the jail at 12:45 a.m. *Id.* p. 598. As he came onto the porch of the jail building, he heard a "slam-like noise." *Id.* p. 603. His view into the jail was obscured, but he saw a woman and Mr. Tisius there. *Id.* p. 605. Mr. Tisius had a gun in his hand and was holding it down over the counter towards the dispatch area. *Id.* Mr. White heard four popping noises. Then he heard Mr. Tisius say, to the woman

be "St's Trial 1 Ex. #" and "Def. Trial 1 Ex. ##." References to the first direct appeal record will be "Trial 1 LF p. ##" and "Trial 1 Supp. LF p. ##." References to the first post-conviction transcript will be "PCR 1 Tr. P. ##" and to the exhibits as "PCR 1 Ex. ##." References to the first post-conviction appeal record will be "PCR 1 LF p. ##." References to the jury resentencing transcript will be "Trial 2 Tr. P. ##." References to the resentencing direct appeal record will be "Trial 2 LF p. ##." References to the second post-conviction transcript will be "PCR 2 Tr. P. ##" and to the exhibits as "PCR 2 Ex. ##." References to the first post-conviction appeal record will be "PCR 2 LF p. ##."

with him, "Get him." *Id.* p. 606. Mr. White drew his weapon, but instead decided to call for help. Unable to reach anyone on the radio, Mr. White then ran "a small block" to Deputy Eric Brown's house so they could call for help. *Id.* p. 607.

The two returned to the jail. When they arrived, the front door was standing open. Trial 1 Tr. P. 608. Deputy White saw Mr. Acton and Mr. Egley on the floor. *Id.* 609. Mr. Acton died at the scene. Mr. Egley died at the hospital a short time later.

Mr. Tisius and Ms. Bulington ran to Ms. Bulington's car and she drove away Trial 1 Tr. P. 837. Ms. Bulington drove them west and reached Kansas when the car broke down. *Id.*

Later that morning, Officer Brian Vincent of Elwood, Kansas, was driving to court when he spotted a man and a woman with a duffel bag walking down U.S. Highway 36 in Wathena, Kansas. Trial 1 Tr. P. 807. As he arrived at the courthouse, Mr. Vincent heard a broadcast that two people – generally matching the description of the two people he had seen in Wathena – were wanted for killing two deputies in Missouri. *Id.* p. 808. While driving back to Elwood after court, Mr. Vincent saw the two people he had seen earlier. *Id.* p. 810. Along with Chief Walker of the Wathena Police Department, Mr. Vincent approached the two people who "were sitting on a curb there on the sidewalk of the Pizza Hut." *Id.* pp. 811, 817-818.

The officers determined that the people at the Pizza Hut were Mr. Tisius and Ms. Bulington; the same two with Missouri arrest warrants for homicide. The officers arrested them. Trial 1 Tr. Pp 811-812, 818. Mr. Tisius said to the officers, "I think I did something bad last night." *Id.* pp. 813-814.

8

After his arrest, Mr. Tisius made a written statement describing the plan and shooting the jail guards:

> The planning was orignally [sic] just a joke and somewhere along the lines got serious. Roy Vance said to just tell the guards to come back there to the cell and he would have the rest under control. Well I got out of jail and looked up his girlfriend and she wanted to go through with getting him out. Around 12:15 am we went to the jail and Tracie pulled out a gun from a green army bag behind the driver seat. I took the gun, (not aware what was going to happen.) We went to the jail and Tracie acted like she wanted to drop off some cigarettes. And I pulled out the gun, and before I knew it "I" was already dead when I pulled the trigger Got scared and shot a [sic] the other guard. Ran back to the cells and had the wrong key. When I went back up we can't find no keys arounds. [sic] One guard grabbed Tracie and she screamed so I shot again and again (I don't know why why why.) As we left we ran to the car and I through [sic] the keys out the ar [sic] window. When we got further I gave Tracie the gun and she tossed it and a blue rag out the window. We kept driving to KANSAS and we ditched the car and started walking we finally decided to turn our selves [sic] in I know what I have done was wrong and will never be fixed. No I don't believe they deserved it. An Officer asked me if I could go back and do it all over what would I do. I said I would kill myself to save their lives. I know I deserve what ever I get and got coming to me.

St. Trial 1 Ex. 61.

After approximately six hours of deliberation, the jury returned verdicts finding Mr. Tisius guilty of first degree murder. Trial 1 Tr. pp. 945-49.

*First Trial: Penalty phase.*

At the penalty phase, the state called Ms. Bulington as a witness. She testified that she had entered a guilty plea to two counts of second-degree murder and was serving concurrent life sentences. She agreed to testify against Mr. Tisius as part of her plea agreement. Trial 1 Tr. P. 1015.

She testified that she was Vance's girlfriend at that time and that Vance recruited her to help with the breakout plan, telling her "that he was facing 50 or 51

9

years" in prison and that he "couldn't do that." Trial 1 Tr. Pp. 1051, 1062. Ms.
Bulington refused at first, but Vance persisted telling her that he would never see his
daughter again and demanded her help. *Id.* pp. 1051-52.

After his release, Mr. Tisius contacted Ms. Bulington using telephone numbers
supplied by Vance. Trial 1 Tr. P. 1016. Ms. Bulington picked Mr. Tisius up in
Columbia, Missouri. *Id.* p. 1018. The two again discussed Vance's escape plan. *Id.*

Ms. Bulington recounted that in the early morning hours of June 22, shortly
after midnight, Mr. Tisius and Ms. Bulington went to the jail with cigarettes to deliver
to Vance. Trial 1 Tr. p. 1032. Mr. Tisius had a gun that Ms. Bulington stole from her
parents. *Id.* p. 1018. According to Ms. Bulington, Mr. Tisius was "real nervous." *Id.* pp.
1059-1061. "[H]is face was blank, he was almost expressionless. . . . There was terror in
his eyes almost. . . . He looked terrified." *Id.* p. 1061. Ms. Bulington testified he listened
to a song by Bone Thugs 'n Harmony called "Mo Murda" repeatedly. *Id.* p. 1027. The
song was played for the jury. *Id.* p. 1042.

While Ms. Bulington was with Mr. Tisius before the attempted jail break, Mr.
Tisius talked constantly about Vance and "spoke very highly" of him. Trial 1 Tr. pp.
1054, 1062-63. Ms. Bulington's impression of Mr. Tisius was that he was a nice, meek
kid. *Id.* p. 1063. Ms. Bulington told the officers that while driving to Kansas, Mr. Tisius
said over and over, and over again, "I'm sorry, Roy." *Id.* p. 1056.

The state also called several witnesses from the victims' families to testify about
the effect of their death on the family. In addition, the state called Boone County
correctional officer Jacqueline Petri, who described an interaction with Mr. Tisius
while he was in jail before trial. According to Ms. Petri, in the course of requesting a

transfer, Mr. Tisius asked her if she knew he was the person who killed those two officers in Moberly. Trial 1 Tr. pp. 894-897. The state also called Donna Harmon who testified that while Mr. Tisius was in the Chariton County jail, he made a gesture holding his hand as if he had a gun and pantomiming shooting her. *Id.* pp. 1002-1005.

The defense evidence began with the testimony of Mr. Tisius' mother, Patty Lambert. Trial 1 Tr. Pp. 1064-1133. She presented a timeline of Mr. Tisius' life. Def. Trial 1 Exs. 10-12. Ms. Lambert was married to Chuck Tisius, Michael's father, when Michael was born. However, Chuck abandoned Michael not long after that. She described a troubled childhood in which Chuck had little involvement in Michael's life. Michael has an older half-brother, Joey Mertens. Joey was extremely physically abusive to Michael. Michael had mental health issues, school problems, and frequently ran away from home.

Joey Mertens also testified for the defense. Trial 1 Tr. Pp. 1126-1133. He admitted that he attacked Michael and belittled him. He contrasted his own good relationship with his father with Michael's abandonment by Chuck Tisius.

Several neighbors and friends testified about Joey's beatings of Michael, and about Michael's general character as a sweet, caring child. Michael's sixth grade teacher Janice Page testified about his good experience in her class and his talent for drawing. Trial 1 Tr. p. 1146-1161. John Reichle, who was a caseworker assigned to Michael's case as a teenager, testified about his efforts to assist Michael. *Id.* pp. 1061-1176. Several relatives of Mr. Tisius also testified about his good qualities.

Finally, the defense called an expert witness: Dr. Shirley Taylor, a psychologist. She testified about her evaluation of him and review of records. She testified about his

chronic depression and susceptibility to manipulation by others. Trial 1 Tr. pp. 1207-1240.

After approximately nine hours of deliberation, the jury returned a verdict of death as to each count. Trial 1 Tr. pp. 1296-1302.

*First Direct Appeal.*

On direct appeal, Mr. Tisius was represented by Deborah Wafer, a Missouri public defender. She raised the following grounds for relief related to the guilt phase.[3]

1. Error in the admission of evidence that Mr. Tisius was listening to a rap song with the refrain "Mo' Murda" while riding with Ms. Bulington before arriving at the jail. Mr. Tisius argued that the admission of this evidence violated his First Amendment right to listen to music of his own choosing.

2. Error in playing the song to the jury where it was not timely disclosed in discovery.

3. Insufficient evidence of deliberation, a required element of first degree murder.

4. Failure to plead aggravating circumstances in the indictment. Mr. Tisius argued that because the indictment did not specify the aggravating circumstances, the court lacked jurisdiction to sentence him to death.

5. The trial judge permitted cameras in the courtroom over defense objection.

6. The Missouri Supreme Court affirmed the conviction and sentence. *State v. Tisius*, 92 S.W.3d 751 (Mo. banc 2002).

---

[3] Because Mr. Tisius received post-conviction penalty phase relief, this petition does not discuss the first direct appeal grounds relating to the penalty phase.

Case 4:17-cv-00426-SRB   Document 38   Filed 11/02/18   Page 18 of 228

*First post-conviction proceedings.*

Mr. Tisius was represented by Gregory Mermelstein and Pete Carter, two Missouri public defenders, in his first post-conviction proceeding under Mo. Sup. Ct. 29.15. Post-conviction counsel conducted a significantly more extensive investigation than first trial counsel. This investigation included retaining Dr. Stephen Peterson, M.D., to evaluate Mr. Tisius, as well as interviews with numerous witnesses not interviewed or called by first trial counsel.

The timely amended post-conviction petition included the following grounds for relief:

1. Prosecutorial misconduct for presenting false and misleading information in guilt phase argument about whether Mr. Tisius had stolen the gun from Ms. Bulington's parents, and his firing of the gun prior to the offense; ineffective assistance of trial and appellate counsel for failing object to these statements.

2. Penalty phase evidence about the song played in the car was false and misleading.

3. Ineffective assistance of counsel for failure to call as a witness a medical doctor, Dr. Stephen Peterson.

4. Ineffective assistance of counsel for failure to object and preserve for appeal the following issues:

    a. The prosecutor's "acquittal first" argument about the lesser-included offense of second degree murder.

    b. The prosecutor's argument that Mr. Tisius' statement to Ms. Bulington to "Get him" was an instruction to inflict harm on Wilbert White, who was

13

outside.

c. The gruesome and inflammatory photos of the victims' bodies.

d. Description of defense arguments as "an attempt to fool you [jurors]" and "incredible sophistry."

e. Argument that the testimony of Jackie Petri showed that Mr. Tisius was proud of the murders.

f. Argument that Mr. Tisius' expression of remorse was "going to be precious little consolation to deputy Acton and deputy Egley."

g. Expressions of personal opinion in the penalty phase argument.

h. Statements that anyone who killed two policemen deserved the death penalty.

i. Statement about mitigating evidence which suggested that the jurors were limited to considering statutory mitigating circumstances.

j. Statements that Mr. Tisius' age and lack of prior criminal history were "not good enough" to justify a life sentence.

k. Statement that suggested that the jurors should weigh the victims' lives against Mr. Tisius'.

l. Inadequate objection to the prosecutor's statements concerning his experience in the military, objected to as personalization, but actually referenced matters outside the record and were inflammatory.

m. Remarks which suggested the jury had a duty to return a death sentence.

At the evidentiary hearing in the first post-conviction case, counsel presented the live testimony of an expert Dr. A. E. Daniel, who treated Mr. Tisius in jail; and ten new lay mitigation witnesses. Counsel also presented the deposition testimony of over thirty other witnesses, including psychiatrist Dr. Stephen Peterson. None of these witnesses had been interviewed or called by first trial counsel.

Counsel in the first post-conviction proceeding attempted to demonstrate that Mr. Tisius' history was more complicated than that of a fatherless boy. Rather, both his father and his mother neglected and abused him, which left him a homeless teen with few resources to make a life for himself.

The post-conviction motion court granted penalty phase relief on the tape substitution claims, ineffective assistance and prosecutorial misconduct, but denied guilt phase relief and all other penalty phase claims. The state did not timely appeal the granting of penalty phase relief. Mr. Tisius appealed the denial of guilt phase relief.

On appeal, Mr. Tisius was represented by another public defender, Janet Thompson. The following grounds were raised on appeal:

1. Ineffective assistance of counsel at trial and on appeal for failing to object to the prosecutor's statements that Mr. Tisius, rather than Ms. Bulington, had stolen the gun from Ms. Bulington's parents' home.

2. Ineffective assistance of counsel for failure to call a handwriting expert to establish that a letter, which Mr. Tisius sought unsuccessfully to introduce into evidence, was written by Roy Vance.

3. Ineffective assistance of counsel for failure to object to a t-shirt with the slogan "Guardians of Paradise" and the image of a "snarling, winged, tiger-like animal, his talons extended over the yin and yang sign, and his taloned wings encircling his body."

4. Ineffective assistance of counsel for failure to object to the verdict directing instructions for first and second degree murder on the ground that they improperly defined deliberation.

5. Ineffective assistance of counsel for failure to object to the reasonable doubt instruction as lessening the burden of proof.

6. Ineffective assistance of direct appeal counsel for failing to raise as a ground for appeal the presentation of enlarged autopsy photos to the jury.

7. Ineffective assistance of trial counsel during jury selection, including:

a. Failure to object to the prosecutor's statement that the county "has not had the misfortune of having that many murders. . . ."

b. Failing to ask the jury panel whether they could consider the different mental states for first and second degree murder.

8. Ineffective assistance of counsel for failing to object to five improper arguments by the prosecutor:

a. The argument that the jurors could consider murder in the second degree only after finding that the defendant did not commit murder in the first degree.

b. The argument that Mr. Tisius instructed Ms. Bulington to "get" Wilburt White.

c. The use of the victims' photographs during final argument.

d. The prosecutor's rebuttal argument that the defense was "trying to fool" the jurors and that their arguments were "incredible sophistry."

e. The prosecutor's argument that Mr. Tisius' remorse was "little consolation" to the victims.

The Missouri Supreme Court affirmed the decision of the circuit court. *Tisius v. State*, 183 S.W.3d 207 (Mo. banc 2006).

*Second Trial—Jury Resentencing.*

At his second trial, Christopher Slusher and Scott McBride, attorneys in private practice, represented Mr. Tisius pursuant to a flat-fee contract commencing October 2, 2006, for $10,000 each. At a pretrial hearing held three years later on December 8, 2009, Mr. Slusher predicted that the second trial would be shorter than the first. Trial 2 Tr. P. 17. The resentencing jury was to assess penalty only because the guilt findings had been affirmed. Before trial, the public defender made available to Mr. Slusher and Mr. McBride the entire file on Mr. Tisius' case, including the new witnesses developed in the first post-conviction proceeding.

The trial began on July 9, 2010. The state presented a slightly abbreviated version of the guilt and penalty phase evidence from the first trial. Unlike the first jury, the second jury did not hear the actual song that Mr. Tisius listened to before the offense, but they heard a description of it. Finally, the state presented evidence that Mr. Tisius had been convicted of the offense of possessing a prohibited item in prison. The object in question was a piece of metal, commonly known as a shank, which was normally used to stiffen the sole of a boot or shoe but had been removed. It had

rounded, unsharpened ends and was about four inches long. The item was found concealed in Mr. Tisius' radio in his cell.

The defense presented many fewer witnesses than were presented at the previous post-conviction proceeding. The resentencing testimony was sparse. Mr. Tisius' mother, Patricia (Patty) Lambert, again testified about her difficulties with Chuck Tisius, and about his neglect of Michael. She described Mr. Tisius' persecution by his older brother and difficulties in school. She also explained his history of mental health treatment. A neighbor of Ms. Lambert when Mr. Tisius was young, Pathericia McBride, testified about his good relationship with her children and Mr. Tisius' persecution by his older brother. Mr. Tisius' teacher Janice Page again testified about his artistic talent and the fact that he was able, with her encouragement, to do well in school for a brief time. Mr. Tisius' case manager John Reichle testified about his participation in some programs during Mr. Tisius' adolescence. Trial counsel also read into the record portions, but not all of, Dr. Peterson's first post-conviction testimony, and Dr. Daniel's first post-conviction testimony. Finally, the defense presented to the jury the testimony of Dr. Shirley Taylor.

Neither Chuck Tisius father nor any member of his family testified, so the jury did not hear that Michael was abandoned by both parents.

Mr. Tisius was again sentenced to death. Following his sentence, a juror told the Columbia Daily Tribune that she was comfortable with the death sentence, observing, "If he wanted to build a stronger case, he should have done something better than say his dad wasn't in his life. . . . It's easy to find someone that didn't have a father but did something with themselves."

*Second direct appeal.*

Mr. Tisius was represented by public defender Jeannie Willibey on his second direct appeal. The following grounds were presented:

1. Improper admission into evidence of the complaint in the case alleging that Mr. Tisius possessed a prohibited weapon in prison.

2. Improper cross-examination of defense expert regarding a book, "A Child Called It," a study concerning errors in psychological diagnosis, and the fact that Mr. Tisius did not plead guilty.

3. Improper closing argument by the prosecutor that Mr. Tisius did not have the right to ask for mercy, future dangerousness, and the need for justice for the victims' families. (Reviewed for plain error.)

4. Improper verdict-directing instructions. (Reviewed for plain error.)

5. Verdict-directing instruction improperly shifted burden of proof.

6. Information failed to include aggravating circumstances.

7. The death sentence is disproportionate.

The Missouri Supreme Court affirmed Mr. Tisius' sentence. *State v. Tisius*, 362 S.W.3d 298 (Mo. banc 2012).

*Second post-conviction proceeding.*

Missouri public defenders Ms. Valerie Leftwich and Mr. Pete Carter represented Mr. Tisius on his second post-conviction proceeding.

The following issues were raised in the amended post-conviction motion:

a. Ineffective assistance of trial counsel for failure to present to the jury Mr. Tisius' full mental health history through the testimony of Dr. Stephen Peterson.

19

b. Ineffective assistance of trial counsel for failure to investigate and call as mitigation witnesses Corey Baker, Jamey Baker, Deanna Guenther, Lucinda Guenther, Terra Launius, Kevin Launius, Gloria Gray, Lynne Silverman, Olin Standish Smith, Kevin Bunch, Leslie Tisius, Chuck Tisius.

c. Ineffective assistance of trial counsel for failure to investigate and rebut non-statutory aggravating evidence, specifically evidence concerning Mr. Tisius' conviction for possession of contraband in prison, an incident in the Chariton County Jail before trial, and an incident in the Boone County Jail before trial.

d. Ineffective assistance of appellate counsel for failure to raise on appeal the fact that Mr. Tisius' first jury rejected one of the aggravating circumstances, but the court submitted it to the second jury over objection.

e. Ineffective assistance of trial counsel for failure to make proper objections. Specifically, counsel failed to move to strike or use a peremptory challenge on prospective juror Jason D. Smith for cause since he had two relatives who were law enforcement officers and the case concerned the murder of law enforcement officers; failure to move to strike or use a peremptory challenge on prospective juror Joe Beach for cause since he said that he believed that criminal punishments were too lenient; failure to object to the admission of the record of Mr. Tisius' prohibited item conviction as a violation of his rights to confrontation or as irrelevant; failure to object to the cross-examination of expert witness Dr. Shirley Taylor on several grounds; failure to adequately prepare Dr. Taylor to testify; failure to object when the state asked Dr. Taylor whether it was true that Mr. Tisius did not plead guilty; and failure to object during the state's closing argument on several grounds.

f.   Ineffective assistance of trial counsel for failing to present school, juvenile court, counseling, social service agency, Missouri Division of Family Services, and Missouri Department of Corrections records.

g.   Denial of due process of law because Mr. Tisius was sentenced to death when his mental age was that of a child less than eighteen at the time of the offense.

h.   Denial of due process of law and the right against cruel and unusual punishment because of improper jury instructions.

i.   Conflict of interest of trial counsel because of flat fee compensation in the amount of $10,000 per attorney for Mr. Tisius' sentencing retrial.

At the evidentiary hearing on the post-conviction motion, counsel presented the testimony of Leslie Tisius, the former wife of Mr. Tisius' father; Lucinda and Deanna Guenther, two cousins who had known Mr. Tisius as a child, Jamey and Corey Baker, two brothers who knew Mr. Tisius when he was slightly older; Terra Launius, who dated Mr. Tisius as a teen; Olin Stanley Smith, who met Mr. Tisius when they were both in a child protection agency; and Chuck Tisius, Mr. Tisius' father. Counsel also presented numerous depositions from the first post-conviction proceeding.

The motion court denied relief.

*Second post-conviction appeal.*

On appeal from the denial of post-conviction relief, Mr. Tisius was represented by public defender Mr. William Swift. The following grounds for reversal were raised:

1.   Ineffective assistance of counsel for failure to present evidence regarding the prohibited item aggravation.

Case 4:17-cv-00426-SRB   Document 38   Filed 11/02/18   Page 27 of 228

2.    Ineffective assistance of counsel for failure to rebut evidence concerning Mr. Tisius' statements in the Boone County Jail.

3.    Ineffective assistance of counsel for failure to rebut evidence concerning Mr. Tisius' gesture in the Chariton County Jail.

4.    Ineffective assistance of counsel for failure to prepare Dr. Taylor to testify.

5.    Ineffective assistance of counsel for failure to object to cross of Dr. Taylor about the lack of a plea of guilty.

6.    Ineffective assistance of counsel for failure to present Dr. Peterson's complete deposition testimony to the jury.

7.    Ineffective assistance of counsel for failure to call as mitigation witnesses Michael Tisius' father Chuck Tisius, Michael's stepmother Leslie Tisius, Michael's friends Jamey Baker and Deanna Guenther, and Michael's G.E.D. teacher Lynn Silverman.

8.    Ineffective assistance of counsel for failure to object to the prosecutor's closing argument that the victims' families wanted the death penalty.

9.    Ineffective assistance of counsel for failure to object to the prosecutor's closing argument that Mr. Tisius had no right to ask for mercy.

10.    The flat fee arrangement violated Mr. Tisius' right to counsel.

11.    Mr. Tisius' mental age bars his execution.

12.    Ineffective assistance of counsel for failing to offer alternative penalty phase instructions.

13.     Ineffective assistance of appellate counsel for failure to raise on appeal the fact that Mr. Tisius' first jury rejected one of the aggravating circumstances, but the court submitted it to the second jury over objection.

The Missouri Supreme Court affirmed the denial of post-conviction relief. *Tisius v. State*, 519 S.W.3d 413 (Mo. banc 2017). Rehearing was denied on June 27, 2017, and the mandate of the Missouri Supreme Court was issued on the same day. Certiorari was denied March 5, 2018. *Tisius v. Missouri*, 138 S. Ct. 1263 (2018). This petition follows.

### Grounds for relief.

As to each ground alleging ineffective assistance of counsel, Mr. Tisius refers to and invokes the right to effective assistance of trial and direct appeal counsel provided in the Sixth Amendment, made applicable to the states by the Fourteenth Amendment and governed by *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Evitts v. Lucey*, 469 U.S. 387 (1985); and their progeny. Unless otherwise specified in a particular ground, all grounds for relief are either fully exhausted and preserved, or Mr. Tisius can demonstrate legal cause and prejudice for failing to exhaust and preserve them. With respect to prejudice, while Mr. Tisius contends each of the grounds presented below is sufficiently prejudicial to require reversal, he alternatively requests that the court consider whether the cumulative effect of the grounds sustained is sufficiently prejudicial to require relief.

The primary claims presented relate to allegations of trial counsel's ineffectiveness. To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that (1) counsel's representation fell below an objective standard of

reasonableness, and (2) there is a reasonable probability that the result would have been different if counsel had performed reasonably. *Strickland*, 466 U.S 668. In capital cases, counsel's duties include the obligation to investigate and present complete and thorough mitigation information of the defendant's background for purposes of obtaining a sentence less than death. *Wiggins v. Smith*, 539 U.S. 510, 533 (2003). Defense counsel's duty to investigate the client's background for mitigating factors is a critical duty and, in capital cases, the foundation of effective representation and assistance. *Strickland*; *Williams v. Taylor*, 529 U.S. 362 (2000). Failure to investigate or present mitigating evidence at sentencing constitutes ineffective assistance of counsel. "In the instant case, it is undisputed that Williams had a right—indeed, a constitutionally protected right— to provide the jury with mitigating evidence that his trial counsel either failed to discover or failed to offer." *Williams*, 529 U.S. at 393.

The direction from the Supreme Court could not be clearer or more firmly established: trial counsel in death penalty cases "have a duty to make reasonable investigations." *Strickland*, 466 U.S. at 690-91; *Wiggins*, 539 U.S. at 521; *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) ("The notion that defense counsel must obtain information that the State has and will use against the defendant is not simply a matter of common sense" it is a Constitutional mandate); *id.* at 393-396 (O'Connor, concurring); American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, February 2003 ("2003 ABA Guidelines"). In Mr. Tisius' case, this was not done; neither a complete investigation nor a complete social history was ever developed.

The scope of trial counsel's investigation must be viewed "under prevailing professional norms" and in light of the facts "as seen from counsel's perspective at the time." *See Wiggins*, 539 U.S. at 523 (internal quotation and citation omitted). In capital cases, the Supreme Court has stated that trial counsel's mitigation strategy "should comprise efforts to discover *all reasonably available* mitigating evidence." *Id.* at 525 (emphasis in original) (quoting American Bar Association, *Guidelines for the Appointment and Performance of Counsel In Death Penalty Cases*, Guideline 11.4.1I (1989) ("1989 ABA Guidelines")). This obligation includes interviewing "witnesses familiar with aspects of the client's life history" that might uncover "possible mitigating reasons for the offense." 1989 ABA Guideline 11.4.1(D)(3)(B); *see also* 2003 ABA Guideline 10.7, cmt. ("It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client)."); *Bobby v. Van Hook*, 588 U.S. 4, 8 (2009) (finding that although the ABA guidelines are not "inexorable commands with which all capital defense counsel must fully comply," they are "evidence of what reasonably diligent attorneys would do[.]" (internal quotations omitted)).

**Mr. Tisius was denied his constitutional right to conflict-free and effective counsel when trial counsel at his resentencing trial were paid a flat fee of $10,000 apiece.**

Mr. Tisius' counsel each received a sparse flat fee of $10,000 to handle the capital resentencing. They were not required by the public defender system to keep time records so it is unknown at this time how much time they spent. However, at the CJA rate of $178 per hour for capital cases that was in effect at the time they prepared and conducted the trial, this amounted to compensation for approximately 56 hours of work. The trial covered five full days, and required counsel to travel between Columbia, Missouri, where the trial was held, and Springfield, Missouri, where the jury was selected—a 350-mile round trip. At least two additional court settings occurred, one for pretrial and one for formal sentencing. Assuming a conservative trial day of eight hours, counsel, even at the below-market rate for CJA counsel, barely received compensation for the time actually spent in-court. All of their trial preparation time was, essentially, pro bono. This represented not only a flat fee but also a totally inadequate flat fee.

One trial counsel, Mr. Scott McBride, testified that the receipt of a flat fee did not affect his representation; there was nothing he would have done differently had he been adequately compensated. PCR 2 Tr. p. 407. Mr. Christopher Slusher testified that the flat fee did affect his ability to have his office investigator work on the case, but that he was able to request investigative assistance from the public defender system, and did so. PCR 2 Ex. 102 p. 106.[4]

---

[4] Mr. Slusher testified at the post-conviction hearing by deposition.

26

In Mr. Tisius' post-conviction motion, Mr. Tisius alleged that his counsel, because of the inadequate flat fee compensation scheme, had an actual conflict of interest preventing them from properly representing him. This petition alleges numerous specific instances of lack of investigation and trial preparation, including the failure to investigate the "weapons" crime of which Mr. Tisius was convicted while in prison, the failure to investigate and present evidence concerning the alleged jail incidents, the failure to investigate and call expert and lay mitigation witnesses, the failure to adequately prepare Dr. Taylor's testimony, and the failure to file pretrial motions and submit proper jury instructions. *See* Habeas Grounds for Relief Nos. 2, 3, 5, 6-8, 12, 13, 15.

Resentencing counsel had almost four years to prepare for Mr. Tisius' resentencing. They had available to them the deposition testimony of over 30 witnesses presented at the first post-conviction hearing. They presented only five of them, but even for those five, resentencing counsel did not adequately prepare their testimony. Because counsel were essentially not being compensated for any time spent out of court, this is not surprising. But it was devastating to Mr. Tisius' defense.

The Missouri Supreme Court found that there might have been a potential conflict of interest, but in light of the testimony of trial counsel, Mr. Tisius had not established an actual conflict of interest. Thus, the Missouri Supreme Court concluded that the motion court did not plainly err in denying the conflict of interest claim. *Tisius v. State,* 519 S.W3d 413, 430 (Mo. banc 2017).

The ABA Guidelines, which the United States Supreme Court has recognized as relevant to determinations of ineffective assistance of counsel, provide that flat fees are

"improper." See *American Bar Association Guidelines For The Appointment And Performance of Defense Counsel In Death Penalty Cases*, 31 Hofstra L.Rev. 913, 981 (2003); *see also*, 2008 revision at: americanbar.org/groups/committees/death_penalty_representation/resources/aba_guide lines/2008-supplementary-guidelines/2008-guideline-9-1.html (same). The rationale is that flat fee rates discourage lawyers from doing more than what is minimally necessary to qualify for the flat payment. *See* 31 Hofstra L. Rev. at 982. Such flat fee arrangements create conflicts because they pit the client's interest against the lawyer's interests. *State v. Cheatham*, 292 P.3d 318, 340 (Kan. 2013).

In *Cheatham*, the court reversed the defendant's capital conviction because of counsel's flat fee arrangement. *Cheatham*, 292 P.3d at 340-41. The flat fee arrangement created an actual conflict of interest and the lawyer's performance was adversely affected by "the financial disincentive under which [counsel] labored" as demonstrated by counsel's failure to adequately investigate and prepare. *Id.* at 341. The *Cheatham* court, applying federal constitutional standards, held that it was unnecessary for the defendant to show he was actually prejudiced by counsel's failure to adequately pursue his defense. *Id.* at 341.

Cheatham's counsel subsequently was disbarred because of having followed a flat fee arrangement. *See In Re Hawver*, 339 P.3d 573, 595-97 (Kan. 2014). In ordering disbarment, the *Hawver* court reasoned: "Hawver had a financial disincentive under the circumstances to devote the necessary time and resources to Cheatham's case." *Id.*

To obtain relief based on his counsel's conflict of interest, the defendant must demonstrate: (1) an actual conflict of interest between the attorney and the client; and

(2) the established conflict of interest adversely affected the lawyer's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). Contrary to the finding of the Missouri Supreme Court, the evidence here clearly establishes both prongs of this test. First, Mr. Slusher admitted that the low payment discouraged him from investigating. Second, the extent to which trial counsel's performance was deficient also clearly establishes adverse effect. Mr. Tisius' Habeas Grounds for Relief Nos. 2, 3, 5, 6-7, 12, 13, and 15 readily demonstrate an adverse effect, which document trial counsel's failure to investigate, prepare and present readily available mitigation as well as evidence to challenge known aggravation. To uncover even that readily available evidence would have taken time, i.e. uncompensated time in this flat fee case. Even if Mr. McBride genuinely believes that his work on Mr. Tisius' case was not affected by the flat fee, the facts of his representation demonstrate otherwise.

The state court's treatment of the claim is contrary to and/or an unreasonable application of clearly established Supreme Court law, including *Cuyler*, 446 U.S. at 344-345; *see* 28 U.S.C. § 2254(d)(1). It is also based on an unreasonable determination of the evidence presented in state court, under 28 U.S.C. § 2254(d)(2). Mr. Tisius intends to challenge any factual findings pursuant to § 2254 (e)(1). Thus, the writ must issue, and Mr. Tisius is entitled to a new sentencing phase.

**Trial counsel's failure to call lay mitigation witnesses violated Mr. Tisius' constitutional rights to effective assistance of counsel, due process, and freedom from cruel and unusual punishment.**

Abuse, neglect, privation, medical/mental illness, and destitution were the hallmarks of Mr. Tisius' childhood. However, even though courts across the country have determined that this kind of evidence is meaningful to juries, defense counsel did not adequately investigate and present meaningful evidence of Mr. Tisius' troubled childhood to his jury. Counsel's failure to adequately investigate and present this evidence constituted ineffective assistance of counsel.

Defense counsel in a death penalty case are obligated to discover and present all substantial, available mitigating evidence. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Williams v. Taylor*, 529 U.S. 362, 394-98 (2000); *Kenley v. Armontrout*, 937 F.2d 1298, 1307-09 (8th Cir. 1991). Relevant mitigating evidence "is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Tennard v. Dretke,* 542 U.S. 274, 284 (2004). The Supreme Court has consistently held that evidence of a defendant's troubled childhood is evidence that has mitigating value. *See*, *e.g.*, *Wiggins*, 539 U.S. at 535-36. Thus, counsel's duty to investigate includes adequately investigating the defendant's social history and presenting available mitigating evidence regarding the defendant's troubled childhood. *See*, *e.g.*, *id.* at 539 U.S. at 535-36. When a reasonable probability exists that omitted evidence of a defendant's troubled childhood would have caused one juror to balance the scales differently, counsel's failure to present the mitigating evidence prejudices the defendant. *Id.* at 537.

Case 4:17-cv-00426-SRB   Document 38   Filed 11/02/18   Page 36 of 228

Failing to interview witnesses relates to preparation and not strategy. *Kenley*, 937 F.2d at 1304. Lack of diligent investigation is not protected by a presumption in favor of counsel and cannot be justified as strategy. *Id.* at 1304.

Furthermore, any decision to withhold available mitigating evidence must be based on adequate information; counsel's failure to conduct the proper investigation that would have necessary to determine whether to withhold mitigating evidence renders counsel's decision to withhold unreasonable. *Wiggins*, 539 U.S. at 523 (explaining that the proper focus of the *Strickland* inquiry in failure-to-present-mitigating evidence-cases is "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was itself reasonable."). Foregoing the presentation of evidence because it contains something harmful is unreasonable when its harm is outweighed by its helpful value. *Williams*, 529 U.S. at 395-96 (holding that counsel were ineffective for failing to present evidence of severe abuse of the defendant and the and defendant's limited mental capabilities even though not all of the evidence was favorable to defendant).

In Mr. Tisius' case, counsel failed to investigate and present the testimony of various family members, friends, and professionals who would have testified at the penalty phase regarding Mr. Tisius' family background and the abuse, neglect, privation, medical/mental illness, and destitution defining his childhood and teenage years. Counsel was aware or should have been aware of each of these witnesses. Some of them are immediate family members. Many of the witnesses testified during the course of Mr. Tisius' first post-conviction proceedings and their testimonies are in the record of this case. Additionally, defense counsel possessed prior counsel's files, which

31

contain interviews or records containing each of these witnesses. As will be explained below, each of these witnesses possessed mitigating evidence relevant to Mr. Tisius' case for life.

*Chuck Tisius*

Chuck Tisius is Michael Tisius' father. PCR 2 Tr. p. 140. Chuck[5] testified at Michael's second post-conviction hearing. Chuck explained that although he made calls and left messages at offices responsible for representing Michael, (*id.* pp. 167- 68), no defense team contacted Chuck prior to Michael's second post-conviction case. *Id.* p. 167. When the second post-conviction team's mitigation specialist contacted Chuck, Chuck immediately returned her call, even though he was in a shop having work done on his car. *Id.* pp. 169-70. If Michael's defense had contacted Chuck to testify on behalf of Michael, he would have done so. *Id.* p. 169.

Chuck recounted that Michael was born in 1981. *Id.* p. 141. At the time of Michael's birth, Chuck was married to Michael's mother, Patty. *Id.* p. 140. In 1982, Chuck went into the Army Reserves and was in training for approximately six months. *Id.* p. 141. While Chuck was away, he learned that Patty was "catting around." *Id.* Chuck filed for divorce. *Id.* pp. 141-42.

Chuck wanted primary custody of Michael, particularly due to Michael's mother's inappropriate behavior with Michael, such as bringing Michael along with her while she went to bars and drank with men. *Id.* pp. 142-43. However, Michael's mother got custody and Chuck got visitation. *Id.*

---

[5] To avoid confusion, this section refers to Chuck Tisius as "Chuck" and Michael Tisius as "Michael."

Michael's mother frequently failed to make Michael available for visitation with Chuck. *Id.* p. 144. She refused to make visitation accommodations that took into account Chuck's police-officer work shifts. *Id.* p.143.

When Michael's mother allowed him to visit Chuck, Michael always was in ragged clothing and was very dirty. *Id.* pp. 145-46. He also smelled of urine. *Id.* p. 145. Chuck and Leslie (Chuck's then-wife) bought clothes for Michael that they kept at their house because if the clothes went to his mother's house, they never came back. *Id.* p. 146. Chuck often purchased clothing, including coats, for both Michael and Joey (Michael's half-brother), and paid for activities like baseball and Scouts, neither of which materialized. *Id.* pp.146-47.

When Michael and his mother moved from St. Louis to Hillsboro, that made the logistics of visitation more difficult for Chuck given the increased distance and Chuck's work schedule. *Id.* p. 149. Chuck sent Michael letters telling Michael that he wanted to see him, but Chuck did not get any responses. *Id.* pp. 153-56. Chuck also tried calling, but although Michael's mother had Chuck's number, Chuck did not hear back from Michael or his mother. *Id.* When Michael was twelve years old, Chuck picked Michael up for visitation, and Michael "was really just disheveled and just looked horrible." *Id.* pp. 153-56. Chuck was concerned about Michael's well-being, and thereafter, Chuck successfully petitioned for primary custody. *Id.* pp. 156-58. Michael came to live with Chuck and Leslie, but this experience was "rough." *Id.* p. 159. Michael had difficulty with the more-regimented family lifestyle of eating dinner together and doing homework every night.[6] Michael also got into trouble at school. *Id.* pp. 158-61. Michael

---

[6] Michael had been struggling in school at this time – he previously had failed the sixth grade, and this custody change happened during his second year in sixth grade. App Exh 01 pp. 15-16; App Exh 04. P. 13.

then went back to living with his mother. *Id.* pp. 159-60. When Michael resumed living

with his mother, Chuck wrote Michael and explained that he wanted Michael to visit

with them. *Id.* pp. 162-63.

When Michael was fifteen, he again came to live with Chuck and Leslie. *Id.* pp.

163-64. Michael and his mother appeared at Chuck and Leslie's door with a trash bag

of clothes. *Id.* Michael stayed with Chuck for a short time but again encountered

problems with Chuck's rules. *Id.* Michael then stayed briefly with several of Chuck's

relatives. *Id.* pp. 164-65. When Michael was 16 or 17, Chuck received a call from the

police saying that Michael had been a passenger in a stolen car. *Id.* p. 165. The police

first called Michael's mother, but she told them that she did not want anything to do

with Michael and hung up on them. *Id.* Chuck took Michael home with him, and then

Michael went to Chuck's aunt's house for a short time. *Id.* As far as Chuck knew, any

case against Michael regarding the car was dropped. *Id.* p. 165. Chuck did not have

much contact with Michael or Patty after that incident. *See id.* pp. 166-67.

*Leslie Tisius*

Leslie Tisius was married to Michael's father, Chuck Tisius, and was Michael's

stepmother. PCR 2 Tr. p. 56. No counsel contacted Leslie before the second post-

conviction team contacted her. *Id.* p. 64.

At the second post-conviction evidentiary hearing, Leslie explained that when

Michael was three or four years old, he was a part of Leslie and Chuck's wedding. *Id.* p.

57. Patty left Michael at the wedding reception by himself and did not prearrange any

child care for him. *Id.* Leslie recalled that another attendee at the wedding ended up

taking Michael home with him that night. *Id.*

Leslie explained that when Michael was a child, he was a people-pleaser but also standoffish and "just a sad little boy." *Id.* p. 59. Chuck was supposed to have visitation with Michael every other weekend but that did not happen. *Id.* p. 58. Chuck's ability to spend time with Michael was complicated because Chuck worked night and weekend shifts as a police officer. *Id.* pp. 58-59, 61. However, when visitation was arranged, Michael's mother frequently did not show up with Michael. *Id.* pp. 58-61.

When Michael did come for visits, he often was dirty and smelled of urine and usually was sick. *Id.* pp. 59-60. Chuck and Leslie would bathe him and change his clothes because most of the time his clothing did not fit or was dirty. *Id.* p. 60. Chuck and Leslie kept clothing at their house for Michael because when the clothing went with Michael to Patty's house, it was not returned. *Id.*

When Chuck got custody of Michael (who was 12 at the time), Michael was having trouble at school. *Id.* p. 63. He was not doing his work and had some disciplinary issues. *Id.* Michael then went back to live with Patty. *Id.*

When Michael was around 14 or 15, Michael's mother dumped him on their porch with a trash bag full of clothing stating: "He's your problem now." *Id.* p. 63. There was conflict between Chuck and Michael regarding household rules. *Id.* pp. 63-64. Leslie explained that because his mother did not have any rules she expected Michael to follow, Michael "didn't know how to adjust to having rules." *Id.* p. 64.

Leslie noted that Michael was still wetting the bed when he lived with them. *Id.* p. 67. She also indicated Michael was a sad boy in whom she observed signs of depression. *Id.* p. 70. She and Chuck took Michael to the doctor once, but when Patty found out about it, Patty kept Michael away from Chuck and Leslie for a while. *Id.* p. 68.

*Jamey Baker*

Jamey Baker grew up with Michael in Hillsboro. PCR 2 Tr. p. 92. Michael's first post-conviction team deposed Mr. Baker in 2003, and Mr. Baker's deposition is included in the record of Michael's February 2004 post-conviction hearing as PCR 1 Ex. 30.

Mr. Baker explained that Michael was a follower and did not like confrontation. PCR 2 Tr. p. 93. Sometimes Michael was outgoing and sometimes he was quiet. *Id.* When Joey was around, Michael would get upset and aggravated. *Id.*

Mr. Baker saw Joey "brutal[ly]" beat Michael such that he "could not imagine getting [his] butt beat like that by his older brothers." PCR 2 Tr. 94. Joey's beatings of Michael went beyond what was normal for sibling fighting. *Id.* Joey also picked on Michael in a way that was abnormal for brothers. *Id.* Mr. Baker explained that if Michael did not do something how Joey wanted, Michael suffered for it. *Id.* p. 95. Joey would punch Michael, throw balls at him, or make him suffer in other ways. *Id.* p. 95.

Michael's mother treated Joey better than she treated Michael. PCR 2 Tr. p. 95. Michael stayed in Mr. Baker's closet one time after Michael left his mother's home. *Id.* p. 97. Michael was pale and down, and his face was kind of caved-in. *Id.*

*Deanna Guenther*

Deanna Guenther grew up with Michael in Hillsboro. PCR 2 Tr. p. 80. Michael's first post-conviction team deposed Ms. Guenther in 2003, and her deposition is included in the record of Michael's February 2004 post-conviction hearing as PCR 1 Ex. 31.

Case 4:17-cv-00426-SRB   Document 38   Filed 11/02/18   Page 42 of 228

Ms. Guenther was a childhood friend of Michael's. PCR 1 Ex. 31 pp. 5-6. He lived down the street from her, and when she was 10, she first met Michael at the bus stop. *Id.* She and Michael were in the same grade. *Id.* p. 6. She saw him every day until she was 14 and he moved away. *Id.* pp. 6-7.

One summer, Ms. Guenther and Michael spent entire days together. *Id.* p. 8. Michael would go to her house when he got up in the morning and then leave around 10:30 or 11:00 at night. *Id.* Michael followed the rules at her house and was welcome by her parents. *Id.* p. 22. Although Ms. Guenther's parents did not allow any other boys to be in Ms. Guenther's room, they did allow Michael to be in there. *Id.* pp. 8-9. Michael called Ms. Guenther's mother "Mom." PCR 2 Tr. p. 81.

Ms. Guenther explained that Michael was sometimes happy and talkative, but even his happy times seemed forced. PCR 1 Ex 31 pp. 11, 19-20. Bullies would pick on him at school, but he would not respond. *Id.* pp. 19-20.

Ms. Guenther testified that Patty Lambert was not very nice to the neighborhood kids; she did not like having kids around. PCR 1 Ex 31 pp. 14-15. The neighborhood children only would play at Patty's house when Patty was not there. *Id.* p. 15. When Patty was not home, Joey was in charge. *Id.* p. 23.

Ms. Guenther explained that Joey treated Michael "horribly." PCR 2 Tr. p.82. Joey physically assaulted Michael and cursed at him. *Id.* p. 83. His beatings of Michael featured Joey lay[ing] Michael on the ground, "pound[ing] his face in, [and] throw[ing] things at him." PCR 1 Ex 31 p. 23. There was one incident where Joey beat Michael so badly that Michael became unconscious. PCR 2 Tr. p. 83. Michael was out for about five minutes, and when he came to, he was incoherent and did not know what happened.

PCR 1 Ex. 31 p. 14.

Ms. Guenther described Michael as always seeming scared, like a little puppy dog. *Id.* p. 11. His hands were always shaky and he was jumpy. PCR 2 Tr. p. 82. This shaking was worse when Joey was around. PCR 1 Ex 31 p. 22. Michael wanted to run away because of his brother and the way he was treated in his household. PCR 2 Tr. p. 84.

Michael spent lots of time at Ms. Guenther's house to escape from Joey. PCR 2 Tr. pp. 81-82. He was safe there, because "nobody could call him names, nobody could tease him, nobody could touch him, really. PCR 1 Ex 31 p. 9. He drew for hours at a time. *Id.* pp. 9-10. When Michael was unhappy he'd stay in his "own world." *Id.* p. 12.

*Lynne Silverman*

Lynne Silverman was Michael's G.E.D. teacher. PCR 2 Movant's Ex. 82 p. 8. Ms. Silverman taught G.E.D. classes at Maplewood High School and at St. Mary's Hospital, and Michael was in the Maplewood class in the fall of 1997 and the St. Mary's class in the spring of 1998. *Id.* pp. 7-8. Michael's first post-conviction team deposed Ms. Silverman in 2003, and her deposition was admitted into evidence at the February 2004 post-conviction hearing as PCR 1 Ex. 25.

Ms. Silverman testified that wen Michael was in Maplewood class, he was staying with another student in the class. *Id.* pp. 8-9. When Michael came in to St. Mary's class in the spring, Ms. Silverman explained, Michael "was really distraught and said he had no place to stay." *Id.* p. 9. She could tell Michael was very upset and depressed. PCR 2 Movant's Ex. 25 p. 6.

Ms. Silverman went to the nuns who administered the hospital to see if Michael could stay at the convent behind the hospital. *Id.* The nuns agreed, but Michael preferred to sleep in the park. *Id.* Later that evening, Ms. Silverman called John Reichle, a case manager with St. Louis County Youth Programs, to tell him about Michael's situation. *Id.*

Ms. Silverman became especially concerned about Michael's well-being when Michael wrote that he wanted to kill himself and included a drawing of a tombstone. PCR 2 Movant's Ex. 82. pp.9-10. Ms. Silverman reported to John Reichle that Michael wrote on the front of his student folder, "I want to die." PCR 1 Movant's Ex. 25 p. 7.

Reasonably effective counsel would have investigated each of these witnesses from Michael's childhood to determine whether they possessed relevant mitigating information. *Wiggins*, 539 U.S. at 524. This is especially the case when, as in this case, trial counsel's objective was to present evidence of Michael's troubled childhood. PCR 2 Ex. 102 p. 27. Because each of these witnesses possessed mitigating evidence relevant to Michael's case for life and because each witness was willing to provide information to the defense team and testify about what he or she knew, reasonable counsel would have presented their testimony to the jury.

Regarding Chuck and Leslie Tisius, counsel were obligated to obtain the evidence highlighting the adversity Michael endured living with his mother. *Wiggins*, 539 U.S. at 524. The jury heard evidence from Patty Lambert indicating that Chuck was an uncaring father who abandoned Michael and who schemed and manipulated custody so as to avoid his child support obligation. Trial 2 Tr. pp. 917-21, 924-25, 932, 985, 987. But as Chuck and Leslie's testimony demonstrates, Patty's self-serving

testimony did not tell the complete story of Michael's childhood. It did not demonstrate to the jury the amount of neglect that Michael suffered as a child, from both his mother and father. The contrast between the accounts of Chuck Tisius and Patty Lambert demonstrates that each of them saw their relationship with Michael, at least in part, as a way to inflict emotional abuse on each other. Both complained about how the other treated Michael, who was left in the middle without support from either parent. Given what counsel knew about Michael's life and the struggles he faced in school and in other social settings, counsel had a duty to talk to Michael's father and ex-spouse to accurately present the neglect and impoverished childhood Michael experienced.

Furthermore, reasonable counsel would have called them to testify. Even though the testimony painted Chuck Tisius in a more positive light than Patty's testimony did and potentially painted Michael in a more negative light for failing to follow his father's rules and getting into trouble at school, (PCR 2 Tr. pp. 64, 158-61), reasonably effective counsel would have determined that on balance, this testimony helped more than it hurt.

For example, because this evidence showed how bad Michael's home life was—as evidenced by the physical beatings he endured, his ragged clothing, the stench of urine accompanying him, his pervasive destitution, his mother's inability to show him love and provide him with basic needs—it underscored how important having a loving person in his life was to Michael. It showed that he did not have that person in his mother or his father and explains why Michael so desperately latched on to Vance's promises of being family to Michael.

Moreover, although some of the omitted evidence potentially portrayed Michael in a bad light, this evidence also underscored the neglectful circumstances of life in his mother's home: she did not have any rules in her home. The evidence also supported the notion that Michael's childhood medical conditions were a product of a neglectful and non-nurturing parent and were the root causes of his negative behavior, which again was consistent with the defense case.

Thus, even if some of the omitted evidence potentially was harmful, counsel's failure to present it nonetheless was unreasonable. The Supreme Court repeatedly has held that the failure to present potentially harmful evidence can indeed constitute deficient performance. *See Williams*, 529 U.S. at 398 ("While [evidence of remorse], coupled with the prison records and guard testimony, may not have overcome a finding of future dangerousness, the graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was "borderline mentally retarded," might well have influenced the jury's appraisal of his moral culpability."); *Porter v. McCollum*, 558 U.S. 30, 44 (2009) (concluding that the state supreme court unreasonably discounted as unhelpful omitted evidence establishing that the defendant had gone AWOL because that evidence actually was consistent with the theory of mitigation). This authority establishes that the omitted evidence containing potentially harmful aspects is not automatically irrelevant, inconsequential, or ultimately unhelpful just because it did not unqualifiedly support Mr. Tisius. *See Williams*, 529 U.S. at 398; *Porter*, 558 U.S. 30 at 43 (concluding that it was "unreasonable to discount to irrelevance the evidence of [the defendant's] abusive childhood, especially when that kind of history may have particular salience for a jury

41

evaluating [the defendant's] behavior in his relationship with [the victim].").

Reasonable counsel also would have called Jamey Baker, Deanna Guenther, and Lynne Silverman. Each already had provided deposition testimony during the first post-conviction case and were readily available.

Each of these witnesses presented unique insights into Michael's childhood and adolescent years: objective views of Michael's relationships with his brother, mother, and father. They observed the physical abuse Michael suffered at the hands of his older brother; the neglect Michael suffered from both his mother and father; Michael's homelessness, and Michael's expressions of his feelings of being unwanted, unloved and lonely. These witnesses also observed other behavioral symptoms of Michael's medical/mental illnesses, including but not limited to his hypervigilance, compulsive drawing, and the disposition of a follower. All of this information was relevant to Michael's medical/mental health issues affecting him at the time of the offense.

Counsel's deficient performance prejudiced Michael. Like the jury in *Williams*, Michael's jury did not hear the complete, graphic description of Michael's childhood, which was filled with abuse, neglect, privation, medical/mental illness, and destitution. A reasonable probability exists that had the jury considered this evidence, at least one juror would have struck a different balance. *See Williams*, 529 U.S. at 398.

Because the jurors only heard Ms. Lambert's testimony, they were left with the misperception that Michael had at least one stabilizing force in his life (his mother) when in fact that was not the case. The jury also did not understand that Michael was a pawn in his parents' custody battles; that Ms. Lambert participated in the development of Michael's symptoms of abandonment, rejection, and hypervigilance;

and that Michael had no one to turn to for a consistent, stable, caring environment.

Chuck Tisius and Leslie Ann Tisius explained that Michael's childhood was far from idyllic and rife with neglect. Their testimony established that Michael's mother kept him in ragged clothing and he smelled of urine. PCR 2 Tr. pp. 59-60, 145-46. His mother failed to provide other necessities like a coat. *Id.* p. 146-47. At times, she sought to abandon him. *Id.* p. 63. At other times, she kept him with her, but as she went to drink at bars. *Id.* pp. 142-43. She failed to make him available for visitation with his father, (*id.* pp. 58, 143-44), and she refused to accommodate his father's work schedule such that visitation could occur. *Id.* pp. 58-59, 61, 143).

Jamey Baker and Deanna Guenther also described the pervasive emotional and physical abuse that was a fixture in Michael's life. The picture that this testimony illustrates is quite different from what the jury heard.

Although the jury heard some testimony about the beatings Michael endured at the hands of his brother, the jury did not hear additional relevant details describing the severity and magnitude of the beatings. Jamey Baker described that the beatings went beyond what was normal for sibling fighting. PCR 2 Tr. p. 94. Michael was "brutal[ly]" beaten, he explained, and he commented that "could not imagine getting [his] butt beat like that." *Id.* Ms. Guenther explained that Michael's brother treated Mr. Tisius "horribly" and regularly physically assaulted him and cursed at him. *Id.* pp. 82-83. These beatings included pounding Michael's face in and throwing things at him. PCR 1 Ex. 31 p. 23. Once, Ms. Guenther recalled, Mr. Tisius' brother beat him so badly that he became unconscious. PCR 2 Tr. p. 83.

Deanna Guenther's testimony also established that Michael's mother did not protect Michael from these beatings. Deanna Guenther recalled that Michael often sought refuge in her home to escape from the beatings. PCR 2 Tr. pp. 81-82. In fact, Michael's mother in some ways rewarded the brother's behavior: Jamey Baker recalled that Michael's mother treated Michael's brother better than she treated Michael. *Id.* p. 95.

Had the jury heard from Lynn Silverman, Michael's G.E.D. teacher, the jury would have learned that Michael was destitute and homeless while still a teenager. PCR 2 Movant's Ex. 82 p. 9. The jury would have learned the depth of despair Mr. Tisius felt at this time, which he exhibited by drawing a tombstone and expressing that he wanted to kill himself. *Id.* pp. 9-10. The testimony of Leslie Ann Tisius, who testified that Mr. Tisius was a sad boy who exhibited signs of depression, (PCR 2 Tr. p. 70), as well as the testimonies of Deanna Guenther and Jamey Baker, would have corroborated this testimony.

The omitted evidence established that Michael did not grow up in a consistent, stable, or caring environment; instead, his childhood was filled with abuse, neglect, privation, medical/mental illness, and destitution. A reasonable probability exists that even of some of the omitted evidence painted Mr. Tisius in a bad light, such as portraying him as uncooperative or troublemaker, (*Tisius*, 519 S.W.3d at 428), the evidence nonetheless might well have influenced one juror's appraisal of Mr. Tisius' moral culpability. *See Williams*, 529 U.S. at 398 ("While [evidence of remorse], coupled with the prison records and guard testimony, may not have overcome a finding of future dangerousness, the graphic description of Williams' childhood, filled with abuse

44

and privation, or the reality that he was "borderline mentally retarded," might well have influenced the jury's appraisal of his moral culpability."); *Porter*, 558 U.S. at 44 (2009) (concluding that the state supreme court unreasonably discounted as unhelpful omitted evidence establishing that the defendant had gone AWOL because that evidence actually was consistent with the theory of mitigation); *Porter*, 558 U.S. at 43 (concluding that it was "unreasonable to discount to irrelevance the evidence of [the defendant's] abusive childhood, especially when that kind of history may have particular salience for a jury evaluating [the defendant's] behavior in his relationship with [the victim].").

For all of the above reasons, a reasonable probability exists that had the jury considered the omitted evidence, at least one juror would have struck a different balance. *See Williams*, 529 U.S. at 398. Counsel's deficient performance rendered the proceedings fundamentally unfair.

The state court's treatment of the claim is contrary to and/or an unreasonable application of clearly established Supreme Court law. *See* 28 U.S.C. § 2254(d)(1). It is also based on an unreasonable determination of the evidence presented in state court, under 28 U.S.C. § 2254 (d)(2). Mr. Tisius intends to challenge any factual findings pursuant to 2254 (e)(1). Thus, this Court should reverse Mr. Tisius' conviction and remand for a new trial.

**Mr. Tisius was deprived of his right to the effective assistance of counsel under the Sixth, Eight, and Fourteenth Amendments when counsel failed to adequately and properly investigate, develop, and present significant expert mitigating evidence.**

Mr. Tisius' resentencing counsel were ineffective for not conducting a timely, thorough, and proper mitigation phase investigation. Counsel failed to meet with potential mitigation witnesses, collect and review records, prepare a social history, develop a coherent mitigation strategy, and seek appropriate expert evaluations of Mr. Tisius. As a result, Mr. Tisius' trial counsel were ineffective for failing to investigate, prepare, and present available mitigating evidence from a trauma expert, a neuropsychologist, a neuro-psychiatrist, and a prison adjustment/security expert.

Trial counsels' deficient performance in investigating and presenting mitigating evidence during the penalty phase of Mr. Tisius' resentencing was prejudicial. *Strickland*, 466 U.S. 668; *Wiggins*, 539 U.S. at 524. "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." *Rompilla*, 545 U.S. at 387. The Eighth Circuit has explained that under *Strickland* "[r]easonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories." *Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir. 1993).

The Supreme Court recognizes capital counsel's obligation to thoroughly investigate and prepare mental health and other mitigating evidence. *Williams*, at 396. Such obligation cannot be met by relying on "only rudimentary knowledge of [the

defendant's] history from a narrow set of sources." *Wiggins*, at 524. Rather, counsel has an obligation to investigate to not only present mitigation, but also to prepare to rebut aggravating circumstances put forth by the state. *Rompilla*, at 386.

Courts have repeatedly found counsel ineffective for failing to properly prepare mental health experts with information gleaned through a comprehensive mitigation investigation. *See, e.g.*, *Rompilla*, 545 U.S. at 391-93 (holding that had counsel conducted a competent mitigation investigation, they would have discovered evidence, including organic brain damage, extreme mental disturbance, and impairments stemming from fetal alcohol spectrum disorder, that "would have destroyed the benign conception of Rompilla's upbringing and mental capacity defense counsel had formed . . . [in part] from reports of the mental health experts"); *Ferrell v. Hall*, 640 F.3d 1199, 1227 (11th Cir. 2011) (finding counsel ineffective for failing to conduct a comprehensive mitigation investigation, which resulted in a narrowly conscribed mental health evaluation); *Gray v. Branker*, 529 F.3d 220, 231 (4th Cir. 2008) (holding that counsel was ineffective for relying on Gray's "self-assessment of his mental health" and not providing a mental health expert with readily available evidence concerning Gray's mental deterioration and the circumstances surrounding the offense).

It is not sufficient for counsel merely to retain an expert and present expert testimony. Effective counsel must adequately prepare expert witnesses and effectively present their testimony. *See Walbey v. Quarterman*, 309 F. App'x 795, at 803 2009 WL 113778 (5th Cir. Jan. 19, 2009) (counsel ineffective when he failed to adequately prepare mental health expert to testify and failed to rehabilitate expert when state elicited on cross-examination that the defendant could have anti-social personality

disorder, an aggravating diagnosis); *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007) (counsel retained expert shortly before trial, did not explore or test the basis for the expert's opinion, and thus, failed to take the requisite reasonable steps to present favorable expert testimony to the fact finder).

Resentencing counsel was required to conduct a thorough mitigation and develop a comprehensive life history, which would have detailed the history of mental illness and suicidality for the client and his family, before making any decision concerning the scope of evaluation and the mental health expert needed to conduct an evaluation. Counsel's complete failure to conduct a timely and comprehensive investigation demonstrates that counsel provided deficient performance under the *Strickland* standard.

Counsel's performance was not reasonably effective. There is no strategy decision here. The failure of resentencing counsel to investigate fully their client's psychosocial-familial history, consider that information in deciding what experts to retain, and then convey that information to an expert "resulted from inattention, not reasoned strategic judgment." *Wiggins*, 539 U.S. at 525. Regardless, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91; *Williams,* 529 U.S. at 396 (not a tactical decision because counsel had not "fulfilled their obligation to conduct a thorough investigation of the defendant's background.").

Trial counsel in death penalty cases "have a duty to make reasonable investigations." *Wiggins*, 539 U.S. at 523. Mr. Tisius' trial counsel failed to conduct a reasonable investigation into his background and history. As a result of their failure to

investigate, prepare, and present available mitigating evidence, Mr. Tisius was prejudiced when his jury was deprived of compelling mitigating evidence. *Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Rompilla*; *Wiggins*. The Eighth Amendment requires the sentencer to consider the circumstances of the crime and the defendant's character, history, and background during the penalty phase of a capital trial. *Boyde v. California*, 494 U.S. 370, 377–78 (1990); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).

Despite these well-defined norms, Mr. Tisius' resentencing counsel failed to conduct an investigation into his background that was either reasonable or thorough. Rather, they rested upon what had been done before. As noted in the Habeas Ground for Relief No. 2, Mr. Tisius' counsel ignored much of the evidence that had been developed since Mr. Tisius' death sentence seven years earlier. This is particularly problematic given that the earlier proceeding had resulted in a death sentence and that initial post-conviction counsel had developed substantial new evidence.

Although resentencing counsel received their contract in October 2006 and the trial occurred almost four years later, resentencing counsel presented almost none of the voluminous mitigation evidence developed by post-conviction counsel seven years earlier. Mr. Tisius' first post-conviction lawyer Mr. Mermelstein will testify that he was surprised when, a short time before the resentencing's scheduled start, Mr. McBride called him to ask what penalty phase witnesses should be presented. Mr. Mermelstein advised Mr. McBride to present all of the witnesses from the earlier post-conviction proceeding. Mr. McBride ignored this advice. Of course, by that time, it was likely too late to investigate and prepare all of those witnesses, even if counsel had the resources

to do so.

A full and proper investigation would have resulted in substantial psychological, medical, social, and education evidence being placed before the jury. Mr. Tisius' current team has conducted numerous interviews and collected a swath of records, and based on those materials, developed a social history documenting neglect and trauma occurring in a family with multiple generations of mental illness with often occurring suicides.

Prior defense counsel made no substantive effort to investigate Mr. Tisius' family history beyond creating a rudimentary timeline. Mr. Tisius has uncovered a rich, multigenerational family history of suicide, mental illness (depression, mania, and paranoia), instability, and family dysfunction, as well as substance abuse on both the maternal and paternal sides of his family.

Taking these actions leads to the ability to present compelling mitigation evidence and to rebut aggravating evidence. Critically, the information collected provided a vivid understanding of Mr. Tisius' cognitive difficulties, neuropsychiatric, and neuropsychological deficits, which informed the retention of appropriate experts and permitted the experts to select the appropriate testing instruments with which to evaluate Mr. Tisius' impairments.

In stark contrast to the abbreviated mitigation presented, the evidence presented below outlines the evidence, facts, diagnosis, and consequences of Mr. Tisius' life that could have impressed at least one juror. There is a "particularly critical interrelation between expert psychological assistance and minimally effective representation of counsel." *Beavers v. Balkcom*, 636 F.2d 114, 116 (5th Cir.

Case 4:17-cv-00426-SRB   Document 38   Filed 11/02/18   Page 56 of 228

1981) (*citing United Stated v. Fessel*, 531 F.2d 1275, 1279 (5th Cir. 1976)); *see also Wolfs v. Britton*, 509 F.2d 304, 310 n.13 (8th Cir. 1975) (agreeing "[t]here is a critical interrelation between expert psychiatric assistance and minimally effective representation of counsel.").

Fully developed and supported with documentation and witnesses, and explained by mental health professionals, these witnesses would have provided insight and understanding of Mr. Tisius' life and would have ensured that at least one member of the jury would not have returned a sentence of death. *Rompilla,* 545 U.S. at 392-93. "This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury . . . the undiscovered 'mitigating evidence, taken as a whole 'might well have influenced the jury's appraisal of [Tisius'] culpability.'" *Id.* (citing *Wiggins*, 539 U.S. at 434, 538). As will be shown below, there is a reasonable probability that at least one juror would have found life the more appropriate sentence.

### Failed to Retain and Present a Trauma Expert.

Trial counsel failed to retain and present a trauma expert for Mr. Tisius. Dr. Paula Lundberg-Love, Ph.D., reviewed relevant records, witness interviews, and met Mr. Tisius in order to develop a social history, detailed as part of her report. App Exh 01. Dr. Lundberg-Love is an expert in childhood trauma and its impact on the child's developing brain and behavior.

Dr. Lundberg-Love found that trauma pervaded Mr. Tisius' childhood and adolescence. He was exposed to six out of ten possible Adverse Childhood Experiences ("ACEs"), including parental divorce, physical neglect, emotional neglect, verbal abuse,

physical abuse, and mental illness in the household.

A trauma expert would have demonstrated to the jury that Mr. Tisius' childhood trauma made him significantly more likely to be susceptible to Vance, to commit crimes, and to struggle with decision-making. Mr. Tisius grew up in an abusive and neglectful environment where he was physically abused by his father and older brother, physically and emotionally neglected by his mother and father, and lived with a mother and father with severe mental health issues.

Dr. Lundberg-Love explains that Mr. Tisius' brain suffered greatly from this environment. Trauma invokes a person's fight-or-flight response. Consistent overuse of the flight-or-fight response mechanism alters the brain's neurochemical system leading to long-term consequences. Reasonable counsel would have retained a trauma expert to educate the jury beyond its simplistic defense mitigation narrative that Mr. Tisius had "a bad childhood" and instead explained how high ACE factors lead to neurological consequences that alter the brain permanently and how these ACE factors impacted his behavior.

Dr. Lundberg-Love could have testified how the regular traumas impacted not only the "then," when they occurred, but the "now," at the time of the crime:

> Michael essentially was "fatherless" from the time of his birth. Life with his mother and brother was chaotic and unpredictable. He was a victim of physical and emotional neglect and verbal abuse by his mother and significant physical abuse by his brother, Joey, for the entirety of his childhood and adolescence.
>
> At a very early age Michael came to realize that he could not count upon his mother or brother to help him survive and navigate the trauma that was his life. Indeed, he had to try to survive in spite of his family members' abuse and neglect. As a result Michael has had life- long difficulty ascertaining who was and was not trustworthy. Additionally, his ability to form relationships with others was negatively impacted by the

52

fact that Michael was repeatedly betrayed by members of his family. How can one trust to enter into relationships with others when one cannot even trust one's family members? As a result, Michael was extremely emotionally needy, searching for someone who would love him and care for him. So when he thought he had found someone who was legitimately nurturant, or might look out for his best interest, he tended to attach himself to that person and often inappropriately trust him/her. As a result, he was exceedingly gullible, manipulable, and vulnerable to those who sought to take advantage of him.

The physical abuse of Michael by his older, stronger brother coupled with no effective intervention by his mother to prevent or stop such abuse, resulted in Michael living in a state of unrelenting powerlessness due to fear. Joey's aggression was chronic, unpredictable and severe . . .

As a result, it is not surprising that Michael Tisius developed excessive and pervasive levels of anxiety, fear, and powerlessness which culminated in hypervigilance. The coalescence of these symptoms resulted in the development of PTSD from which he still suffers. Based upon the ACEs research, it is apparent that the traumatic life experiences suffered by Michael Tisius during childhood and adolescence were complexly interrelated with his mental health issues. The impact of ACEs during the early years of infancy and childhood sculpted the circuitry and responsivity of the nervous system in a manner much like a child's footprint in wet cement.

App Exh 01 p. 12.

The impact of the trauma and its effect upon Mr. Tisius is described by Dr.

Lundberg-Love as:

Mr. Tisius has an extensive trauma history. This history shaped the development of his nervous system in a manner that created a desperate need for someone to love him and resulting gullibility, manipulability, and vulnerability such that he was especially susceptible to others taking advantage of him. These impairments have affected his behavior across his lifespan.

App Exh 01 p. 47.

### Failed to Present a Neuropsychologist.

Mr. Tisius has a defective brain. Resentencing counsel and the sentencing jury

did not know the salient facts that: "Mr. Tisius demonstrated a particular constellation of deficits putatively implicating deep brain structures associated with frontal-striatal and temporal lobe functions." App Exh 04 p. 36.

Although resentencing counsel consulted with a neuropsychologist, he spent a meager six hours on the case, including travel time. Resentencing counsel only had that doctor conduct a bare-bones evaluation involving only three neuropsychological tests. Resentencing counsel did not provide the doctor with sufficient data to make clear that more extensive and better targeted testing was needed.

Dr. Dale Watson has now conducted the needed testing. Over a period of approximately 15 hours, he administered to Mr. Tisius numerous tests. App Exh 04 pp. 2-3. Dr. Watson's testing indicated that Mr. Tisius has deficits in his frontal- striatal and temporal lobes. Dr. Watson observed:

> Mr. Tisius demonstrated a particular constellation of deficits putatively implicating deep brain structures associated with frontal-striatal and temporal lobe functions. He demonstrated a profound degree of forgetfulness on tasks of verbal memory, marked deficits in motor programming that included motor perseveration in speech (stuttering) and movement, with associated cognitive perseverations, apparent motor impairments, significant "signal-detection" deficits across memory, attentional, and auditory processing tasks, and a severe degree of microsmia (loss of the sense of smell). In addition, there were signs of marked psychiatric impairments including severe depression, and a pattern of insecure attachment that significantly impacts his capacity for relationship, in the background of severe trauma.

App Exh 04 pp. 36-37.

In particular, Mr. Tisius has memory problems associated with temporal lobe dysfunction. He has deficits in his ability to recall information after a period of interference. He has a stutter, as well as difficulty with motor planning (as shown on

tests where he was required to perform rapid hand movements). Other motor deficits suggest that Mr. Tisius' frontal lobes, as well as his temporal lobes, are damaged. He has deficiencies in his ability to identify smells, which are connected with dysfunction in the orbital frontal lobes.

Mr. Tisius' neuropsychological dysfunction impacts him in different ways. For instance, "he has trouble responding to stimuli in a controlled manner such that his behavior can be erratic and hindered by impulsivity." App Exh 04 p. 48. "Mr. Tisius also has difficulty accurately discriminating between correct responses and incorrect responses due to a kind of internal 'noise.' Thus, he has significant 'signal-detection' deficits across memory, attentional, and auditory processing tasks. . . Mr. Tisius at times also demonstrates deficits in his capacity to think and problem solve using verbal fluid reasoning skills." *Id.* p. 49.

Two important factors intersect with Mr. Tisius' neurpsychological deficits. First, Mr. Tisius has other forms of mental illness. As Dr. Watson notes, "there were signs of marked psychiatric impairments including severe depression, and a pattern of insecure attachment that significantly impacts his capacity for relationship, in the background of severe trauma, that further impact his functional capacities. His psychiatric difficulties began during childhood and were marked by depression with withdrawal, poor school performance, irritability, mood swings, insomnia, anorexia, decreased concentration and anger. His attachment issues have made him vulnerable to manipulation and influence by those who provide attention to him." App Exh 04 p. 49. Second, Mr. Tisius' youth at the time of the offense exacerbates the impact of his brain damage: "the brain of a 19-year-old, particularly one that is already impaired,

will not process information as accurately or efficiently as someone of greater maturity." *Id.* pp. 49-50.

As discussed below, this testing data was used by the neuropsychiatrist to correlate Mr. Tisius' brain problems with his day-to-day functioning. Had trial counsel obtained this readily available data, he could have presented a much clearer picture of Mr. Tisius to the jury.

Evidence that Mr. Tisius was suffering from a severe, biologically-based illness that was completely beyond his control, and not simply behaving poorly by his own fiat, is certainly persuasive mitigating evidence for jurors considering the death penalty. *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004) (granting sentencing relief for failure to present organic impairment); *see also Glenn v. Tate*, 71 F.3d 1204, 1211 (6th Cir. 1996) (citing empirical evidence of juror sympathy to claims of "organic brain problems"); *Brewer v. Aiken*, 935 F.2d 850, 862 (7th Cir. 1991) (Easterbrook, J., concurring) (same). Even when some mitigation is presented, the Supreme Court has recognized the strength of an organic impairment to establish prejudice. *Sears v. Upton*, 561 U.S. 945 (2010).

### Failed to Retain and Present a Neuropsychiatrist.

Mr. Tisius was recently evaluated by Dr. George Woods, a neuropsychiatrist. Although Mr. Tisius previously had a psychiatric evaluation by Dr. Peterson, Dr. Woods, who is a neurologist as well as a psychiatrist, was better able to integrate Mr. Tisius' brain dysfunction with his psychiatric disorders using Dr. Watson's data. Dr. Woods has now diagnosed Mr. Tisius with several neurological and psychiatric disorders that represents highly relevant mitigation.

56

Dr. Woods found that Mr. Tisius has complex post-traumatic stress disorder. This arose from the well-documented trauma and neglect he suffered as a child. However, Dr. Woods found additional diagnoses that would have greatly strengthened the mitigation presentation.

Dr. Woods found that Mr. Tisius has frontotemporalstriatal dysfunction. This brain defect affects both the frontal and lobes of the brain. Dr. Woods observed:

> Mr. Tisius has difficulty understanding spoken language presented in rapid succession, although he is able to understand words presented to him singly efficiently. He described attempting to get the "gist" of the conversation, rather than truly understanding what is being said. It also appears that Mr. Tisius may have temporal lobe deficits consistent with absence seizure activity, which means short periods of loss of consciousness. Absence seizure activity is often mistaken for a lack of attention, focus, or day dreaming. These temporal lobe phenomena are most often caused by mid-temporal lobe dysfunction or sclerosis.

App Exh 05 p. 28. Mr. Tisius' trial teams failed to spend enough time with him to understand the symptoms he presented. As a result, they did not seek evaluation by an appropriate specialist.

Dr. Woods also could have provided testimony about the significance of Mr. Tisius' age at the time of the offense. He would have testified that "[t]he parts of the brain that are able to weigh and deliberate and to effectively pick up social cues as well as monitor judgment are not fully matured until the mid-20s." App Exh 05 p. 31. Because adolescents rely on parts of the brain that are fully developed at birth, such as the amygdala, they have "a more reactionary, less reasoned, perception of situations than adults." *Id.*

Dr. Woods would have explained that the adolescent brain does not activate its executive functioning areas in stressful situations. Rather, emotional responses are

primary. *Id.* p. 31.

Finally, Dr. Woods found that Mr. Tisius suffers from dependent personality disorder, which is highly relevant to the mitigation theme endorsed by counsel: Mr. Tisius was under the substantial domination of Vance at the time of these offenses. The combination of dependent personality disorder and the brain damage meant that Mr. Tisius was unable to understand, from social cues that would have been clear to a normal brain, that he was being manipulated. As Dr. Woods explained:

> Mr Vance . . . exploited Mr. Tisius when Mr. Tisius was at his most vulnerable.
>
> This domination continued after the offense occurred. Mr. Tisius did not understand how he had been "taken" by Mr. Vance. Years later Mr. Vance approached Mr. Tisius asking him to support to the premise of Mr. Vance's habeas petition which placed the entire blame for the crime on Mr. Tisius. Even at the time of signing the declaration, he continued to believe Mr. Vance was his friend. Difficulty picking up social cues is consistent with Mr. Tisius' social history and his cognitive frontal temporal lobe dysfunction.

App Exh 05 p. 29.

Resentencing counsel presented evidence on three statutory mitigating circumstances which were included in the jury instructions: 1) Whether the defendant had no significant history of prior criminal activity; 2) Whether the defendant acted under extreme duress or under substantial domination of another person; and 3) The age of the defendant at the time of the offense. Trial 2 LF Vol. 2 pp. 154, 163.

Dr. Woods' testimony would also have supported two additional mitigating circumstances: 1) that Mr. Tisius acted under the influence of extreme mental or emotional disturbance, and 2) that Mr. Tisius's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially

impaired.

With respect to the extreme mental or emotional disturbance issue, Dr. Woods

found, and would have testified,

> Mr. Tisius' cognitive impairment was further exacbated by the stressors
> from which he was suffering. . . . Mr. Vance groomed Ms. Bulington and
> Mr. Tisius to help him escape from jail. . . . Mr. Tisius was homeless and
> penniless when he was released from jail. Mr. Vance directed Ms.
> Bulington to provide Mr. Tisius with a place to stay and drugs, as well as
> other grooming strategies. Mr. Vance recognized exactly the cognitive and
> emotional vulnerabilities of Mr. Tisius and exploited them.

App Exh 05 p. 29.

On the issue of Mr. Tisius' ability to appreciate the criminality of his conduct or

conform his conduct to the requirements of law, Dr. Woods would have told the jury,

> Mr. Tisius' capacity to conform his conduct to the requirements of the law
> was substantially impaired due to his difficulty picking up social cues and
> vulnerability to Mr. Vance's grooming.
>
> . . .
>
> Mr. Tisius described significant symptoms of trauma at the time of the
> offense. He had been groomed for weeks, yet demonstrated affective
> dysregulation, shooting the deputy without understanding why. He had
> significant dissociative amnesia, not recalling anything after the first
> shot. The shot itself demonstrated the hyperreactivity of trauma.
>
> Cognitive symptoms manifested both before and after the offense. Ms.
> Bulington describes his "trance like" mental state before the offense, and
> perseveration after the offense. Mr. Tisius' cognitive and traumatic
> symptoms are interwoven throughout his offense, undermining his
> capacity to effectively reason and deliberate.

App Exh 05 pp. 29-31.

Under Missouri's death penalty scheme, the jury must unanimously find at least

one statutory aggravating circumstance before a defendant can be eligible to receive

the death penalty. R.S.Mo. § 565.030.4. If the jury finds the existence of at least one

59

statutory aggravating circumstance, then each juror must consider all relevant statutory mitigating circumstances, as well as non-statutory mitigating and aggravating evidence in the record. *State v. Ramsey*, 864 S.W.2d 320, 337 (Mo. banc 1993), *as modified on denial of reh'g* (Oct. 26, 1993). Missouri juror instructions require the jurors to consider and give effect to these statutory mitigating circumstances before returning a verdict. *See Ramsey*, 864 S.W.2d at 337 ("Under [Missouri's instructional] scheme, the jury must consider both aggravating and mitigating factors before returning a death sentence verdict.").

Given the foregoing, "[o]ne of the primary duties of counsel at a capital sentencing proceeding is to neutralize the aggravating circumstances advanced by the state and present mitigating evidence." *Ervin v. State*, 80 S.W.3d 817, 827 (Mo. banc 2002); *see also Wiggins*, 539 U.S. at 524 (noting that prevailing professional norms dictate that counsel has a duty to investigate and rebut aggravating evidence). Because evidence of impaired intellectual functioning is highly mitigating, counsel have a specific duty to investigate. *Wiggins*. Accordingly, many courts have determined that when the jury did not hear available evidence of impaired intellectual functioning establishing statutory mitigating circumstances related to the defendant's mental state at the time of the crime (and therefore rebutting aggravation evidence), the defendant suffered prejudice and is entitled to a new sentencing hearing.

For example, in *Pruitt v. Neal*, 788 F.3d 248, 274 (7th Cir. 2015), a case which also involved the murder of a law enforcement officer, the court found prejudice where new experts diagnosed mental conditions which supported two statutory mitigating circumstances not found by the sentencer. Other courts have reached similar

conclusions. *Magwood v. Smith*, 791 F.2d 1438, 1450 (11th Cir. 1986) (holding that the omission of evidence, which demonstrated that (1) the defendant killed the victim while under the influence of extreme mental or emotional disturbance and (2) the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, overcame "the presumption of correctness accorded the state court's findings by 28 U.S.C. § 2254(d) and . . . entitled [the defendant] to a new sentencing hearing in order to satisfy the constitutional standards for sentencing in death penalty cases."); *Brownlee v. Haley,* 306 F.3d 1043, 1071-72, (11th Cir. 2002) (failure to investigate and present evidence to support statutory extreme mental or emotional disturbance mitigating circumstances was ineffective).

When the state has presented statutory aggravating circumstances but the defendant has not presented sufficient statutory mitigating circumstances, a weighing imbalance is likely. This imbalance gives rise to concerns about the reliability of the sentence imposed. After all, "the Eighth and Fourteenth Amendments **require** that the sentencer, in all but the rarest kind of capital case, not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604 (footnote omitted) (emphasis added).

It would have been extremely significant to the jury that Mr. Tisius, in addition to being an unsophisticated youth, suffered from brain damage and mental illness. This evidence would have rebutted the prosecutor's argument that Mr. Tisius made the free choice to do what Vance proposed. There is a vast difference between someone who

Case 4:17-cv-00426-SRB   Document 38   Filed 11/02/18   Page 67 of 228

chooses to misbehave and someone who, as a result of a brain that is malfunctioning at the time of the crime, commits a criminal act.

### Failed to Retain and Present a Prison Adjustment/Security Expert.

Mr. Tisius was denied the effective assistance of counsel at his resentencing when defense counsel failed to reasonably investigate and present mitigating evidence of Mr. Tisius' good prison behavior even though this information was known, available, and relevant. *See Skipper v. South Carolina,* 476 U.S. 1, 5 (1986). The omissions of counsel prejudiced Mr. Tisius and denied him due process and the effective assistance of counsel. *See Wiggins*, 539 U.S. 510; *Williams*, 529 U.S. at 396-98; *Strickland*, 466 U.S. 668.

Mr. Tisius is not a risk to correction officers or others. As noted by James Aiken, "Mr. Tisius' confinement history does not reflect a pattern of a prison predator nor is there evidence of his continual, methodical use of violence and power to successfully gain control over inmates, staff or the operation of the confinement facility. There is the absence of random and systemic behaviors regarding escape or attempted escapes, violence against staff, sexual predator behaviors, or [the organization of] collective continual violence." App Exh 06 pp. 5-6.

The Supreme Court has unmistakably recognized the importance of permitting capital defendants to put forth evidence of the likelihood of future good conduct at sentencing. *Ayers v. Belmontes*, 549 U.S. 7, 15 (2006). In *Skipper,* the trial court found evidence of the defendant's good behavior during the period of his incarceration between arrest and trial to be irrelevant and excluded such evidence. 476 U.S. at 5. The Supreme Court reversed Skipper's death sentence, holding that evidence of good

behavior was relevant to refute the state's allegations of future dangerousness, and noting that "any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose." *Id.* at 5 (quoting *Jurek v. Texas*, 428 U.S. 262, 275 (1976)). In the capital context, a sentencing authority may consider a defendant's past conduct as indicative of his probable future behavior. *Skipper*, 476 U.S. at 5 (finding that "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating.").

Defense counsel failed to reasonably and competently investigate, prepare, and present available *Skipper* evidence at the resentencing. Counsel's deficient performance precluded the sentencing jury from considering and giving weight and effect to available, compelling mitigation evidence in the determination of Mr. Tisius' sentence. Resentencing counsel's failure was not the result of a reasonable strategic decision, but rather was a dereliction of duty that prejudiced Mr. Tisius. *See Wiggins*, 539 U.S. at 525 (stating that a *Strickland* violation is established where the scope of an attorney's investigation into mitigating evidence prior to trial was "unreasonable in light of what" counsel knew about their client).

The need for a prison adjustment expert was acute in Mr. Tisius' case, where the state presented evidence of prison conduct the state contended predicted future dangerousness. Mr. Aiken could have effectively challenged the non-statutory aggravation upon which the state relied. Mr. Aiken reviewed each of the incidents upon which the state relied to argue for death and found them wanting, and explainable.

As to both the Chariton County and Boone County incidents, Mr. Aiken noted:

"There is an absence of criminal charges or disciplinary violations for the observations made by the deputy [and the correctional officer]. When inmates conduct behaviors that are in violation of institutional rules or statute then it is the responsibility of the officials to conduct an investigation or administrative review. I've not been provided with documentation that reflects that any sanction, reclassification, additional security measures or any other measures were taken as a result of this observation." App Exh 06 pp. 11, 12. As Mr. Aiken noted, immature comments and gestures tend to happen in correctional settings, and that, contrary to the great significance placed upon it by the state, "[t]he gravity of this observation by law enforcement is of the least amount of significance in determining his adjustment to incarceration, endangerment to staff and other inmates." *Id.*

Mr. Aiken could have lessened if not quashed the impact of the boot-shank aggravation. Mr. Aiken could have described that, while a "boot shank" sounds ominous, that the reality in the correctional setting is that:

> Assessment of this violation, which is conducted in a prison operational context, reveals that **Mr. Tisius has not attempted or inflicted bodily harm to another inmate or staff member with or without a weapon, he has not demonstrated a** chronic history of violent behavior while in lawful confinement. There is no validation that he has demonstrated gang or security threat group systemic or individualized violence. It is also noteworthy from a correctional assessment perspective that the piece of metal from the boot is not reported to have been sharpened on either end or manipulated in some way to be used as a weapon. In my experience incidents of this kind are largely resolved without adjudication in court. That is to say an incident of this sort in my experience would most likely not be prosecuted criminally.

App Exh 06 p. 12. Resentencing counsel could have ameliorated the boot shank with readily available expert testimony.

64

Thus, this type of expert provided two tools to defense counsel. One, it represents strong affirmative mitigating evidence. Two, it acts as a shield from the negative inferences the state raised from what in the correctional setting is nothing more than immature behavior. It both acts as mitigation and rebuts aggravation.

### Conclusion

This issue has not been raised in state court. This failure occurred because of the ineffective assistance of Mr. Tisius' post-conviction counsel. Should the state assert that this ground is not available for review, Mr. Tisius will argue that under *Martinez v. Ryan*, 1566 U.S. 1 (2012), he is entitled to develop and present this ground for relief in this Court.[7]

---

[7] As of the filing of this petition, Mr. Tisius is unaware of any Missouri remedy that will now permit him to exhaust this ground for relief, or the other grounds in this petition that are available under *Martinez* if the state asserts a procedural defense. Should the Missouri Supreme Court later authorize such a remedy, Mr. Tisius reserves the right to move for stay and abeyance to allow him to return to state court to raise these grounds there.

## Habeas Ground for Relief No. 4

**Resentencing counsel's failure to submit all relevant portions of Dr. Peterson's prior testimony and omission of testimony supporting two additional mental-state statutory mitigating circumstances not otherwise presented to the jury—that Mr. Tisius acted under the influence of extreme mental or emotional disturbance and that Mr. Tisius' capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired— violated Mr. Tisius' rights to effective assistance of counsel, due process, and freedom from cruel and unusual punishment at his resentencing.**

Resentencing counsel's theory was that Mr. Tisius was a young man who sought to please Vance because Vance was a father-figure to Mr. Tisius, and in trying to help Vance escape from jail, Mr. Tisius' will was overborne by Vance. PCR 2 Tr. pp. 347-48. Counsel possessed, but did not present, unique expert evidence from Stephen Peterson, M.D., which was consistent with this theory but also supported two additional mental-state statutory mitigating circumstances not otherwise presented to the jury. Although counsel presented some of the expert testimony of Dr. Peterson to the jury, counsel omitted portions of the testimony regarding the additional mental-state statutory mitigating circumstances. Counsel's failure to adequately investigate and present this evidence and request instructions regarding the two statutory mitigating circumstances constituted ineffective assistance of counsel.

A capital defendant has "a constitutionally protected right" to present mitigation evidence to the sentencing jury. *Williams v. Taylor*, 529 U.S. 362, 393 (2000). Without such evidence, each juror cannot render the individualized decision the Eighth Amendment requires. *Gregg v. Georgia*, 428 U.S. 153 (1976).

Under Missouri's death penalty scheme, the jury must unanimously find at least one statutory aggravating circumstance before a defendant can be eligible to receive

66

the death penalty. R.S.Mo. § 565.030.4. If the jury finds the existence of at least one statutory aggravating circumstance, then each juror must consider all relevant statutory mitigating circumstances, as well as non-statutory mitigating and aggravating evidence in the record. *State v. Ramsey*, 864 S.W.2d 320, 337 (Mo. banc 1993), *as modified on denial of reh'g* (Oct. 26, 1993). Missouri jury instructions require the jurors to consider and give effect to these statutory mitigating circumstances before returning a verdict. *See Ramsey*, 864 S.W.2d at 337 ("Under [Missouri's instructional] scheme, the jury must consider both aggravating and mitigating factors before returning a death sentence verdict.").

Given the foregoing, "[o]ne of the primary duties of counsel at a capital sentencing proceeding is to neutralize the aggravating circumstances advanced by the state and present mitigating evidence." *Ervin v. State*, 80 S.W.3d 817, 827 (Mo. banc 2002); *see also Wiggins v. Smith*, 539 U.S. 510, 524 (noting that prevailing professional norms dictate that counsel has a duty to investigate and rebut aggravating evidence). Because evidence of impaired intellectual functioning is highly mitigating, counsel have a specific duty to investigate it. *See Wiggins,* 539 U.S. at 524; *Hutchison v. State*, 150 S.W.3d 292, 297 (Mo. banc 2004) (recognizing that "[c]ounsel have a [specific] duty under the United States Constitution to conduct a reasonable investigation and to present evidence of impaired intellectual functioning—evidence that is inherently mitigating—in the penalty phase of a murder trial."). Accordingly, many courts have determined that when the jury did not hear available evidence of impaired intellectual functioning establishing statutory mitigating circumstances related to the defendant's mental state at the time of the crime (and therefore rebutting aggravation evidence),

the defendant suffered prejudice and was entitled to a new sentencing hearing. *See*, *e.g.*, *Pruitt v. Neal*, 788 F.3d 248, 274 (7th Cir. 2015) (holding that trial counsel's failure to present evidence supporting two statutory mental-state mitigating circumstances prejudiced the defendant); *Magwood v. Smith*, 791 F.2d 1438, 1450 (11th Cir. 1986) (holding that the omission of evidence, which demonstrated that (1) the defendant killed the victim while under the influence of extreme mental or emotional disturbance and (2) the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, overcame "the presumption of correctness accorded the state court's findings by 28 U.S.C. § 2254(d) and . . . entitled [the defendant] to a new sentencing hearing in order to satisfy the constitutional standards for sentencing in death penalty cases.").

When the state has presented statutory aggravating circumstances but the defendant has not presented sufficient statutory mitigating circumstances, a weighing imbalance is likely. This imbalance gives rise to concerns about the reliability of the sentence imposed. After all, "the Eighth and Fourteenth Amendments **require** that the sentencer, in all but the rarest kind of capital case, not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (footnote omitted) (emphasis added).

In this case, counsel possessed, but did not present, unique expert evidence supporting two statutory mitigating circumstances not otherwise presented to the jury. Dr. Peterson, who is a psychiatrist, testified at first state post-conviction hearing. He

Case 4:17-cv-00426-SRB   Document 38   Filed 11/02/18   Page 74 of 228

opined that Mr. Tisius suffered from major depressive disorder, severe without psychotic features; childhood onset post-traumatic stress disorder; dysthymia or dysthymic disorder; alcohol and marijuana abuse and/or dependence; and some problematic personality traits such as passive/aggressive personality or compulsive personality. In addition to supporting the substantial domination mitigating circumstance, which counsel intended to present to the jury, Dr. Peterson's testimony also supported two other statutory mitigating circumstances: that Mr. Tisius acted under the influence of extreme mental or emotional disturbance, (PCR 2 Ex. 5 pp. 277-79), and that Mr. Tisius' capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired. *Id.* pp. 274, 275, 276, 291.

Several years passed before Mr. Tisius' resentencing trial began. During this time, resentencing counsel did not did not speak with Dr. Peterson about the case. PCR 2 Tr. p. 240, PCR 2 Ex. 102 p. 20. Resentencing counsel acknowledged that they omitted portions of Dr. Peterson's testimony. PCR 2 Tr. pp. 358-61. Resentencing counsel testified that they thought the evidence they did present was sufficient to support their theory of defense. *Id.*

Reasonable counsel would have spoken with Dr. Peterson and subsequently would not have omitted any of Dr. Peterson's testimony, particularly the parts establishing the two additional statutory mitigating circumstances. *See Magwood*, 791 F.2d at 1450. Resentencing counsel was not aware of any objection to the submission of the entirety of Dr. Peterson's testimony to the jury. They believed that Dr. Peterson ultimately was a credible witness—otherwise, they would not have presented any of

this testimony. They knew that Mr. Tisius' mental state was the central issue in the case. Resentencing counsel also knew, or should have known, that in addition to supporting one mental-state mitigating circumstance counsel already intended to present to the jury, Dr. Peterson's testimony established two additional mental-state statutory mitigating circumstances, both of which were consistent with the defense theory. Thus, reasonable counsel would have submitted the entirety of Dr. Peterson's testimony. Resentencing counsel's failure to do so constituted deficient performance.

Resentencing counsel's deficient performance prejudiced Mr. Tisius. Evidence of impaired intellectual functioning is inherently mitigating and directly would have countered the weight of the aggravating circumstances. Moreover, under Missouri's sentencing scheme, the jury would have been required to consider and give effect to the additional mental-state mitigating circumstances. Had defense counsel presented this evidence, a reasonable probability exists that at least one juror would have struck a different balance. The omitted evidence would have countered the weight of the aggravating circumstances. The principal disputed issue at sentencing was Mr. Tisius' mental state at the time of the crime. The State argued that Mr. Tisius exercised cool deliberation, whereas the defense argued that Mr. Tisius did not form the requisite mental state for first-degree murder. However, despite possessing evidence establishing the two additional mental-state statutory mitigating circumstances, defense counsel did not present it to the jury. Had defense counsel presented this evidence, a reasonable probability exists that one juror would have struck a different balance.

The likely damage from defense counsel's failure to present mental-state defenses is best understood by taking the word of the prosecutor during closing argument. *See Detrick Cole v. State of Tennessee*, No. W2008-02681-CCA-R3-PD, 2011 WL 1090152, at *45 (Tenn. Crim. App. Mar. 8, 2001) (finding that state's closing arguments focusing on the absence of mitigating evidence cannot be disregarded and must be considered in the prejudice analysis). One of the principal themes of the state's argument was that Mr. Tisius chose to commit these acts. The state argued that Mr. Tisius knew right from wrong, planned these crimes for days, and ignored his multiple opportunities to choose not to commit the crimes. The state argued, even the defense's own experts said he knew right from wrong and could choose to act in a criminal way or not:

> Now – but the important thing here is this: When you talk about being under the dom – it doesn't matter if he was wanting to please Roy or not; it doesn't matter, because his experts, all of them, Dr. Peterson who the transcript was read in, Dr. Taylor, all of them said what? He knows the difference between right and wrong. He could choose to act in a criminal fashion or not. He knows what he's doing. So if he's doing this to please Roy, that's fine. The important thing is, does he know right from wrong?
>
> . . .
>
> You choose to do these things. Michael Tisius chose to commit these crimes. You know, and I go back again. We don't need a $6,000 doctor to tell us that. His brother, from the same family, from better circumstances, committed serious felony offenses too. He didn't murder anybody. As Dr. Taylor would say, yet.
>
> It's not what your childhood is. It's not who your dad was, not who your mom was. It's what – when you walk out of these environments, it's what you choose to do. We all know that. We all know that.

Trial 2 Tr. pp. 1187, 1191.

Another principal theme was that because Mr. Tisius was the type of person who

Case 4:17-cv-00426-SRB   Document 38   Filed 11/02/18   Page 77 of 228

would plan and commit such a crime, the jury had a duty to stop him before he did it again in prison. For example, the state argued as follows:

> And more importantly than that, he might not have had a prior criminal history, but even though he's in the Department of Corrections for at least the rest of his life, what is he doing? He's committing more crimes. He has a boot shank. He's got a boot shank. Because, you know what he knows? There is nothing worse we can do to him. He got five years for that, and they just ran it concurrent with his life sentence. Every crime he commits from this day forward as long as he's alive is a freebie. It's a freebie.

> He's going to be – continue to be a danger to our society, and we have an obligation. As representatives of our state, we all have an obligation to protect those jailers in those Departments of Correction, those staff members, those doctors, those nurses. And you know what? The Roy Vances of the world that are in those prisons we have to protect from murderers like him.

> Ladies and gentlemen, if he killed twice to try and get a friend out, do you think if he's given the opportunity he would kill again to get himself out?

*Id.* pp. 1189-90.

The prosecutor closed his argument on this note:

> But even – I have another request though. I'm asking you on behalf of the entire law enforcement community, I'm asking you to protect us, protect them from people like Michael Tisius. There is three categories of people in this world. There's the wolves. Michael Tisius is a wolf. What does the wolf do? He stays around the edges of the flock, and when the flock runs, he picks off the slowest member. That's what the wolf does. Picks off the slowest member of the sheep. The sheep are the second community, second group of people. That's what wolves do; they pick off that slowest member. Okay?

> That third group of people in our society that isn't a wolf, that isn't a sheep, they are the law enforcement officers. They are here to protect those sheep, and they can't be everywhere at every time. But if we have a man who is willing to kill a law enforcement officer inside a correctional center, what does that say about our society?

> What I'm asking you to do is justified, and, ladies and gentlemen, it's necessary.

*Id.* p. 1192.

The omitted evidence would have countered the weight of the aggravating circumstances in at least four important ways. First, although Dr. Taylor testified that Mr. Tisius chose to commit the crimes, the omitted testimony of Dr. Peterson explained that Mr. Tisius' medical illnesses were substantially impairing his cognition and judgment at the time of the crime:

> Q.     Now, going back very briefly to the extreme mental or emotional disturbance issue, can you explain how major depression or PTSD acting together can cause a disturbance? Are these serious enough illnesses that they cause disturbance of thinking?

> A.     I can explain it, and, yes, they do, in fact, cause disturbance in thinking.

> At the beginning, separately, major depression very commonly causes people to have impaired thinking, impaired reasoning ability, poor judgment, at least in the kind of major depression I'm talking about and that's where somebody needs psychotherapy and medication treatment, not the blues or having a bad day.

> Major depression also impairs people by causing problems with emotional control, especially anger control, whether it is directed towards themselves or others. Post-traumatic stress disorder for a young man who has had it since childhood, some of those symptoms actually overlap with major depression, but more predominantly such persons experience extreme anxiety end panic as well as the problems of identifying with the aggressor as a way to find some emotional solace. These are slightly separate -- well, they are not slightly separate. They are significantly separate in that not only would Michael experience cognitive impairment from his -- from his major depression, he would also experience severe impairment of his judgment due to making distinctions and thinking through problems and solving problems when he was extremely anxious and panicking.

> It is well-known that people who are panicking don't make good decisions. That's why they go through training to control their emotions and their thinking. Michael never had any kind of training like that.

PCR 2 Ex. 5 pp. 280-81. Thus, any "choice" that Mr. Tisius made at the time of the crime could not be separated from the product of his medical illnesses he was suffering

from at the time of the crime. *See id.*

Second, although both Dr. Taylor and Dr. Peterson testified that Mr. Tisius knew right from wrong, the omitted testimony of Dr. Peterson explained that knowing right from wrong is not the same as being able to *refrain* from doing wrong in certain circumstances:

> Q.     On the issue of knowing right from wrong, did Mr. Tisius express that he feels very sorry for what – for what happened – for what he did in this case?
>
> **A.     Yes. And knowing right from wrong is different than being able to refrain from doing wrong or assuming doing right.**
>
> Q.     Can you describe what the difference is and why you think that is different?
>
> A.     Well, I think in – in Michael Tisius, in large part, he was involved in this attempted breakout to please Roy Vance and to garner his affection and continue what he thought was a special relationship, errantly, actually, a special relationship. In fact, as he was driving away, he repeated to Tracie Bulington, "I'm sorry, Roy,' like he had failed Roy, and that shows his preoccupation and his substantial domination by Roy Vance.
>
> Q.     And as you said on direct, you believe that he acted under the extreme mental or emotional disturbance at the time of the shooting?
>
> A.     Yes.

*Id.* pp. 291-92 (emphasis added). Thus, had counsel presented this testimony to the jury, the jury would have heard that although Mr. Tisius knew right from wrong, due to his medical illnesses affecting his cognition and judgment at the time of the crime, he was not able to *refrain* from doing wrong at the time of the crime. *Id.*

Third, because Dr. Peterson's testimony was the only mental state evidence sufficient to satisfy the two additional mental-state statutory mitigating circumstances, Dr. Peterson's evidence was inherently different from the other expert evidence presented at the sentencing hearing. Thus, Dr. Peterson's evidence of mental impairments affecting Mr. Tisius at the time of the crime would have countered the

aggravating evidence in a way that the other mitigating evidence could not. *See Pruitt,* 788 F.3d at 274, *Brownlee,* 306 F.3d at 1071-72. Empirical studies show that evidence of mental impairments, like evidence of a troubled childhood, "is exactly the sort of evidence that garners the most sympathy from jurors." *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004) (citing empirical evidence of juror attitudes); *see also Glenn v. Tate*, 71 F.3d 1204, 1211 (6th Cir. 1996) (citing empirical evidence of juror sympathy to claims of "organic brain problems"); *Brewer v. Aiken*, 935 F.2d 850, 862 (7th Cir. 1991) (Easterbrook, J., concurring) (same). A reasonable probability therefore exists that the difference inherent in the omitted evidence would have been meaningful to at least one juror.

Fourth, the omitted evidence would have explained that Mr. Tisius' behavior at the time of the crime was a product of his mental impairments. *Anderson v. Sirmons*, 476 F.3d 1131, 1144, 1148 (10th Cir. 2007); *Smith*, 379 F.3d at 943 ("What the jury wholly lacked was an *explanation* of how Mr. Smith's organic brain damage caused these outbursts of violence and caused this 'kind hearted' person to commit such a shocking crime."). Given the facts of the crime and the fact that the state's argument focused on Mr. Tisius' mental state at the time and afterward while he was in prison, it was crucial for Mr. Tisius' counsel "to explain[] to the jury the difference between abnormalities of personality and actual mental disorders." *Wilson v. Sirmons*, 536 F.3d at 1091. Without such an explanation, jurors likely perceived Mr. Tisius' personality traits or actions as "'meanness' or antisocial behavior, but with expert evaluation and explanation [they would have been] properly explained as deriving from disruption and impairments to the nervous system." *Anderson*, 476 F.3d at 1144. Furthermore,

Case 4:17-cv-00426-SRB   Document 38   Filed 11/02/18   Page 81 of 228

without Dr. Peterson's testimony, the jury was likely to believe—as the state contended—that Mr. Tisius was just a bad person who posed a threat to the future safety of law enforcement officers specifically and society in general.

Only Dr. Peterson's testimony—which did explain that Mr. Tisius' actions were the product of his intellectual impairments—was sufficient to establish the two additional mental-state statutory mitigating circumstances providing an explanation for Mr. Tisius' behavior at the time of the crime. Only the omitted testimony explained how Mr. Tisius' medical illnesses affected his judgment in a way that substantially impaired his ability to control his behavior or use appropriate judgment, despite knowing the difference between right and wrong. Thus, the omitted testimony countered the state's argument in a meaningful way, and only the omitted testimony did so.

Had this evidence been presented, the jury would have been instructed to consider and give effect to Mr. Tisius' mental impairments. As explained above, Missouri's jury instructions **require** the jury to consider and give effect to statutory mitigating circumstances before returning a verdict. *Ramsey*, 864 S.W.2d at 337 ("Under [Missouri's instructional] scheme, the jury must consider both aggravating and mitigating factors before returning a death sentence verdict."). The intent of this scheme is to ensure reliability in the sentencing decision. *Id.* ("Because the jury must consider both aggravating and mitigating circumstances before returning a verdict imposing the death penalty, our instructions are consistent with the mandate of *Lockett* and *Jurek* [*v. Texas*, 428 U.S. 262 (1976)].").

However, because counsel did not present available evidence establishing the two additional mental-state statutory mitigating circumstances, the jury could not consider them. Yet on the other side of the scale, the jury was considering three statutory aggravating circumstances in each case against Mr. Tisius. And for each of these aggravating circumstances, the state was relying on evidence of Mr. Tisius' alleged planning, deliberation, and free choice.

In a weighing state like Missouri, this type of imbalance satisfies the *Strickland* prejudice standard. Had the two additional statutory mitigating circumstances been presented to the jury in each case, each juror would have been required to consider and give effect to them. Because the omitted evidence explained Mr. Tisius' behavior at the time of the crime, not to mention throughout his life, a reasonable probability exists that, but for counsel's deficient performance, at least one juror would have struck a different balance. Counsel's deficient performance rendered the proceedings fundamentally unfair.

The state court's treatment of the claim is contrary to and/or an unreasonable application of clearly established Supreme Court law. *See* 28 U.S.C. § 2254(d)(1). It is also based on an unreasonable determination of the evidence presented in state court, under 28 U.S.C. § 2254(d)(2). Mr. Tisius intends to challenge any factual findings pursuant to § 2254 (e)(1). The writ must issue, and this Court should reverse Mr. Tisius' conviction and remand for a new trial.

**Mr. Tisius was denied his constitutional right to effective assistance of counsel when trial counsel failed to prepare their expert witness, Dr. Shirley Taylor, by informing her of evidence that would be offered at trial concerning statements and conduct of Mr. Tisius while he was in jail before his resentencing hearing.**

At Mr. Tisius' resentencing, the only live defense expert witness presented was Dr. Shirley Taylor. Dr. Taylor, a psychologist, testified extensively concerning Mr. Taylor's chaotic upbringing and its results on his functioning at the time of the offense. She testified that Mr. Tisius' personality test results were consistent with depression, anxiety, and post-traumatic stress disorder. Trial 2 Tr. p. 1115. She opined that the shootings were not in keeping with Mr. Tisius' history of passivity and lack of aggression. She described his remorse about the shootings and his strong desire to please Vance. *Id.* p. 1121.

On cross-examination, the state inquired of Dr. Taylor regarding: 1) Mr. Tisius' alleged statements, while in jail, made to Officer Petri, asking whether the officer knew who he was and that he had killed two guards; and, 2) Mr. Tisius' alleged gesture made to another jail guard simulating shooting a gun at her. Resentencing counsel failed to inform Dr. Taylor of these incidents, and thus, she admitted that she was unfamiliar with these incidents. She said she would need to know about the "context" of the incidents. *Id.* pp. 1149-1150. Thus, resentencing counsels' shortcomings left Dr. Taylor in a position where she could not credibly and effectively respond.

In his closing argument, the prosecutor said, "You don't need any context like Dr. Taylor to know what's going on there. There is no context. That's the type of man we're dealing with." Trial 2 Tr. pp. 1183-1184.

During the post-conviction hearing, trial counsel testified that there was no strategy behind failing to inform Dr. Taylor of the facts concerning the jail conduct and statements. PCR 2 Tr. pp. 74-75.

Preparing witnesses, particularly expert witnesses, to testify is an essential part of effective assistance of counsel. As the court put it in *Smith v. Stewart*, 189 F.3d 1004, 1012 (9th Cir. 1999), "A lawyer who should have known but does not inform his expert witnesses about essential information going to the heart of the defendant's case for mitigation does not function as 'counsel' under the Sixth Amendment."

The Missouri Supreme Court said that this claim had been "abandoned" because PCR counsel failed to present evidence from Dr. Taylor about how foreknowledge of these facts would have changed her testimony. Accordingly, the court declined to review this ground. *Tisius v. State,* 519 S.W.3d 413, 425 (Mo. banc 2017). Because this substantial ground of ineffective assistance of trial counsel was not reviewed by the Missouri Supreme Court because of ineffective assistance of initial, trial post-conviction counsel, it must be reviewed *de novo* by this Court. *Martinez v. Ryan*, 566 U.S. 1 (2012). Discovery and an evidentiary hearing will be required.

The writ must issue, and upon hearing, Mr. Tisius is entitled to a new penalty phase trial.

**Trial counsel were ineffective for failing to investigate, prepare, and rebut known aggravation being presented by the State in violation of Mr. Tisius' rights as guaranteed by the First, Sixth, and Fourteenth Amendments.**

As previously noted, to establish ineffective assistance of counsel, Mr. Tisius must show that counsel's performance was deficient and that Mr. Tisius was prejudiced. *Strickland*, 466 U.S. 668; *Williams*, 529 U.S. at 390-91. "Counsel's obligation to rebut aggravating evidence extended beyond arguing it ought to be kept out." *Rompilla*, 545 U.S. at 386.

One of the primary duties of counsel at a capital sentencing proceeding is to neutralize the aggravating circumstances advanced by the state and present mitigating evidence. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (counsel has duty to investigate and rebut aggravation); *Rompilla*, 545 U.S. at 386; *Parker v. Bowersox*, 188 F.3d 923, 929-31 (8th Cir. 1999) (counsel ineffective for failing to present evidence that would have rebutted aggravation that victim was potential witness against Parker).

**Improper characterization that Mr. Tisius' question to a Boone County jail guard was "bragging" that he killed two guards.**

Reasonably effective counsel, knowing that the State of Missouri argued in the first sentencing phase that Ms. Petri's testimony demonstrated "bragging," would have investigated and presented evidence of an alternative meaning to rebut respondent's "bragging" characterization. *Rompilla v. Beard*, 545 U.S. 374 (2005). Mr. Tisius' resentencing counsels' failures to challenge known aggravation prejudiced Mr. Tisius. There exists a reasonable probability that the jury would not have sentenced Mr. Tisius to death; if counsel had not allowed an ambiguous statement to be converted into an unwarranted highly aggravating inference.

Resentencing counsel should have known it was coming; there simply was no excuse not to be ready. At the original trial, Ms. Petri was the *last* witness to testify in guilt. Trial 1 Tr. pp. 894-98.[8] The state's guilt phase rebuttal closing argument *finished* with urging the jury to convict Mr. Tisius of first-degree murder based on the statements Ms. Petri attributed to him:

> Remember Jackie Petri, my last witness. The guard from the Boone County Jail. "Don't you know who I am? Don't you read the papers? I killed two police officers up in Moberly." Folks, what does that tell you? Besides admitting the acts again? What does it tell you? *He's proud of it. He sees it as part of his identity. Makes him a big man.* Okay. Big man.
>
> How about murder in the first degree? That will give you something to be proud of. That's what you ought to do, folks. That's exactly what you ought to do. And that's what I'm going to urge you to do. Because that's what this is. Murder in the first degree. Two counts. Because that's the just result.
>
> You've been very attentive and very kind. Thank you again.

*Id.* p. 944-45 (emphasis added).

At the resentencing, counsel objected to Ms. Petri's testimony urging that Mr. Tisius' statements could be viewed as ambiguous and lead to "wild inferences." Trial 2 Tr. pp. 890-94. The state argued this "bad act evidence" went to "the true character of this Defendant" and urged this testimony was admissible because it "show[ed] a flagrant disregard to law enforcement and our society in general by making such acts and conducts and it is something the jury should consider." *Id.* The state asserted the jury should be allowed to assess whether Mr. Tisius is in fact remorseful for the killings or whether he was bragging. *Id.* The state noted that counsel were long on notice of this matter and it was on record in a transcript. *Id.*

The state hit the future dangerousness theory early and often. In opening

---

[8] All lawyers know the principles of primacy and recency as advocates.

statement, the jury heard that Mr. Tisius wanted to be transferred to a different county jail while he was awaiting trial. Trial 2 Tr. p. 552-53. The state represented that when a guard told Mr. Tisius to fill out a request form that he asked whether she knew that he was responsible for killing two guards at the Moberly jail. *Id.* The state then told the jury that Mr. Tisius' statement reflected that he was "proud of what he did." *Id.* p. 553.

Ms. Petri was picking up inmate food trays in the evening. Trial 2 Tr. pp. 906-08. Mr. Tisius informed Ms. Petri he wanted to be moved from the Boone County Jail. *Id.* p. 908. Ms. Petri told Mr. Tisius that he needed to complete a request form. *Id.* Mr. Tisius told Ms. Petri that he really wanted to be moved that same night. *Id.* p. 908-09. Mr. Tisius was anxious to be moved and told Ms. Petri that there was a court order for him to be moved. *Id.* p. 909. Ms. Petri reported that Mr. Tisius asked her if she knew who he was and when she indicated that she did not, that he told her he was the person who killed the two Randolph County guards. *Id.* p. 908-09.

Trial counsel's cross-examination covered a meager two complete pages of transcript. *Id.* p. 909-11. On cross-examination, Ms. Petri indicated that Mr. Tisius stated that there was a court order for him to be moved from Boone County and that he was anxious to leave. *Id.* p. 909. Ms. Petri testified: "He was, like, you know, Look at me. I'm the one that killed those two jailers. That's how I took it." *Id.* p.910. Counsel's cross-examination did not include any evidence that Mr. Tisius' statement was subject to another interpretation – Mr. Tisius inartfully attempted to convey that he was frightened and why it was important for him to leave the Boone County Jail. Such evidence was available.

During the second post-conviction hearing, Dr. Peterson testified that Mr. Tisius'
statement to Ms. Petri was subject to an interpretation other than "bragging." PCR 2
Tr. p. 324. Rather than bragging, Mr. Tisius attempted to convey that he was
frightened and why it was important for him to leave immediately. *Id.*

Mr. Slusher testified he was aware the state intended to call Ms. Petri and he
expected her to testify consistent with the prior trial. PCR 2 Ex. 102 p.64-65. He was
uncertain what, if any, pretrial preparation was undertaken as to Ms. Petri. *Id.* p.65.

Mr. McBride was also aware the state intended to call Ms. Petri. PCR 2 Tr. p.
365. On cross-examination, McBride testified he did not think "linger[ing]" over the
boot shank, Boone County jail events, and the Chariton County jail matters so as to
create "a mini trial" would advance Mr. Tisius' interests. *Id.* p. 403. In particular, as to
Ms. Petri, McBride thought that her overall reaction was that she was not bothered by
her exchange with Mr. Tisius. *Id.* McBride did not want to "make it into a bigger deal"
than it was. *Id.* p. 403-04.

Mr. Tisius' counsel was ineffective because counsel knew that at the original
trial respondent concluded its guilt phase closing argument urging that Petri's
testimony demonstrated Mr. Tisius was "proud" of killing the jail guards. Trial 1 Tr.
pp. 944-45. Reasonably effective counsel would have investigated the circumstances
surrounding Mr. Tisius' statements. *See Rompilla v. Beard*, 545 U.S. 374 (2005).
Resentencing counsel had available the testimony of Dr. Peterson described above, but
failed to present it to the jury. Presenting that testimony, at a minimum, was required
for a reasonably effective assistance of counsel. Reasonably effective counsel would
have called an expert like Dr. Peterson, to testify that a reasonable interpretation of
Mr. Tisius' statement was that he was actually telling the listener he was frightened

and why it was important for him to leave now. It was not an expression of "pride" by Mr. Tisius as to what he had done.

Lack of diligent investigation is not protected by a presumption in favor of counsel and cannot be justified as strategy. *Kenley v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir. 1991). As noted in *Strickland*, 466 U.S. at 691, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations in investigation." Counsel's strategy choices must be objectively reasonable and sound. Counsels' actions did not reflect a reasonable strategy, but rather a failure to prepare, investigate, and present the reasonable alternative construction of Mr. Tisius' statement. PCR 2 Tr. p. 324.

Resentencing counsel did not elicit any evidence on cross-examination of Ms. Petri to suggest Mr. Tisius' statements could be interpreted as anything other than bragging. Indeed, their cross-examination actually highlighted and reinforced the state's assertion that Mr. Tisius' statements reflected bragging: "He was, like, you know, Look at me. I'm the one that killed those two jailers. That's how I took it." Trial 2 Tr. p. 910. This conflicts with trial counsel's testimony that he did not want "make it into a bigger deal" than it was. PCR 2 Tr. 403-04.

The prejudice from counsels' failure to offer an alternative interpretation for what Ms. Petri alleged Mr. Tisius said is demonstrated again by the state's closing at the second sentencing. The prosecutor again argued to the jury that death was warranted because Mr. Tisius "bragged" about killing the guards when he asked Ms. Petri whether she knew he was the guy who killed the jail guards. Trial 2 Tr. pp.1183-84. *See Strickland, Wiggins, Rompilla*.

84

In the defense closing, resentencing counsel argued it was the state's burden to prove "bragging." Trial 2 Tr. p. 1195-96. Ironically, this argument contradicts what trial counsel introduced in Ms. Petri's cross-examination that elicited: "He was, like, you know, Look at me. I'm the one that killed those two jailers. That's how I took it." *Id.* p. 910. Resentencing counsel reinforced the state's theory and presented no alternative, even though one was available. In rebuttal argument, the state again hit on the future dangerousness and told the jury Mr. Tisius did not display remorse when he made the gun-hand gestures to Harmon and "brag[ged]" a year later to Ms. Petri about the killings. *Id.* pp. 1218-19.

The prejudice to Mr. Tisius from counsels' failure to rebut Ms. Petri's testimony is underscored by the state's reliance on Ms. Petri's testimony to discredit Dr. Taylor's opinions on cross-examination. *See* Habeas Ground for Relief No. 5. There is a reasonable probability that Mr. Tisius would not have been sentenced to death had the jury heard that the statement Ms. Petri attributed to him could be interpreted as Mr. Tisius telling the listener he was frightened to be at the Boone County Jail due to the offense with which he was charged. A new penalty phase is required.

### Failing to challenge the state's aggravating evidence that Mr. Tisius was making noises and making threatening gestures by presenting available photographic evidence that contradicted it.

Ms. Donna Harmon was a Chariton County Jail guard. Trial 2 Tr. p. 898. She testified that one early morning, she was going into the jail shortly after midnight. *Id.* pp. 899-900, 904. Ms. Harmon testified that lights are *turned off* in the inmate cells at 11:00 p.m. *Id.* pp. 899-900. She noticed movement in Mr. Tisius' cell. *Id.* She reported that Mr. Tisius had his hands raised as though he was holding a pistol and made

motions at Ms. Harmon as if he was shooting at her. *Id.*

On cross-examination, Ms. Harmon acknowledged that the cell doors at the Chariton County Jail are solid doors with a bullet-proof glass window. *Id.* pp. 901, 903. She also acknowledged that the cells are almost soundproof, and therefore, inmates frequently will make hand gestures to communicate with one another. *Id.* pp. 901-02. Referencing the glass between Ms. Harmon and Mr. Tisius, she testified: "[w]e can see into their cells," but "[i]t's not so clear for them to see into us." *Id.* pp. 903-04.

There was no explanation for this discrepancy – i.e. two-way or tinted glass. Resentencing counsel ineffectively failed to present evidence that included pictures depicting the lighting conditions around Mr. Tisius' cell and where Ms. Harmon was standing to demonstrate that it simply could not be true – or she misinterpreted what she saw. Simply, Ms. Harmon could not have seen Mr. Tisius making gestures with the lights out in his cell. She would not have had a clear view of what Mr. Tisius was doing because of the lighting conditions around Mr. Tisius' cell and where she stood.

Reasonably effective trial counsel would have investigated and presented evidence that included pictures demonstrating that Ms. Harmon was mistaken about the gestures as it either was impossible to see anything, or if anything was visible, it was readily subject to misinterpretation because the cell's lights were out. Mr. Tisius was prejudiced because had counsel presented such evidence there is a reasonable probability he would not have been death sentenced. Mr. Tisius was denied effective assistance of counsel because counsel failed to rebut respondent's aggravation from Chariton County jail guard Ms. Harmon that Mr. Tisius mimicked hand gestures of firing a gun at her. There is a reasonable probability that had counsel rebutted this

evidence Mr. Tisius would not have been death sentenced.

The state hit the future dangerous aggravator again. In its opening statement, the prosecutor informed the jury that it was going to hear evidence that while Mr. Tisius was held in the Chariton County Jail that he pointed his finger at a guard through glass and said "Bang, bang." Trial 2 Tr. p. 553.

Mr. Slusher knew Ms. Harmon would be called and knew what her testimony was expected to be based on her testimony at the original trial. PCR 2 Ex. 102 p. 63. Mr. Slusher did not recall doing any investigation into Ms. Harmon's ability to actually see into Mr. Tisius' cell. *Id.* p. 64. No one traveled to the Chariton County Jail to investigate and take pictures, in an effort to show the jury what the lighting conditions were. *Id.* There was no strategy reason for failing to investigate the lighting conditions at the jail. *Id.*

Mr. McBride testified they were aware the state would be calling Ms. Harmon at trial to introduce aggravating testimony. PCR 2 Tr. 364. Mr. McBride agreed there was no investigation of the lighting conditions at the Chariton County Jail. *Id.* pp. 364-65.

At the second post-conviction hearing, counsel for Mr. Tisius presented photos taken at the jail. PCR 2 Exs. 74, 75. They provide a view from the control bubble, where Ms. Harmon reported she stood and looked into Mr. Tisius' cell. PCR 2 Tr. pp. 182-83. The photos were taken in the direction of the cell where Mr. Tisius was held. *Id.* p. 183. Unlike for the Attorney General's investigator, the sheriff prohibited Mr. Tisius from taking photos with anyone standing in Mr. Tisius' cell. *Id.* p. 185-87.

PCR 2 Ex. 74 has the lights out in the cell Mr. Tisius occupied. PCR 2 Tr. 184, 188. The interior of that cell is not visible at all and it is black. PCR 2 Ex.74; PCR 2 Tr.

pp. 184, 188-89. Someone inside the bubble, where Ms. Harmon reported she was, could not see a person in Mr. Tisius' cell with the lights out in that cell. *Id.* The photographer testified that when the lights are out in the cell Mr. Tisius occupied, the hallway between the bubble and the cell has reduced lighting, which actually makes viewing inside the cell more difficult. *Id.* p. 190.

The state's evidence in post-conviction did not refute Mr. Tisius' claim. A Missouri Attorney General Investigator Gerald Greene took photos with varying lighting conditions at Chariton County from where Ms. Harmon reported she was standing and looking into Mr. Tisius' cell. PCR 2 Exs. 76, 77, 78; PCR 2 Tr. pp. 171-80. In the Missouri AG's photos, there was a Chariton County jail guard, who was not Ms. Harmon, standing in the cell where Mr. Tisius was housed. *Id.* PCR 2 Exs. 76 and 77 had lights on in the cell where Mr. Tisius was housed, even though Ms. Harmon testified at trial the lights in Mr. Tisius' cell were off. Trial 2 Tr. pp. 899- 900. PCR 2 Ex. 78 had lights off in the cell where Mr. Tisius was housed.

Mr. Greene testified that in all the photos that he took he stood where Ms. Harmon reported she was standing and viewing Mr. Tisius in his cell. PCR 2 Tr. p. 177. Mr. Greene also testified that under the lighting conditions in all three photos he would have been able to see the hand gestures Ms. Harmon attributed to Mr. Tisius. *Id.* Mr. Greene acknowledged in his testimony that he *did not know* that Ms. Harmon's testimony was that *the lights were off* in Mr. Tisius' cell. *Id.* p. 180.

In the photos with the cell lighted (PCR 2 Exs.76, 77), the guard is visible from where Ms. Harmon reported she was standing. In contrast, for the photo with the cell lights out (PCR 2 Ex.78), there is only a small partial, incomplete, faint, barely visible

Case 4:17-cv-00426-SRB   Document 38   Filed 11/02/18   Page 94 of 228

outline of the guard.

Lack of diligent investigation is not protected by a presumption in favor of counsel and cannot be justified as strategy. *Kenley*, 937 F.2d at 1304. As noted in *Strickland*, 466 U.S. at 691, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations in investigation." Counsel's strategy choices must be objectively reasonable and based on a requisite investigation. Reasonable investigation, in Mr. Tisius' case, would have uncovered the incredible and unreliable nature of Ms. Harmon's testimony.

Reasonably effective counsel would have investigated and relied on photos and testimony about those photos demonstrating that either Ms. Harmon was mistaken about the gestures as it was impossible to see anything, or if anything could be seen, it was readily subject to misinterpretation due to poor lighting, which included the lights in Mr. Tisius cell were out. *See Wiggins*, *Rompilla*, and *Parker*. Counsels' actions did not reflect a reasonable strategy, but rather a failure to prepare, investigate, and then present evidence relating to the lighting. The photos taken *by both parties with the lights out* establish Ms. Harmon could not have seen what she reported. PCR 2 Ex. 74, taken by Mr. Tisius' investigator, shows it was impossible for Ms. Harmon to have seen what she reported because the cell is black. PCR 2 Tr. pp. 184, 188-89. Similarly, PCR 2 Ex. 78, taken by the state's investigator, evidences only a small, partial, incomplete faint, barely visible outline of the guard who stood in the cell where Mr. Tisius was housed.

During the trial prosecutor's initial closing argument, the jury was told death was warranted because Mr. Tisius "bragged" about killing the guards when he asked Ms. Petri whether she knew he was the guy who killed the jail guards. Trial 2 Tr. pp. 1183-84. Augmenting that argument, the trial prosecutor relied upon Ms. Harmon's testimony as further evidence death was warranted. *Id.*

In rebuttal argument, the state argued Mr. Tisius did not display remorse when he made the gun hand gestures to Harmon and "brag[ged]" a year later to Petri about the killings. *Id.* pp. 1218-19. The state followed by asserting that "it's all about the context" and the jury had heard how important context was. *Id.*

The prosecutor's reliance on Ms. Harmon's testimony demonstrates how highly prejudicial it was. The state cast this event that simply could not have been accurately viewed, as a basis of future dangerousness and a lack of remorse. The prejudice was only accentuated and compounded by the Boone County evidence that trial counsel also failed to challenge. *Strickland.* The prejudice to Mr. Tisius from counsels' failure to rebut Ms. Harmon's testimony is underscored by how respondent relied on Ms. Harmon's testimony to discredit Dr. Taylor's opinions on cross- examination. *See* Habeas Ground for Relief No. 5.

Resentencing counsel could have squarely presented to the jury physical evidence that challenged whether Ms. Harmon actually saw Mr. Tisius engage in gestures at all, or, if she did see some gestures, whether she accurately perceived them. The jury should have seen and heard this evidence, so it could decide whether to believe Ms. Harmon's perception of what happened. The post-conviction photos and testimony associated with the photos establish that there is a reasonable probability

that the jury would not have believed Mr. Tisius engaged in mimicking shooting a gun at Harmon. There is a reasonable probability that the jury would not have sentenced Mr. Tisius to death. *See, Strickland*. A new penalty phase is required.

Because trial counsel knew this evidence was coming, trial counsel's failure to investigate and present evidence to challenge the aggravating evidence from Petri and Harmon constituted prejudicial deficient performance. The state court's treatment of Mr. Tisius' claim is contrary to and/or an unreasonable application of the clearly established Supreme Court law of *Strickland*. *See* 28 U.S.C. § 2254(d)(1). It is also based on an unreasonable determination of the evidence presented in state court under 28 U.S.C. § 2254(d)(2). Mr. Tisius intends to challenge any factual findings pursuant to § 2254 (e)(1). The writ must issue, and this Court should reverse Mr. Tisius' conviction and remand for a new sentencing hearing.

**Trial counsel were ineffective for failing to investigate and rebut Mr. Tisius' boot shank conviction used by the state as aggravating evidence at his resentencing in violation of Mr. Tisius' rights as guaranteed by the Fifth, Sixth and Fourteenth Amendments.**

While Mr. Tisius was awaiting resentencing in June of 2006, a prohibited object was found in his prison-issued radio. The object was a "boot shank," a piece of metal that was originally built into a boot. Other than being removed from the boot, the item had not been altered in any way. It was sealed into the radio, and no evidence was presented that Mr. Tisius had ever touched it. However, he did make a statement acknowledging that he knew it was there.

Mr. Tisius was charged in Washington County, Missouri, Circuit Court with possession of a prohibited object in prison. The charging document alleged that Mr. Tisius "knowingly possessed a metal object, commonly known as a boot shank, a weapon or item of personal property that could be used in such a manner as to endanger the safety or security of a correctional center, or to endanger the life or limb of any offender or an employee of a correctional center to wit: Potosi Correctional Center."

The court appointed the public defender of Washington County to represent Mr. Tisius in this matter. In December of 2006, Assistant Public Defender Susan DeGeorge met with Mr. Tisius and informed him that the state had offered a five-year sentence. Mr. Tisius indicated that he was unsure if he wished to accept. Ms. DeGeorge obtained from Mr. Tisius consent to consult with his capital attorneys and a medical release so she could investigate a mental health defense. Ms. DeGeorge spoke with Scott

McBride, Mr. Tisius' resentencing attorney, in February of 2007. Mr. McBride requested a copy of the discovery in the case, and suggested that the case be delayed as much as possible. Thereafter neither he nor Mr. Slusher offered any input to Mr. Tisius' lawyers in the Washington County case.

The discovery in the case included photographs of the item found in the radio. It is evident from the photographs that the item has not been altered beyond being removed from the boot.[9] PCR 2 Exs. 70-72. Neither Mr. Tisius' Washington County public defenders nor his resentencing attorneys ever personally examined the item.

In November of 2007, Mr. Tisius was represented in Washington County by another public defender, Joshua Hedgecorth, after Ms. DeGeorge left the office. Mr. Hedgecorth entered the following memorandum after a visit with Mr. Tisius.

> I spoke to D at PCC on 11/28/07. . . . D would have pled already if not for his resentencing on his murder case. He still thinks, and I agree, that a conviction on this wouldn't really hurt him that much on that case. And we probably can't drag this out that long anyway. The murder case is just floating out there. It could mean the difference between the jury hearing that he has a conviction with a 5 year sentence vs. a 15 year sentence. Ex. 14.

On January 9, 2009, Mr. Tisius entered an "Alford plea" to the charge. The plea was entered along with those of four other defendants in a single proceeding. This practice is referred to as a "group plea." Group pleas are strongly disapproved by the Missouri courts, but Mr. Hedgecorth made no objection to it. *See DePriest v. State*, 510 S.W.3d 331, 342 (Mo. banc 2017) ("[T]his practice should be consigned to judicial history."); *Roberts v. State*, 276 S.W.3d 833, 837 (Mo. banc 2009) ("There is no doubt

---

[9] The Missouri Supreme Court observed that "the photographs show the boot shank had not been modified or sharpened…." *Tisius v. State*, 519 S.W.3d 413, 422 (Mo. banc 2017).

that group plea proceedings like the one in which Movant's plea was entered unnecessarily increase the opportunities for mistakes or confusion."). It is noteworthy that both *DePriest* and *Roberts* concern plea proceedings from the same state circuit where Mr. Tisius pled.

During the plea proceeding, Mr. Tisius affirmatively expressed confusion. *See* App Exh 08 p. 37 ("I didn't understand a word you just said.").[10] While the court then repeated the preceding question, and obtained a response from Mr. Tisius, the totality of the proceedings makes it far from clear that he understood them. In particular, when the prosecutor recited the evidence against Mr. Tisius, he said, "Potosi Correctional Center seized that radio, took it apart, and found what they described as a boot shank which is a long, narrow piece of metal that is sharpened at one end with a cutting type weapon." *Id.* p. 23. Mr. Tisius ***and his attorney*** agreed that this statement was "basically what you understood the state's evidence would be on this matter if it were to go to jury trial." *Id.* at p. 24. Neither objected to the false statement that the object had been sharpened.

The state relied heavily on Mr. Tisius' boot shank conviction throughout the resentencing. During its opening statement, the prosecutor discussed the three statutory aggravators he would prove, and then shifted and said:

> You're going to hear additional aggravating evidence. While he's in prison on these charges in Potosi, he decides he needs a weapon, and they find him in possession of a prohibited item, and he's been convicted now of possessing what we call a prohibited item, a boot shank, a weapon you would cut up somebody with.

---

[10] The exhibit is a four-to-one transcript printout. Page references are to the individual pages of the original transcript.

Trial 2 Tr. p. 563. The state admitted the boot shank conviction into evidence and read the docket entry and charging information to the jury. *Id.* at pp. 895-97; St. Trial 2 Ex. 53. The state used Mr. Tisius' conviction to impeach Mr. Tisius' expert Dr. Shirley Taylor. The following exchange occurred:

> Q. You have been in and out of prisons before?
>
>                        . . .
>
> A. Yes, I have, uh-huh.
>
> Q. Do you know what a shank is?
>
> A. Yes, I do.
>
> Q. A shank, basically, is in prison, they make these homemade tools.
>
> A. Right.
>
> Q. Maybe out of radios, all kinds of different things. They sharpen them up so they can use them as weapons against inmates, guards, whatever, correct?
>
> A. Yes.
>
> Q. It's against the law to have shanks in prison, isn't it?
>
> A. Yes.
>
> Q. Have you been made aware that while he was -- since you first got involved in this case and today that he's been convicted of possessing a boot shank while he was in prison?
>
> A. I know he had a piece of metal that he was holding for someone else.
>
> Q. Well, that's what he told you he was holding -- he was doing with it, correct?
>
> A. Yes.
>
> Q. Okay. And should we believe him?
>
> A. The context rang true to me.

*Id.* at pp. 1149-50 (emphasis added). The state further impeached and discredited Dr. Taylor on re-cross by suggesting her opinion that Mr. Tisius was "remorseful and a very passive guy" was made without knowledge of the other incidents the state introduced in aggravation. *Id.* at pp. 1163-64. It was the final line of inquiry before the defense rested its evidence. *Id.* Finally, the prosecutor laid out in closing argument exactly why the boot shank conviction was such a damaging aggravator:

> And more importantly than that, he might not have had a prior criminal history, but even though he's in the Department of Corrections for at least the rest of his life, what is he doing? He's committing more crimes. He has a boot shank. He's got a boot shank. Because, you know what he knows? There is nothing worse we can do to him. He got five years for that, and they just ran it concurrent with his life sentence. Every crime he commits from this day forward as long as he's alive is a freebie. It's a freebie.

> He's going to be — continue to be a danger to our society, we have an obligation. As representatives of our state, we all have an obligation to protect those jailers in those Department of Corrections, those staff members, those doctors, those nurses. And you know what? The Roy Vances of the world that are in those prisons we have to protect from murderers like him.

> Ladies and gentlemen, if he killed twice to try to and get a friend out, do you think if he's given the opportunity he would kill again to get himself out?

*Id.* at pp. 1189-90.

Reasonably effective resentencing counsel would have taken a two-faceted approach to the new charge. First, they would have adequately informed Mr. Tisius of the impact that his plea would have on his capital case instead of allowing him to plead guilty on the assumption that "a conviction on this wouldn't really hurt him that much on that case." They should either have made certain that his plea was actually knowing and voluntary (by objecting to group plea proceedings, for one thing), or have urged him to go to trial. At the plea proceeding, counsel should have objected to the

prosecutor's false statement that the item had been sharpened.

Given the evidence available to counsel had they properly investigated, which is explained in more detail below, there was no advantage to Mr. Tisius from entering a guilty plea. If he had gone to trial, the jury would have had the opportunity to learn that the object was placed in his property under duress, and that he had good reason to fear the person who caused it to be placed there. *See* Mo. Rev. Stat. § 562.071; *State v. Crenshaw*, 14 S.W.3d 175 (2000) (judgment reversed for failure to instruct on duress).

Mr. Tisius told the Department of Corrections and his attorneys that inmate Charlie Hurt placed the shank in his radio. Resentencing counsel could have corroborated this account in several ways. First, they could have obtained Mr. Hurt's prison records. While post-conviction counsel obtained records concerning one of Mr. Hurt's convictions, that for stabbing his cellmate to death, they did not obtain his full prison record, which would have shown Mr. Hurt's propensity for exactly the conduct that Mr. Tisius said happened here. The information described below was readily available both to Mr. Tisius' Washington County public defenders and to his resentencing counsel.

Charlie Hurt has incurred twelve separate conduct violations for possessing dangerous weapons: including knives, ice picks and a twenty-eight and a half inch metal rod. (App Exh 09, Charlie Hurt's MDOC records). The dangerous weapons charges are detailed below:

| Year | Conduct Violation |
|------|-------------------|
| 1981 | #3 - Dangerous contraband; Hurt observed placing a 28.5 inch metal rod in a locker |

| 1983 | #3 - Dangerous contraband; 10.25 inch knife found in Hurt's mattress, placed in AdSeg. |
|------|------|
| 1983 | #3 - Dangerous contraband; 12.75 inch knife found in Hurt's bed. |
| 1983 | #3 - Dangerous contraband; 8 weapons found, all knives or ice picks fashioned from overhead light fixture. 2 weapons found on Hurt's body. |
| 1983 | #3 - Dangerous contraband; homemade knife 10.25 inches hidden in Hurt's towel in his cell. |
| 1984 | #9 - Contraband; hacksaw blade concealed in legal mail from law firm "Bogler & York, 818 Grand Ave., Suite 700, Kansas City, MO." This package was opened in front of Hurt in the Lieutenant's office. |
| 1984 | #3 - Dangerous contraband; 8 inch knife hidden in a cardboard box. |
| 1984 | #3 - Dangerous contraband; 5.5 inch ice pick found in Hurt's cell. |
| 1984 | #3 - Dangerous contraband; 11.5 inch ice pick found in Hurt's cell. |
| 1984 | #3 - Dangerous contraband; Hurt was striped searched and avoided detection when he put pants back on to go the rec yard during cell search. CO noticed something in his pants, searched Hurt and found an 8.5 inch ice-pick like weapon. CO thinks the metal is from a missing pipe in a weight machine. |
| 1985 | #3 - Dangerous contraband; 7.5 inch knife found, cotton balls and other drug paraphernalia found in cell. A search of Hurt's body revealed a needle & syringe taped to Hurt's penis. |
| 1987 | Dangerous contraband; threw 9 inch ice pick out his cell window when CO asked to search him, placing in housing unit 5C. |

Mr. Hurt also incurred twelve separate conduct violations for assaults, fighting, and attempting to incite riots, including two conduct violations for assaulting corrections officers and one conduct violation for inciting a riot that forced the corrections officers to use mace to restore order to the prison. App Exh 09. Mr. Hurt obtained at least nine separate conduct violations for possessing contraband including the possession of homemade handcuff keys, needles and syringes, and twice possessing

Crock Pots with altered serial numbers. App Exh 09. The use of altered serials

numbers is critical to the duplicitous nature of Mr. Tisius' radio being manipulated by

Mr. Hurt and Mr. Sanders. Lastly, Mr. Hurt obtained seven conduct violations related

to radios. App Exh 09. The radio-related conduct violations are detailed below:

| | |
|---|---|
| 1983 | #2 - Assault; fought CO after CO attempted to confiscate radio, placed in Administrative Segregation. |
| 1983 | #26 - Fraud (attempted conspiracy) violation; Hurt forged a letter and signature from another inmate to have MDOC return Hurt's radio to him. |
| 1984 | #9 - Contraband; radio with indecipherable serial numbers found in Hurt's cell. C.O.'s were able to determine the radio belonged to inmate Charles Brady (# 40003). |
| 1988 | #24 - Theft - stolen radio found in Hurt's cell. |
| 1988 | #16 - Giving False Information; Hurt lied about the whereabouts of his radio, said it was being repaired, when it was in Frank Doyle's (# 42544) cell. |
| 2002 | #3 - Dangerous contraband; two radios in Hurt's cell had their security seals and all screws removed. They belonged to Hurt and Walter Storey (# 990093). Also found were homemade tools. While being escorted, Hurt announced there was a syringe he could obtain, the CO and Hurt returned to Hurt's cell and he took a syringe out of his ice chest. Hurt placed on TASC. |
| 2003 | #22 - Theft; possessed altered radio, it had been sanded and Hurt's name was engraved on it, the back I.D. was melted, the bottom I.D. tag was sanded off and the factory issued serial number tag was replaced with a typed tag. |

This pattern of conduct, from personally possessing weapons to tampering with

radios, clearly supports Mr. Tisius' innocence.

Second, reasonably effective counsel would have interviewed Ricky Sanders. In

addition to Charlie Hurt, Mr. Tisius provided his counsel with the name of Ricky

Sanders as someone involved in placing the item in the radio. Mr. Sanders has

admitted that he placed the item in Mr. Tisius' radio at Mr. Hurt's request. App Exh

99

10. Declaration of Ricky Sanders. It was a favor Mr. Sanders did for Mr. Hurt. Mr. Sanders identified a Panasonic radio, the black wrapping paper the shank was placed in, and the type of boot the shank came from. Mr. Sanders detailed how Mr. Hurt would hide boot shanks in other inmate's personal property in order to get himself out of trouble when he was caught with drugs: he would tell the C.O. where the hidden weapon was and the C.O. would not write up Mr. Hurt for his drugs violation. Mr. Sanders admitted he never saw Mr. Tisius with a weapon in Missouri Department of Corrections. Finally, Mr. Sanders explained Mr. Tisius' dilemma: take the shank out of the radio or report the shank to C.O.'s. Neither was an attractive option to Mr. Tisius; both would have resulted in a conduct violation and made Mr. Tisius vulnerable to retaliation from Mr. Hurt and other prisoners. He could not take the shank out, because he feared the inmates who put it in there in the first place. Equally, he could not go to the C.O.'s to explain a weapon was hidden by others in his radio, because he would be labeled a "snitch" and suffer the inmate's violence on the back end. App Exh 10. p. 2. Reasonably effective counsel would also have challenged, by objection or re-direct examination, the state's suggestion to Dr. Taylor that the item had been sharpened.

In addition to the significant factual evidence that could have been presented in opposition to the boot shank aggravation, expert testimony was also available. Dr. Woods could have testified that the group plea setting would have made it particularly difficult for Mr. Tisius, with his damaged brain, to enter a knowing and intelligent plea of guilty. This is corroborated by Mr. Tisius' expression of not knowing what was going on during the plea. App Exh 08 p. 37. Dr. Woods' diagnostic findings concerning Mr.

Tisius' dependent personality disorder would also have helped the jury understand why Mr. Tisius capitulated to Mr. Sanders and Mr. Hurt:

> Mr. Tisius exhibits extreme vulnerability and suggestibility. Both are corroborated by his social history and personality testing. Mr. Tisius' cognitive impairments, difficulty with understanding complex language, poor executive functioning, "getting stuck" mentally, and executive function deficits lead to a vulnerability to rely upon others. This is exacerbated by his complex trauma history, where no one helped him develop coping mechanisms as a child and undermined his independence. Mr. Tisius has an increased vulnerability to being groomed, which was observed throughout his life. It is evident in his relationship with his mother, who used him as a pawn for her own personal gain, and his brother, who used him to engage in criminal behaviors for his brother's profit. Grooming is the linchpin behavior in the offenses for which he is currently sentenced to death. As noted by the MMPI-2, "individuals with passive, unasserting lifestyle are often unable to assert themselves appropriately and are frequently taken advantage of by others." (MMPI-2, 10/11/2012).

App Exh 05. p. 28

This information could have been used in several ways. If it was investigated before Mr. Tisius' plea (as it should have been, either by resentencing counsel or by Mr. Tisius' Washington County public defender), it would have made the plea unlikely. If it was discovered after the plea, it could have been used to vacate the conviction in a post-conviction proceeding under Missouri Rule 24.035.

Finally, to rebut the violation as an aggravating factor, resentencing counsel could have presented expert testimony from a prison adjustment expert on the significance of the prohibited weapon conviction. Jim Aiken would have testified:

> Assessment of this violation, which is conducted in a prison operational context, reveals that **Mr. Tisius has not attempted or inflicted bodily harm to another inmate or staff member with or without a weapon, he has not demonstrated a chronic history of violent behavior while in lawful confinement. There is no validation that he has demonstrated gang or security threat group systemic or individualized violence.** It is also noteworthy from a correctional assessment perspective that the piece of

101

metal from the boot is not reported to have been sharpened on either end or manipulated in some way to be used as a weapon. In my experience incidents of this kind are largely resolved without adjudication in court. That is to say an incident of this sort in my experience would most likely not be prosecuted criminally.

App Exh 06. p. 12 (emphasis added).

This evidence, from a former correctional official who was familiar with prison culture, would have effectively blunted the prosecutor's contention that Mr. Tisius' possession of this item foretold future violence. As previously noted, to establish ineffective assistance of counsel, Mr. Tisius must show that counsel's performance was deficient and that petitioner was prejudiced. *Strickland*, 466 U.S. 668; *Williams*, 529 U.S. at 390-91. "Counsel's obligation to rebut aggravating evidence extended beyond arguing it ought to be kept out." *Rompilla*, 545 U.S. at 386. Yet, Mr. McBride and Mr. Slusher ignored the information they had and did not investigate further. Counsel's duty to thoroughly investigate and present all reasonable mitigating evidence includes an obligation to investigate and present evidence to rebut aggravation presented. *See* ABA Guideline 11.4.1(C) (counsel should investigate evidence to rebut any aggravating evidence that may be introduced by the prosecutor) (quoted in *Rompilla*, 545 U.S. at 387 n.7; *Wiggins v. Smith*, 539 U.S. 510, 524 (2003).

In his post-conviction deposition, Mr. Slusher admitted that he was aware that Mr. Tisius had asserted that someone else put the item in his radio, and identified that person as Charles "Charlie" Hurt. PCR 2 Ex. 102, pp. 53-58. Mr. Slusher also knew that Mr. Tisius had requested protective custody several times as a result of his fear of other inmates. *Id.* at 56-57. Counsel did not investigate Mr. Hurt. *Id.* at 58. Nor did counsel present any evidence that someone put the item in Mr. Tisius' radio and he was afraid to take it out. *Id.* at 57. Mr. Slusher was not aware that Mr. Hurt had been

convicted of capital murder for stabbing his cellmate to death. *Id.* at 58 PCR 2 Ex. 73.

Mr. Slusher did not request a copy of Mr. Tisius' corrections property records, which reflected that Mr. Tisius never owned a pair of boots. PCR 2 Ex. 102, p. 59. Mr. Slusher offered no strategic reason for failing to request the property records. Id.

Mr. McBride testified they knew the state would adduce the *Alford* plea to the boot shank conviction as aggravating evidence. PCR 2 Tr. pp. 366. Mr. McBride testified that "once [Mr. Tisius] had entered the plea" they were "stuck" with it, and no investigation of any kind was done. *Id.* at pp. 367. Additionally, Mr. McBride knew the boot shank charge was pending during their capital representation of Mr. Tisius, but Mr. McBride did not attempt "to step into that case." *Id.* at pp. 368.

Mr. McBride did not know that Mr. Tisius' corrections records reflected he never owned a pair of boots. *Id.* at pp. 369-70. Mr. McBride knew from either Mr. Tisius himself or from corrections records that Mr. Tisius had requested protective custody and had reported that someone else put the shank in his radio. *Id.* at pp. 369-70.

Ms. Tami Miller, the mitigation specialist assigned to assist in the re-sentencing, echoed the above. Ms. Miller testified that neither Mr. Slusher nor Mr. McBride requested her to investigate anything about the boot shank incident. PCR 2 LF pp. 193-194.

Resentencing counsel's failure to investigate and present evidence against Mr. Hurt was deficient and unreasonable. This new evidence — consistent with Mr. Tisius' longstanding claim of innocence —corroborates Mr. Tisius' assertion that he did not place the boot shank in his radio. Mr. Hurt has a lengthy and extensive history of both possessing knives and ice picks along with tampered radios. Mr. Tisius informed trial

and post-conviction counsel that Mr. Hurt was the culprit, and it was unreasonable and deficient for them to fail to obtain and present Mr. Hurt's MDOC records.

Reasonably effective counsel would have investigated and presented the evidence detailed here to rebut Mr. Tisius' boot shank conviction at his resentencing. A reasonable investigation would have revealed both Charlie Hurt's extensive MDOC write ups and Ricky Sanders' admission.

The new evidence discovered by habeas counsel demonstrates that Mr. Tisius was actually innocent of the contraband charge. Although the contraband was in his radio, there was no evidence that he ever touched it or had any way to remove it from the radio to use it. Mr. Tisius had a right to file a post-conviction motion under Mo. Sup. Ct. R. 24.035 within 180 days of his sentence. That time has obviously expired, but he can now file a petition for writ of habeas corpus in the Circuit Court of Washington County, alleging his actual innocence as "cause" to excuse the procedural default. *Clay v. Dormire*, 37 S.W.3d 214, 217 (Mo. banc 2000); *Schlup v. Delo*, 513 U.S. 298 (1995). If Mr. Tisius can establish that his conviction of the offense used in aggravation is void, he is clearly entitled to a new capital sentencing proceeding.

This issue has not been raised in state court. This failure occurred because of the ineffective assistance of Mr. Tisius' post-conviction counsel. Should the state assert that this ground is not available for review, Mr. Tisius will argue that under *Martinez v. Ryan*, 1566 U.S. 1 (2012), he is entitled to develop and present this ground for relief in this Court.[11]

The writ must issue, and Mr. Tisius is entitled to a new sentencing phase.

---

[11] Mr. Tisius reserves the right to move for stay and abeyance to allow him to return to state court to raise these grounds there.

**Mr. Tisius was denied effective assistance of counsel when trial counsel failed to present evidence that Mr. Tisius was under the substantial domination of Roy Vance when the offense was planned and committed.**

A part of resentencing counsel's mitigation theory was that Mr. Tisius was under the influence of his older co-defendant Roy Vance when the offense was committed. PCR 2 Tr. p. 348; Trial 2 Tr. pp. 1199-1201. Yet, trial counsel failed to investigate and present substantial evidence supporting that theory. In addition, trial counsel failed to object to the prosecutor's argument that the decision to kill the victims was Mr. Tisius' alone. This contention was inconsistent with the state's prosecution of Vance on murder charges. Had trial counsel used this evidence, and made proper objections, there is a reasonable probability of a different outcome at the resentencing.

At trial, the state presented the testimony of Thomas Antle. While Mr. Antle was cross-examined about Vance's influence over Mr. Tisius, he could have provided additional information. For example, Mr. Antle has described Vance as "glued to Mike [Tisius]." He mentioned that Vance had bragged about recent escape attempts. He described Vance's behavior toward Mr. Tisius as "grooming." This evidence, combined with the additional testimony described below, would have given the jury a far clearer picture of the extent of Vance's influence over Mr. Tisius. Resentencing counsel did not interview Mr. Antle.

James Foote, another inmate in the Randolph County Jail at the time when Mr. Tisius and Vance were there before the offense, could have been called as a defense witness. Mr. Foote remembered Vance telling Mr. Tisius the two of them "were going to Mexico and live large." Mr. Foote heard Vance tell Mr. Tisius how great Mexico was

going to be: that they would have money and drinks, and would live it up. From Mr. Foote's observations of Mr. Tisius, the offense was not something Mr. Tisius would have done absent Vance's influence.

Mr. Foote was interviewed by Mr. Tisius' first post-conviction counsel, and provided a deposition which was used in the post-conviction proceedings. But despite having actual possession of this evidence, counsel at the second trial did not interview him or call him as a witness.

Derek S. Freese could also have been called as a witness. Mr. Freese was an inmate at the Macon County, Missouri, jail when Vance attempted to escape from the jail. He was also present at the Randolph County Jail at the time of the offense. He remembered that Vance had a "subtle influence" over younger inmates. Mr. Freese, who has an extensive prison record, is well-versed in prison culture, and could have informed the jury about the type of relationships that develop between older inmates and younger, less sophisticated ones. Mr. Freese was never interviewed by anyone representing Mr. Tisius. However, his identity was available to the defense team via discovery.

Trial counsel could also have called Richard Lockett as a witness. Mr. Lockett knew Vance for several years and also met Mr. Tisius briefly before the offense. He could have told the jury that Mr. Tisius "thought the world of Roy" and that Mr. Tisius was manipulated. Mr. Lockett's identity could have been discovered by counsel had they reviewed Vance's prior conviction records, since he and Vance had been co-defendants. However, no one involved in Mr. Tisius' defense ever interviewed him.

Trial counsel could also have presented Gerardo Arteaga's testimony. Mr. Arteaga has recently been interviewed about his experience with Mr. Tisius. Mr. Arteaga hired Mr. Tisius to work for him at Dairy Queen in Moberly. Mr. Tisius was a good employee. Mr. Arteaga allowed Mr. Tisius to stay with him at his home. Mr. Tisius occasionally cared for Mr. Arteaga's baby. By the time of the offense, Mr. Arteaga was in the Randolph County jail at the same time Mr. Tisius was incarcerated there. Mr. Arteaga observed, "Roy programmed Mike . . . Roy was very organized . . . Roy already had him – there wasn't nothing I could do." Mr. Arteaga, whose name was readily available, was never interviewed by any member of the defense team. He remembers Mr. Tisius fondly and would have been willing to help.

Counsel could have questioned Ms. Bulington much more effectively about Vance's domination of Mr. Tisius. Resentencing counsel did not interview Ms. Bulington even though they knew she had spent the week before the crime exclusively with Mr. Tisius. When recently interviewed Ms. Bulington said, "I've never felt like I've had an opportunity to share what I observed in terms of how Roy affected Michael – how totally brainwashed he was. I had never seen anything like it." App Exh 11. p. 9. In that vein, Ms. Bulington could have testified as follows:

Roy manipulated and shoehorned himself in with a person:

I, too, was vulnerable like Michael Tisius. Roy got me to trust him, share my secrets with him. He got me to open up and tell him about my marriage and about Tony. Then he used my weaknesses against me. Whatever had hurt me in the past – he became the opposite. Roy learned where I was weak and he got in there. He gave me exactly what I was looking for. He treated me like an equal. He knew how bad the physical abuse in my past relationship hurt me. He promised he would never put his hands on me. He was a very good manipulator.

App Exh 11. pp. 2-3.

Roy used those same tactics and got into Mr. Tisius' head:

It was clear from the moment I met Michael that Roy had gotten into that kid's head. Michael was only 19 years old when the crime happened. Mike was childlike. Even for his age he wasn't mature. Roy manipulated Michael. He knew that Michael was looking for love. He knew Michael was looking for a father figure. Roy got to know Michael and then brainwashed him. Roy got the kid to open up and he became what Mike needed. The way Mike talked about Roy– he idolized him. The same way a kid would with their dad. I've had time now to reflect on everything that happened. Roy was smart. He didn't pick Michael by accident. He chose him because he was easy to manipulate. It was Roy's goal to get into that kid's head.

App Exh 11. p. 6.

Mr. Tisius idolized Roy and parroted his language:

[He was] always talking about Roy – how good Roy was to him, how Roy would do anything for him. He was a kid. He just rambled on. I just let him talk. He seemed misguided, lost. Just as soon as I picked Mike up he started talking about the plan to get Roy out. Mike used phrases and made statements that I had heard Roy say. Mike used the terms 'bunk and junk' and 'play hero'. Those were terms Roy had said to me over and over again… Mike idolizing Roy. Mike went on and on about how Roy was good to him and had been there when he was down or needed something.

App Exh 11. pp. 6-7.

There was a difference in how Roy and Mr. Tisius, burdened by youth and

immaturity, viewed their "relationship":

Mike's face used to light up when he was able to talk to Roy. It made him happy. He was uplifted. Mike said that once we were able to get Roy out of jail he would have his friend with him. Mike told me he missed Roy and couldn't wait for him to get out. Mike was constantly talking about Roy. Every day it was 'I can't wait to see him.' Roy had talked about all of us going to Mexico. Michael talked about that too. The way Mike talked about Roy was very different than the way Roy talked about him.

108

App Exh 11. p. 7. It was not just Roy, though: "Mike was the type of kid that was looking for acceptance. The way he acted around other people – he was someone who wanted to be liked." *Id.* App Exh 11. p. 8. Ms. Bulington could have provided yet another example of Roy's manipulation. *See* App Exh 11. p. 7. ("Roy's relationship with Karl Bartholomew was also all about manipulation.")

Ms. Bulington would have presented critical post-crime evidence of remorse and of a lack of true deliberative process. She would have testified that Mr. Tisius' state of mind and his immediate response to the crime was: "Mike was rubbing his face. He said, 'Oh my god, what did I do? What just happened?'" App Exh 11. p. 9.

Ms. Bulington asserts that: "[h]ad I been asked I about the information contained in this declaration by any of the lawyers working on Michael Tisius' behalf in the past I would have shared what I know. Had I been asked I would have been willing to testify on his behalf." App Exh 11. p. 9-10.

Resentencing counsel could also have presented evidence that on August 9, 2000, Vance was convicted of attempting to escape from the Macon County Jail. (This was the event that resulted in his transfer to the Randolph County Jail.) The attempt involved removing mortar from a brick wall. Vance confessed, entered a guilty plea, and was sentenced to two five-year concurrent sentences for attempting to escape and property damage to the jail. In addition, counsel could have learned from Vance's criminal history that just over six months before the incident in question, Vance stole heavy equipment from his former employer Foundation Recovery Services and coaxed a younger and vulnerable acquaintance, Richard Lockett, to assist him with the heist under false pretenses. Vance deceived Mr. Lockett by insisting the equipment was his

and then left him with the stolen property once he feared he was likely to be apprehended.

The records of this conviction were public and were available to resentencing counsel at the time of Mr. Tisius' first trial and jury resentencing. Apparently, neither resentencing nor post-conviction counsel ever obtained these records.

Resentencing counsel could also have presented expert evidence concerning Mr. Tisius' susceptibility to the influence, or "grooming," by Vance. Dr. Woods, who recently evaluated Mr. Tisius, has diagnosed him with dependent personality disorder based on his clinical interview and on personality testing. He states,

> Mr. Tisius exhibits extreme vulnerability and suggestibility. Both are corroborated by his social history and personality testing. Mr. Tisius' cognitive impairments, difficulty with understanding complex language, poor executive functioning, "getting stuck" mentally, and executive function deficits lead to a vulnerability to rely upon others. This is exacerbated by his complex trauma history, where no one helped him develop coping mechanisms as a child and undermined his independence. Mr. Tisius has an increased vulnerability to being groomed, which was observed throughout his life. It is evident in his relationship with his mother, who used him as a pawn for her own personal gain, and his brother, who used him to engage in criminal behaviors for his brother's profit. Grooming is the linchpin behavior in the offenses for which he is currently sentenced to death. As noted by the MMPI-2, "individuals with passive, unasserting lifestyle are often unable to assert themselves appropriately and are frequently taken advantage of by others." (MMPI-2, 10/11/2012).

App Exh 05. p. 28.

Had Mr. Tisius been properly evaluated prior to trial by a clinician with full information about his history, this compelling testimony would have been readily available to trial counsel to help explain Mr. Tisius' behavior at the time of the crime.

Missouri includes as a statutory mitigating circumstance "[w]hether the defendant acted under extreme duress or under substantial domination of another

110

person." Mr. Tisius' jury was instructed as to this mitigating circumstance. Trial 2 LF Vol. 2 p. 163. In closing argument, the state highlighted Mr. Tisius' reference to Vance as "My boy Roy," and argued there was no domination because Mr. Tisius could have decided not to commit the offense. Trial 2 Tr. p. 1215. The omitted evidence would have rebutted the state's contention.

Moreover, resentencing counsel should have objected to this argument on the ground that it was inconsistent with the state's prosecution of Vance for murder. *Bankhead v. State*, 182 S.W. 3d 253 (Mo. App. 2006); *Smith v. Groose,* 205 F. 3d 1045, 1049 (8th Cir. 2000).Had resentencing counsel properly presented their theory that Mr. Tisius was under the substantial domination of Vance, there is a reasonable probability of a different outcome. This issue has not been raised in state court. This failure occurred because of the ineffective assistance of Mr. Tisius' post-conviction counsel. Should the state assert that this ground is not available for review, Mr. Tisius will argue that under *Martinez v. Ryan*, 1566 U.S. 1 (2012), he is entitled to develop and present this ground for relief in this Court.[12] The writ must issue, and Mr. Tisius is entitled to a new sentencing hearing.

---

[12] As of the filing of this petition, Mr. Tisius is unaware of any Missouri remedy that will not permit him to exhaust this ground for relief, or the other grounds in this petition, which are available under *Martinez* if the state asserts a procedural defense. Should the Missouri Supreme Court later authorize such a remedy, Mr. Tisius reserves the right to move for stay and abeyance to allow him to return to state court to raise these grounds there.

111

**The trial court erred in allowing the improper cross-examination of the defense expert, psychologist Dr. Shirley Taylor, over objection in violation of Mr. Tisius' rights to due process, trial by a fair and impartial jury, and freedom from cruel and unusual punishment, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments.**

When he cross-examined Dr. Taylor, the prosecutor referred to irrelevant hearsay and prejudicial information, without laying a foundation. Specifically, the prosecutor improperly asked on cross-examination about: a) a study, without demonstrating that it was an authoritative scientific text, and misstated that the "study demonstrated 100 percent error rate in [the psychological] profession;" b) the prosecutor asked about hearsay facts contained in a book entitled *A Child Called "It,"* an autobiography by David Pelzer, without demonstrating that the book was an authoritative scientific text; and c) the prosecutor told the jury that Mr. Tisius "did not plead guilty" (where Mr. Tisius offered to plead to life without parole and wanted to plead guilty).

Mr. Tisius suffered a substantial injurious effect because the prosecutor's statements unfairly prejudiced the jury's consideration of the mitigation evidence and misled the jury. During the state's cross-examination of Dr. Taylor, the prosecutor asked her if she had heard of the "Rosenhan study," and she testified that she had not. Trial 2 Tr. pp. 1129-30. Over defense counsel's objection, the prosecutor cross-examined Dr. Taylor about the study and stated that the study "demonstrated 100 percent error rate in your profession." *Id.* pp. 1129-30. Also, over defense counsel's objections, the prosecutor questioned Dr. Taylor about the content of an autobiography by David Pelzer, *A Child Called "It." Id.* pp. 1154-8. Over defense counsel's objection, the

prosecutor also cross-examined Dr. Taylor about the fact that Mr. Tisius did not plead guilty to the crimes. *Id.* pp. 1140-1.

Thus, the state successfully engaged in three improper lines of attack in cross-examining defense expert Dr. Shirley Taylor. Mr. Tisius will discuss each in turn.

During the prosecutor's cross-examination of the defense expert, Dr. Shirley Taylor, the following occurred:

> Q. [I]s there a test you can give me to figure out what my problems are?
>
> A. Yes. It would probably be the Milan Clinical Multiaxial Inventory or the Personality Assessment Inventory . . . if you answered it truthfully.
>
> Q. Bingo. You are relying on me to self-report truthfully . . . ?
>
> A. Yes.
>
> Q. . . . even then, there is some error rate in your profession?
>
> A. . . . yes.
>
> Q. . . . are you familiar with the Rosenhan study?
>
> A. The Rosenhan study? Never heard of it.
>
> Q. The Rosenhan study, let me help you. It was a study where thirty people that were completely normal were asked to go to various doctors –
>
> MR. MCBRIDE: Judge, I'm going to object to the relevance of this line of questioning.
>
> MR. ZOELLNER: Judge, I'm asking her if she's familiar with it. She's an expert.
>
> THE COURT: It's cross-examination. The objection will be overruled.
>
> Q. The Rosenhan study, thirty people, as part of a study at a psychological department, were asked to . . . report to doctors

about various problems they were having. All of those thirty people came back with diagnoses. All of those were wrong. It was a study that demonstrated 100 percent error rate in your profession. You're not familiar with that study?

A. Well, I am familiar with that. I didn't know what it was called.

Q. . . . So you are familiar with that study?

A. I'm familiar that there have been a number of studies like that, and that just shows you that we can all be fooled.

Trial 2 Tr. pp. 1129-1130.

The Rosenhan study was an experiment conducted in 1973 in which **eight** sane persons applied for admission to twelve different mental hospitals. Rosenhan, "On Being Sane in Insane Places," Science Vol. 179 (Jan. 1973), 250-8; 13 Santa Clara L.Rev. 379. After calling for an appointment, the malingerers arrived at the appointment falsely complaining of hearing voices. *Id.* Immediately upon admission into the psychiatric ward, the malingerers ceased simulating any abnormal symptoms. *Id.* However, the malingerers were never identified as malingerers. *Id.* All were admitted, except in one case, with a diagnosis of schizophrenia, and those malingerers were discharged with a diagnosis of schizophrenia in remission. *Id.* Rosenhan concluded that "we cannot distinguish the sane from the insane in psychiatric hospitals." *Id.*

During the state's cross-examination of Dr. Taylor, the following also took place:

Q. [T]here have been occasions, some of those good kids from those good environments grow up to commit murder, don't they?

A. Yes.

Q. And some kids that have it just like Michael, even worse,

114

can grow up to be productive members of society, correct?

A. Yes.

Q. Are you familiar, ever heard of *A Child Called "It"*?

A. Yes.

Q. David Pelz [sic] is a child called "It," isn't he?

A. Yes.

. . .

MR. MCBRIDE: Objection. Relevance, Your Honor.

...

MR. ZOELLNER: . . . Dave Pelz [sic] is an author. He came from deplorable circumstances . . . [and] became a hero. This defense has been about explaining this behavior. They can call it explaining, but what they are trying to do is say, You grow up bad, this is what happens to you. I want to give another concrete example that this woman is familiar with as an expert to show that you can have it bad and you can still make something of your life. I believe through this entire defense they've opened up this line of questioning.

MR. MCBRIDE: Well, I disagree. I object to the relevance of the use of a book from this author . . . I believe that, yes, we've talked about his life because that's what we're supposed to talk about here today, but then to bring in an outside resource like that from an author I just think is irrelevant and immaterial and should be excluded.

MR. ZOELLNER: . . . she's an expert witness. . . When you call a witness, I get to cross-examine them. I get to test their theories and knowledge.

THE COURT: I'm going to overrule the objection.

Q. Ma'am, I believe I'd asked you if you are familiar with David Pelz's [sic] *A Child Called "It"*?

A. Yes.

Q. . . . it's a book he wrote about his life?

115

A. Right.

Q. . . . I'm going to ask you a question at the end of this. *"A Child Called 'It'"* is the unforgettable account of one of the most severe child abuse cases in California history. It is the story of David Pelzer . . . who was brutally beaten and starved by his emotionally unstable, alcoholic mother, a mother who played torturous, unpredictable games, games that left him nearly dead. He had to learn how to play his mother's games in order to survive because she no longer considered him a son, but a slave; and not longer a boy, but an 'it.' Dave's bed was an old army cot in the base--"

MR. MCBRIDE: Judge, I believe we've –

THE COURT: I'm going to sustain the objection . . . Ask a question, Mr. Zoellner.

[BY MR. ZOELLNER:]

Q. Are you familiar with. . . Dave Pelzer's background?

A. Yes.

Q. . . . would you agree it was much, much worse than what you know about Mr. Tisius' background?

A. I don't know if it was worse. . . .

Q. How many people has Dave Pelzer killed?

A. None yet that I know of.

Q. . . . Do you remember what became of Dave Pelzer?

A. He became an author.

Q. He became a captain in the United States Air Force, played major roles in Just Cause, Desert Storm and Desert Shield. . . Does that help to refresh your memory?

A. Uh-huh.

Q. While serving in the Air Force, he worked . . . with youth at risk programs throughout the State of California. Do you

116

remember that now?

A. Yes.

Q. He---

MR. MCBRIDE: Again, Your Honor, I'm going to object to this questioning.

THE COURT: Let's get to it, Mr. Zoellner. [BY MR.

ZOELLNER:]

Q. . . . Dave Pelzer grew up to be the type of guy every one of us should want to be despite a horrible childhood?

A. Yes.

Q. And he did it through hard work and determination.

A. Yes.

Trial 2 Tr. pp. 1154-1158.

During the state's cross-examination of Dr. Taylor, also included an exchange

regarding Mr. Tisius not pleading guilty:

Q. . . . When you were first hired, the issues confronting this man was whether he was going to be found guilty of murder and, if so, the punishment?

A. He didn't care if he was found guilty of murder. He knew he was guilty of murder.

Q. Okay. That may be.

A. Yes.

Q. But did he plead guilty? No. Right? He didn't plead guilty.

...

MR. MCBRIDE: I'm going to object [to] relevance. . . He was never offered that chance to plead guilty, and I think that's improper and highly prejudicial to bring forth . . .

117

MR. ZOELLNER: He can plead guilty on his own volition, Judge, at any time.

THE COURT: . . . the question was whether or not he had a motivation to lie, and your witness didn't answer . . . and that prompted the additional questions . . . I don't want to get too far into this . . . I'm overruling the objection with the understanding that I'm going to hear a different question now.

*Id.* pp. 1140-1141.

**Each of the three topics is an erroneous basis for cross-examination.**

Relevant evidence tends to prove a fact in issue or corroborates other relevant evidence that bears on a principal issue in the case. Even if evidence is relevant, it should be excluded if the prejudicial effect on the jury is wholly disproportionate to its probative value, or if the prejudicial effect of the evidence outweighs the considerations that make the evidence useful to prove an issue in the case.

In Missouri, relevance is composed of two facets. *State v. Freeman*, 269 S.W.3d 422, 427 (Mo. banc 2008). *Logical* relevance refers to the tendency "to make the existence of a material fact more or less probable." *Id.*; *State v. Winfrey*, 337 S.W.3d 1 (Mo. banc 2011). *Legal* relevance refers to the weighing of the evidence's probative value against the dangers to the opposing party of "unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." *Freeman*, 269 S.W.3d at 427 (*quoting State v. Anderson*, 76 S.W.3d 275, 276 (Mo. banc 2002)).

The Rosenhan study had no logical relevance to the case, because it did not tend to prove or disprove any fact in issue. The Rosenhan study was conducted in 1973—28 years before Dr. Taylor initially evaluated Mr. Tisius in 2001 and 37 years before Dr. Taylor testified at the 2010 resentencing. *Rosenhan*. The prosecutor told the jury that

the study involved "thirty people . . . [who] were asked to . . . report to doctors about various problems they were having. All of those thirty people came back with diagnoses. All of those were wrong. It was a study that demonstrated a 100 percent error rate in your profession." Trial 2 Tr. p. 1130. However, the study consisted of eight persons, instructed to deceive the care-givers, and examined diagnoses and treatment that those faking-patients received from mental hospitals. The Rosenhan study may have cast doubt on the practices within mental institutions in 1973, but it had no logical relevance to Mr. Tisius' case 30 years later.

Assuming *arguendo* that the Rosenhan study had some legitimate tendency to impeach the credibility or findings of the defense psychological experts, any limited probative value was outweighed by its unfair prejudicial impact. The prosecutor's cross-examination regarding the Rosenhan study was prejudicial, because the prosecutor made untrue assertions regarding the study that misled the jury. Trial 2 Tr. pp. 1130. The Rosenhan study did not involve 30 people, only eight people who went to mental hospitals and falsely reported hearing voices. *Rosenhan*, at 250-8. The study was of 12 mental institutions in **1973** *in a clinical setting*, and was not any reliable demonstration of a "100 percent error rate" in the psychological profession *in a forensic setting* in **2010**.

Similarly, *A Child Called "It"* is an autobiographical account of abuse that Mr. Pelzer suffered as a child. It is a single, anecdotal hearsay account that bears no relevance to Mr. Tisius' childhood or how Mr. Tisius' childhood issues affected him. The book was published for profit and therefore was neither a peer-reviewed nor a scientific text. It simply was not subject to the level of scrutiny required to allow on cross-

examination.

Even assuming that David Pelzer's childhood and adult accomplishments were somehow relevant to Mr. Tisius' experiences and life leading up to the crimes, the prejudicial impact of this evidence outweighed any probative value. The jury heard that David Pelzer was able to overcome severe abuse through determination. However, this information was cherry-picked from Mr. Pelzer's self-account of his own history and accomplishments. Certain important factors are unknown (i.e., it is not known whether Mr. Pelzer had other support systems in his life that enabled him to become a hero, when the abuse began, if he had a positive male role model, if he also suffered from mental illness), and asking the jury to compare Mr. Tisius to the "hero," David Pelzer, unfairly prejudiced the mitigation case and added confusion to the jury's assessment of the mitigation evidence. The jury was to consider Mr. Tisius' life, not compare it to the life of a hero as depicted in an autobiography, in determining what weight to give the childhood abuse, neglect, and mental health issues suffered by Mr. Tisius.

In addition, the Rosenhan Study and *A Child Called "It"* were not demonstrated to be authoritative scientific texts. In Missouri, scientific texts can be used in the examination of an expert witness only if they are authoritative. *State v. Love*, 963 S.W.2d 236, 245 (Mo. App., W.D. 1997) (*citing Grippe v. Momtazee*, 705 S.W.2d 551, 556 (Mo. App., E.D. 1986)). There must be evidence that the text is generally accepted and accredited in the profession; the witness's mere familiarity with the text is not sufficient. *Id.* Particularly with regard to articles in journals, there must be a showing that the article is generally accepted and accredited because articles do not carry the

same level of reliability as a standard text. *Id.*

In *Love*, the defendant argued that the trial court plainly erred in allowing the state to cross-examine a defense expert by reading portions of a journal article that criticized her work. *Id.* at 246. The defendant asserted that there was no foundation for the impeachment because no witness adopted the letter as being authoritative and the letter was hearsay. *Id.* The court held that it was improper for the state to try to impeach the expert's credibility with text that was not first shown to be authoritative. *Id.* However, the court did not find that manifest injustice had occurred because the defense had brought out the issue on direct examination. *Id.*

Here, the prosecutor used the Rosenhan study and *A Child Called "It"* to question Dr. Taylor's findings that the abuse, neglect, and depression Mr. Tisius suffered as a child affected his actions as a teen. Specifically, the prosecutor used the book to argue that child abuse and neglect can be overcome by will and determination; Mr. Tisius' childhood did not matter. Trial 2 Tr. pp. 1154-8, 1186. The prosecutor used the Rosenhan study to argue that it demonstrated a 100% error rate in the diagnoses of psychologists. *Id.* p. 113. These were attacks on Dr. Taylor's credibility and findings. Yet, the memoir by David Pelzer of his childhood and the Rosenhan study were not demonstrated to be authoritative.

While Dr. Taylor was familiar with the book and studies similar to the Rosenhan study, that familiarity did not demonstrate that either was authoritative. Mere familiarity of a witness with a publication or periodical does not render it authoritative. Rather, there must be some evidence of general acceptance and accreditation of the text or the treatise within the profession. An article or treatise is

not self-declaratory as being authoritative and, therefore, it should not be indiscriminately used. Otherwise, court proceedings could become the ken of wikipedia entries.

The underlying reason for the restricted use of scientific articles applies to the prosecutor's use of the Rosenhan study and *A Child Called "It."* The underlying reason for the restricted use of scientific periodicals is that articles published in periodicals and journals are not vested with the same trustworthiness and reliability as standard texts used in the practice of teaching various professions. Many published articles relate to experimentation and speculation based upon preliminary studies, intended to invoke comment and criticism. Stated another way, they are not subjected to robust peer review.

The Rosenhan study and *A Child Called "It"* were not demonstrated to possess trustworthiness and reliability. Thus, it was improper for the state to try to impeach Dr. Taylor's credibility and findings with a study and an autobiography that were not first shown to be authoritative. The prosecutor had a responsibility to use the proper procedure to cross-examine from written material.

It was also not relevant to any issue in the case that Mr. Tisius did not plead guilty.[13] The purpose of this trial was to determine whether Mr. Tisius should receive either an LWOP or death sentence. This trial was not an inquiry into whether or not defendant had at an earlier time pleaded guilty. *See State v. Hoopes*, 534 S.W.2d 26, 37 (Mo. banc 1976) (court held that the prosecutor improperly cross- examined the

---

[13] Evidence of plea negotiations or related to guilty pleas is not admissible in any criminal proceeding against the person who made the plea or offer. Missouri Supreme Court Rule 24.02. The use in trial of a withdrawn guilty plea and statements made in connection with it constitutes reversible error. *State v. Danneman*, 708 S.W.2d 741 (Mo. App., E.D. 1986).

defendant about his confession made as part of an agreement later withdrawn by the state. "This trial was not an inquiry into whether defendant had agreed at some earlier date to plead guilty . . ."). Mr. Tisius should not be penalized with death for exercising his constitutional rights. *See United States v. Jackson*, 390 U.S. 570 (1967).

In addition, the prosecutor's statement that "Michael did not plead guilty" was also misleading, especially in light of other evidence and argument presented by the state that Mr. Tisius was not remorseful. Trial 2 Tr. pp. 898-900, 906-10, 1140. The jury would necessarily believe from this statement that Mr. Tisius had the opportunity to plead guilty but did not, in spite of the fact that he was guilty. *Id.* p. 1140. In truth, Mr. Tisius had from the beginning of his case sought to plead guilty in exchange for LWOP. PCR 2 Tr. pp. 662-3. Mr. Tisius wanted to plead guilty, but the state refused. *Id.* pp. 664-5. As such, it was misleading for the prosecutor to tell the jury that Mr. Tisius did not plead guilty. *Id.* p. 1140; *Napue v. Illinois*, 360 U.S. 264 (1959).

**Mr. Tisius was prejudiced.**

The trial court's rulings permitted impermissible cross-examination that unfairly prejudiced the jury's consideration of the mitigation evidence. This resulted in manifest injustice. Mr. Tisius' mitigation case revealed, but was not limited to, a history of parental neglect, a lack of parental nurturing, long-standing depression, horrible physical and continuous beatings, and post-traumatic stress disorder in the time period leading up to the crime. Trial 2 Tr. pp. 952, 955-7, 960-2, 989, 992, 994, 1023, 1067, 1077, 1115, PCR 2 Tr. pp. 235-6, 246, 251-2, 270. Additionally, one of the statutory mitigators submitted and argued to the jury was that at the time of the crimes, Mr. Tisius acted under substantial domination of another person. Trial 2 LF

187, 195. A critical mitigation component was Mr. Tisius' susceptibility, due to beatings by his older brother, rejection by his father, and his mental health issues, to the influence and domination of the older Vance, who manipulated Mr. Tisius into engaging in an ill-fated escape plan that would only benefit Roy. Another part of the mitigation evidence included that Mr. Tisius was remorseful, had matured since the crimes, which occurred when he was 19, and had sought spiritual guidance and prayed for the victims. Trial 2 Tr. pp. 848-9, 1078-81, 1118-9.

The prosecutor's cross-examination, including that the Rosenhan study showed a "100 percent error rate" in the psychological profession, asking the jury to compare Mr. Tisius to a hero, and informing the jury that Mr. Tisius did not plead guilty – misled the jury, confused the jury's assessment of the mitigation evidence, and unfairly prejudiced the defense case for LWOP. The jury was thereby told that the diagnoses given to Mr. Tisius were unreliable, Mr. Tisius was capable of overcoming his childhood issues through determination, and Mr. Tisius chose not to plead guilty. Because the credibility of the defense case was undermined by the prosecutor's untrue and misleading assertions, the improper cross-examination created a substantial and injurious effect violating Mr. Tisius' rights.

In the capital context, the need for reliable sentencing is paramount. The Eighth Amendment "requires provision of 'accurate sentencing information [as] an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die.'" *Simmons v. South Carolina*, 512 U.S. 154, 172 (1994) (Souter and Stevens, J.J., concurring) (*quoting Gregg v. Georgia*, 428 U.S. 153, 190 (1976)). "Because the death penalty is unique 'in both its severity and its finality,' . . . we have recognized an

acute need for reliability in capital sentencing proceedings." *Monge v. California*, 524 U.S. at 732. The "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). Mr. Tisius respectfully requests that this Court reverse his sentences of death and remand the case for a new penalty phase.

The state court's treatment of Mr. Tisius' claim is contrary to and/or an unreasonable application of the clearly established Supreme Court law of *Strickland*. *See* 28 U.S.C. § 2254(d)(1). It is also based on an unreasonable determination of the evidence presented in state court, under 28 U.S.C. § 2254(d)(2). Mr. Tisius requests the opportunity to challenge any factual findings under 28 U.S.C. § 2254(e)(1). Thus, this Court should reverse Mr. Tisius' conviction and remand for a new trial.

**Counsel's failure to object to the prosecution's closing arguments urging that (1) the jury had an obligation to sentence Mr. Tisius to death to protect the law enforcement community from Mr. Tisius; (2) death was appropriate because that was what the victims' families desired and (3) Mr. Tisius did not have the right to ask for mercy violated Mr. Tisius' constitutional rights to effective assistance of counsel, due process, and freedom from cruel and unusual punishment.**

The pervasive improper arguments in Mr. Tisius' case resulted in a sentencing decision that was the result of passion and prejudice, rather than the reasoned decision required by the Eighth Amendment. *Gardner v. Florida*, 430 U.S. 349, 358 (1977). Resentencing counsel's failure to object to these arguments violated Mr. Tisius' constitutional rights to effective assistance of counsel, due process, and freedom from cruel and unusual punishment.

The failure to object to improper prosecutorial argument constitutes deficient performance under *Strickland. See, e.g., Baer v. Neal*, 879 F.3d 769, 785 (7th Cir. 2018). Regarding prejudice, courts must remand for a new trial when the prosecutor's conduct in the context of the trial was "'so inflammatory and prejudicial to the defendant . . . as to deprive him of a fair trial . . . .'" *United States v. Chaimson*, 760 F.2d 798, 809 (7th Cir. 1985) (quoting *United States v. Zylstra*, 713 F.2d 1332, 1339 (7th Cir. 1983)). As in all ineffective of assistance of counsel cases, a petitioner need only demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

**Improper arguments concerning law enforcement protection**

The prosecutor argued that because Mr. Tisius was the type of person who would

plan and commit such a crime, the jury had a duty to stop him before he did it again in

prison. For example, the state argued as follows:

> And more importantly than that, he might not have had a prior criminal history, but even though he's in the Department of Corrections for at least the rest of his life, what is he doing? He's committing more crimes. He has a boot shank. He's got a boot shank. Because, you know what he knows? There is nothing worse we can do to him. He got five years for that, and they just ran it concurrent with his life sentence. Every crime he commits from this day forward as long as he's alive is a freebie. It's a freebie.

> He's going to be -- continue to be a danger to our society, and we have an obligation. As representatives of our state, we all have an obligation to protect those jailers in those Departments of Correction, those staff members, those doctors, those nurses. And you know what? The Roy Vances of the world that are in those prisons we have to protect from murderers like him.

> Ladies and gentlemen, if he killed twice to try and get a friend out, do you think if he's given the opportunity he would kill again to get himself out?

Trial 2 Tr. p. 1189-90.

> The prosecutor closed his argument on this note:

> Ladies and gentlemen, Friday at some point in time I stood in front of you and after laying all these rules out, after laying them all out for you, what you were going to have to do, I couldn't tell you all the facts back then, but each and every one of you told me, you said to me, If you have the goods in the appropriate case, I will consider giving realistic, meaningful consideration to imposing a sentence of death.

> Every single one of you said you could do that. We're here. And, ladies and gentlemen, on behalf of the entire state of Missouri that you represent, I'm asking you to do that. Okay?

> But even -- I have another request though. *I'm asking you on behalf of the entire law enforcement community, I'm asking you to protect us, protect them from people like Michael Tisius.* There is three categories of people in this world. There's the wolves. Michael Tisius is a wolf. What does the wolf do? He stays around the edges of the flock, and when the

flock runs, he picks off the slowest member. That's what the wolf does. Picks off the slowest member of the sheep. The sheep are the second community, second group of people. That's what wolves do; they pick off that slowest member. Okay?

That third group of people in our society that isn't a wolf, that isn't a sheep, they are the law enforcement officers. They are here to protect those sheep, and they can't be everywhere at every time. But if we have a man who is willing to kill a law enforcement officer inside a correctional center, what does that say about our society?

What I'm asking you to do is justified, and, ladies and gentlemen, it's necessary.

*Id.* pp. 1191-92 (emphasis added).

In rebuttal, the prosecutor again asked the jury to protect the law enforcement community:

Maybe he will die in prison. I think our goal is to make sure he's the only one that does and that no other guard, no other nurse, no other person that works there with him, no other inmate that's in that facility is going to be vulnerable to the same type of decision-making that these two officers suffered from.

*Id.* p. 1213.

These arguments speculated about Mr. Tisius' propensity to commit future criminal acts. Furthermore, they implied that the jurors would be directly responsible or accountable for failing to stop Mr. Tisius' future harm of another person. The state only asked the jurors for protection. If the jurors did not provide such protection to the law enforcement community, no one would.

It is improper for the state to speculate about a defendant's propensity to commit future criminal acts. *State v. Reynolds,* 997 S.W.2d 528, 533 (Mo. App. 1999); *State v. Schaefer,* 855 S.W.2d 504, 507 (Mo. App. 1993). After all, "[a] defendant is on trial for the crime he is alleged to have committed in the past, not for what he might do in the

future." *State v. Griggs*, 999 S.W.2d 235, 245 (Mo. Ct. App. 1998), *opinion adopted and reinstated after retransfer* (Oct. 1, 1999). This rule is "designed to preclude argument that 'goes beyond bounds so as to excite and inflame passion or prejudice' toward the defendant." *Schaefer*, 855 S.W.2d at 507 (quoting *State v. Kalter*, 828 S.W.2d 690, 692 (Mo. App. 1992)). "It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 358 (1977).

To be sure, Missouri courts have concluded that it "is permissible for a prosecutor to argue the necessity for law enforcement, the duty of the jury to convict the defendant to prevent crime and the results to society of a failure to uphold the law." *State v. Willis*, 764 S.W.2d 678, 680 (Mo. App. 1988). However, when the argument suggests or implies that the jurors would be directly responsible or accountable for a defendant's future harm of another person, such argument is impermissible. *State v. Deck*, 303 S.W.3d 527, 544 (Mo. 2010).

Because these arguments speculated about Mr. Tisius' propensity to commit future criminal acts and implied that the jurors would be directly responsible or accountable for failing to stop Mr. Tisius' future harm of another person, they were improper under federal and Missouri law. *Reynolds*, 997 S.W.2d at 533; *Schaefer*, 855 S.W.2d at 507; *Deck*, 303 S.W.3d at 544; *see also Berger v. U.S*, 295 U.S. 78, 88 (1935). Trial counsel's failure to object to these improper arguments constituted deficient performance. *Cf. Baer*, 879 F.3d at 785.

### Improper arguments about the desire of the victims' families

Here, the prosecutor's initial closing argument included the following:

> And, you know, it's pretty audacious to come in here now, as this defendant is doing, and saying, I didn't have a dad and, boy, looked [sic] what happened. Do those Miller kids—do those Miller kids get to kill somebody because their dad, their father figure is gone? If so, Mr. Tisius, write down the name. Tell me who they get to kill, because I bet your name would be on that piece of paper.

Trial 2 Tr. pp. 1184-85. The prosecutor concluded in his rebuttal argument that death was warranted specifically to answer the plea from the victim's family: "It can stop Michael Tisius from doing this again. And **it is an answer to the plea from the families of Leon and Jason** and Randolph County that you do justice in this case." *Id.* p. 1219 (emphasis added).

This "plea from the families" and request from the Miller children to "get to kill" Mr. Tisius were outside of the record. For that reason alone, they were improper. *Berger v. United States*, 295 U.S. 78, 84 (1935) (explaining that prosecutorial statements assuming prejudicial facts not in evidence are improper). The statements also were improper because they contained purported evidence of the victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence for Mr. Tisius, all of which were unconstitutional under *Booth* and *Payne*. *Booth*, 482 U.S. 496, 508-09 (1987); *Payne*, 501 U.S. 808, 830 n.2 (1991). Trial counsel's failure to object to these improper arguments constituted deficient performance. *Baer*, 879 F.3d at 785.

### Argument that Mr. Tisius did not have the right ask for mercy

The prosecutor's initial closing arguing included the following appeal to vengeance:

> Ladies and gentlemen, you can -- and I told you during voir dire a couple days ago, you can extend mercy for whatever reason to this man. You can do that. But the one thing he does not have the right to do is to ask for it.

He forfeited that right on June 22nd when he committed these two murders.

Trial 2 Tr. pp. 1176-77.

This appeal to vengeance was improper under federal and Missouri law. *Lesko v. Lehman*, 925 F.2d 1527, 1545 (3d Cir. 1991); *Drake v. Kemp*, 762 F.2d. Trial counsel's failure to object to these improper arguments constituted deficient performance. *Cf. Baer*, 879 F.3d at 785.

### Prejudice

The cumulative effect of the prosecutor's remarks likely hampered at least one juror's ability to decide dispassionately whether Mr. Tisius should receive a sentence other than death. *Cf. Baer*, 879 F.3d at 788-89. The purpose of the rule prohibiting such argument is "designed to preclude argument that 'goes beyond bounds so as to excite and inflame passion or prejudice' toward the defendant." *Schaefer,* 855 S.W.2d at 507 (quoting *State v. Kalter,* 828 S.W.2d 690, 692 (Mo. App. 1992)). Given the inherent prejudicial nature of the improper argument—a plea for the jurors to exercise their exclusive duties to protect law enforcement outside-the-record evidence of future uncharged conduct similar to the nature of the present crime—a reasonable probability exists that the argument in question improperly affected the decision of at least one juror. No evidence is more prejudicial that uncharged conduct similar to one at issue, particularly when such evidence is coupled with the implication that the jurors are the only ones responsible for stopping it. Thus, counsel's deficient performance rendered the trial fundamentally unfair.

Moreover, the plea for death from the victims' family members had no likely origin other than emotion. Given that these statements were not in the record and

therefore were assertions of personal knowledge of the prosecutor, in whom the jurors trusted to not encourage reliance on inadmissible evidence, the pleas of the victims' families likely carried great weight with at least one juror. *Berger v. U.S.*, 295 U.S. 78, 88 (1935) (explaining that because the average juror trusts a prosecutor, as the representative of an impartial sovereignty, to uphold the duty to refrain from using improper methods calculated to secure a conviction, "assertions of personal knowledge [of the prosecutor] are apt to carry much weight against the accused when they should properly carry none."); *State v. Storey*, 901 S.W.2d 886. 901 (Mo. banc 1995) (same). Furthermore, the argument contending that Mr. Tisius forfeited his right to ask for mercy provided the jury with the belief that because Mr. Tisius did not have the right to ask for mercy, the jury had no choice but to accede to the wishes of the victims' family members.

Given the nature of the improper comments, a reasonable probability exists that the prosecutor's improper arguments caused at least one juror to improperly base his decision on caprice or emotion rather than the evidence presented. *Booth*, 482 U.S. at 508-09; *Berger*, 295 U.S. at 88; *Baer*, 879 F.3d at 788-89; *Lesko*, 925 F.2d at 1545; *Drake*, 762 F.2d at 1460. Thus, counsel's failure to object to the improper arguments prejudiced Mr. Tisius.

The state court's treatment of the claim is contrary to and/or an unreasonable application of clearly established Supreme Court law. *See* 28 U.S.C. § 2254(d)(1). It is also based on an unreasonable determination of the evidence presented in state court under 28 U.S.C. § 2254(d)(2). Thus, this Court should reverse Mr. Tisius' conviction and remand for a new trial.

**Mr. Tisius was denied his constitutional rights to due process of law and to be free from cruel and unusual punishment due to improper jury instructions at the resentencing hearing.**

The jury instructions in Mr. Tisius' case were unconstitutional in two respects. They improperly shifted the burden of proof, and they failed to inform the jury that if they found that mitigating evidence outweighed aggravating evidence, they were required to impose life. The two issues are discussed in turn.

**Improper burden shifting instruction that a life sentence was required only if Mr. Tisius proved that mitigating evidence outweighed aggravating evidence.**

Instructions 9 and 15, given in Mr. Tisius' resentencing, were patterned on MAI-CR3d 313.44A and relate to the third step of Missouri's death penalty procedure, where the jury must weigh mitigating and aggravating circumstances. See Mo. Rev. Stat. § 565.030.4(3). The instructions stated, in pertinent part:

> [Y]ou must . . . determine whether there are facts or circumstances in mitigation of punishment which are sufficient to outweigh facts and circumstances in aggravation of punishment. . . . If each juror determines that there are facts or circumstances in mitigation of punishment sufficient to outweigh the evidence in aggravation of punishment, then you must return a verdict fixing defendant's punishment at imprisonment for life. . . .

Trial 2 LF pp. 154, 163.

These instructions did not require the state to prove that the aggravation outweighed mitigation. Instead, they placed the burden on Mr. Tisius to prove that mitigation outweighed aggravation.

These instructions unconstitutionally shifted the burden of proof from the state to the defense. In *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court held that

any factors that the state must prove in order to enhance punishment are the equivalent of separate elements and must be proven to the jury unanimously, beyond a reasonable doubt.

The statute and instructions violate *Mills v. Maryland*, 486 U.S. 367 (1988), *Lockett v. Ohio*, 438 U.S. 586 (1978), *Eddings v. Oklahoma*, 455 U.S. 104 (1982), and the Sixth, Eighth, and Fourteenth Amendments. By requiring that the jury unanimously find the evidence in mitigation outweighs the evidence in aggravation, Mo. Rev. Stat. § 565.030.4(3) prevents the jury from giving meaningful consideration and effect to mitigating evidence.

Instructions 9 and 15 lessen the state's burden to prove all facts required by the statute to enhance the punishment from the default—life without parole—to death. They prevent the jury from giving meaningful consideration and effect to mitigating evidence.

*Kansas v. Marsh*, 548 U.S. 163 (2006), makes this distinction clear. In *Marsh*, the Supreme Court upheld the constitutionality of the Kansas death penalty statute that provided for the death penalty when mitigating and aggravating factors are in equipoise.

The Missouri death penalty statute, however, differs from the Kansas statute that the Supreme Court upheld in *Marsh*. Unlike the Kansas statute, the Missouri statute creates a presumption in favor of the death penalty. The Missouri statute does so by requiring jurors to unanimously find that the mitigation factors outweigh the aggravating factors. *See* Mo. Rev. Stat. §565.030.4. In the Kansas statute, the Court must impose a sentence of life without parole if the state does not prove beyond a

134

reasonable doubt that the aggravating circumstances outweigh the mitigating evidence. *Marsh*, 548 U.S. at 177-178. As the Supreme Court observed regarding the Kansas statute:

> Significantly, although the defendant appropriately bears the burden of proffering mitigating circumstances—a burden of production—he never bears the burden of demonstrating that mitigating circumstances outweigh aggravating circumstances. Instead, the state always has the burden of demonstrating that mitigating evidence does not outweigh aggravating evidence.

*Id.* at 178 79. The Missouri statute permits a death sentence, even if the jurors do not unanimously agree that the mitigation factors outweigh the aggravating factors, if: (1) the jurors find at least one aggravating circumstance; (2) the jurors find that the evidence in aggravation of punishment warrants the death penalty; and (3) the jurors decide that under all of the circumstances to assess the death penalty. *See* Mo. Rev. Stat. §565.030.4. Unlike the Kansas statute, the Missouri statute thus effectively requires the defendant to prove unanimously that the mitigation outweighs the aggravation in order to avoid death. If the jurors split on that issue, the verdict is not life without parole; instead, the case keeps moving toward death.

The instructions requested by the defense would have restored the constitutional balance by requiring the jury to impose life unless they found the aggravating circumstances outweighed the mitigators by beyond a reasonable doubt.

**Failed to inform the jury, as required by Missouri law, that if the jury "decide[d] that the facts or circumstances in mitigation of punishment outweigh the facts and circumstances in aggravation of punishment" the verdict must be life imprisonment.**

Under Missouri law, in a death penalty case, the jury is to be instructed that a verdict of life imprisonment is required in three circumstances:

1. If the jury fails to find, unanimously, at least one of the aggravating circumstances presented by the state;

2. If the jury fails to find that the facts and circumstances in aggravation of punishment warrant a death sentence; and,

3. If the jury finds that the mitigating evidence outweighs the aggravating evidence.

MAI-CR 313.48A (as in effect at the time of the offense).

The instructions given in Mr. Tisius' case did not include the following required language:

> If you unanimously decide that the facts or circumstances in mitigation of punishment outweigh the facts and circumstances in aggravation of punishment, then the defendant must be punished for the murder of [name of victim in this count] by imprisonment for life by the Department of Corrections without eligibility for probation or parole, and your foreperson will sign the verdict form so fixing the punishment.

Rather, the instructions as to each count said only,

> If you are unable to unanimously find the existence of at least one statutory aggravating circumstance beyond a reasonable doubt, as submitted in Instruction No. 7 or if you are unable to unanimously find that there are facts and circumstances in aggravation of punishment which warrant the imposition of a sentence of death, as submitted in Instruction No. 8 then your foreperson must sign the verdict form fixing the punishment at imprisonment for life by the Department of Corrections without eligibility for probation or parole. (Instructions 11, 17.)

Trial 2 LF pp. 156-57, 165-66.

As a result, the error deprived Mr. Tisius of one of the three ways to which he was absolutely entitled to have the jury impose death. This violated his right to greater reliability in the death penalty process. *Lockett v. Ohio*, 438 U.S. 586, 602 (1978). Moreover, the state court denied Mr. Tisius due process of law when it failed to give him the benefit of a required defense against the death penalty. *See Hicks v. Oklahoma*, 447 U.S. 343 (1980).

136

## Conclusion

The state court's treatment of the claim is contrary to and/or an unreasonable application of clearly established Supreme Court law, including *Lockett* and *Hicks*. 28 U.S.C. § 2254(d)(1). It is also based on an unreasonable determination of the evidence presented in state court, under 28 U.S.C. § 2254(d)(2). Thus, the writ must issue, and Mr. Tisius is entitled to a new sentencing proceeding.

## Habeas Ground for Relief No. 12

**Mr. Tisius was denied effective assistance of counsel when trial counsel failed to offer modified jury instructions that properly set forth the federal constitutional requirements for a death sentence.**

Mr. Tisius' amended post-conviction motion alleged, as Ground 8(H), that the instructions in the penalty re-trial were defective because they:

> do not inform the jury that (a) they do not need to find the mitigation beyond a reasonable doubt; (b) they are not to simply count the number of mitigators proven by the defense and compare that number to the number of aggravators proven by the state; (c) they are not instructed on non-statutory mitigating circumstances; (d) they are not instructed that life without parole means the defendant will die in prison; (e) judges are not allowed, or do not, direct jurors to the instructions which explain things the jurors raise questions about in deliberation; (f) and that the instructions do not inform the jury that a mental disorder is a mitigating circumstance and they should not conclude that the defendant will be a danger in the future and the instructions should distinguish between defense of insanity and a mental disease or defect as a mitigating circumstance in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. . . .

PCR 2 LF p. 77.

In support of this ground, Mr. Tisius presented the testimony of his trial counsel that they had no reasonable strategic reason for not presenting modified penalty phase instructions that properly stated the constitutional requirements for the death penalty. They failed to object because the instructions were consistent with Missouri's approved instructions. PCR 2 Tr. pp. 391-396, PCR 2 Ex. 102 pp. 96-103. The post-conviction trial court misread Mr. Tisius' as a claim of trial court error, which cannot be raised in post-conviction proceedings, as opposed to an IAC claim. The Missouri Supreme Court also found that if Mr. Tisius intended to claim IAC for failing to present alternative instructions, the presentation of evidence did not cure the pleading deficiency. *Tisius*, 519 S.W.3d at 432.

Clearly what post-conviction counsel intended, and what this Court should review, is the issue that trial counsel failed to provide the court with proper penalty phase instructions. Making proper objections, and providing proper proposed instructions, is clearly an element of effective assistance of trial counsel. Moreover, at the time of Mr. Tisius' penalty re-trial, counsel had available to them a 2012 report of the American Bar Association recommending that Missouri's pattern instructions be amended to address the issues listed in the amended motion. See ABA March/April 2012 Missouri Death Penalty Assessment Report at ix, xiii, xxx- xxxii, 291-305 (available at:

americanbar.org/content/dam/aba/administrative/death_penalty_moratorium/final_ missouri_assessment_report.authcheckdam.pdf). This document was presented to the post-conviction court as PCR 2 Ex. 81. Clearly, resentencing counsel were on notice that the pattern jury instructions were not constitutionally adequate, and they had a duty to present this issue to the trial court.

Alternatively, the Missouri Supreme Court refused to consider this substantial ground of ineffective assistance of trial counsel due to the ineffective assistance of initial post-conviction counsel. Should the state assert that this ground is not available for review, Mr. Tisius will argue that under *Martinez v. Ryan*, 566 U.S. 1 (2012), he is entitled to develop and present this ground for relief in this Court.

The writ must issue, and Mr. Tisius is entitled to a new penalty phase proceeding.

Habeas Ground for Relief No. 13

**Resentencing counsel were ineffective for failing to move to prohibit the death penalty because Mr. Tisius' mental age was less than 18.**

At the time of the offense, Mr. Tisius was 19 years old. Resentencing counsel could have presented evidence that Mr. Tisius possessed a mental age of a young teenager. Reasonably competent counsel would have moved to exclude death as a potential penalty.

Mr. Slusher was aware Mr. Tisius was 19 when the alleged acts happened. PCR 2 Ex. 102 p. 94. He acknowledged that Dr. Peterson's prior testimony reflected that while Mr. Tisius was 22 at the time that Dr. Peterson evaluated him that Mr. Tisius displayed the reasoning ability of a young teenager and his cognitive ability was quite immature. *Id.* pp. 94-95. Mr. Slusher also acknowledged that particular portion of Dr. Peterson's prior testimony was read to the resentencing jury. *Id.*

Mr. Slusher noted that Dr. Peterson previously testified that Mr. Tisius was under the substantial domination of Vance and was naive, immature, and needed a father figure. *Id.* p. 95. Mr. Slusher testified there was no strategy reason for failing to pursue a motion to prohibit death based on Mr. Tisius' mental age being less than 18, and no strategy reason for failing to investigate Mr. Tisius mental age being less than 18. *Id.* pp. 95-96.

In *Roper v. Simmons*, 543 U.S. 551, 569, 574 (2005), the Court recognized the Eighth Amendment prohibits executing juveniles for acts committed when they were less than 18. In reaching that result, the Court identified three "general differences between juveniles under 18 and adults," which establish juveniles cannot with reliability be classified among the worst offenders. *Id.* 569. First, there is a lack of

140

maturity and an underdeveloped sense of responsibility in youth often resulting in impetuous and ill-considered actions and decisions. *Id.* Second, juveniles are more vulnerable or susceptible than adults to negative influences and outside pressures, including peer pressure. *Id.* Third, the character of a juvenile is not as well formed as an adult such that their irresponsible conduct is not as morally reprehensible as an adult's conduct and is not evidence of irretrievably depraved character. *Id.* 569-70. Because of the diminished culpability of juveniles, the penological justifications for the death penalty apply to them with lesser force than to adults. *Id.* 571.

The same rationale that warrants not imposing death on someone whose biological age is less than eighteen at the time of the offense applies with equal force to someone whose mental age at the time of the offense is less than 18. *See Simmons.* Dr. Peterson testified that Mr. Tisius had the reasoning ability of a young teenager with a cognitive ability that was significantly immature. PCR 2 Ex. 102 pp. 94-95; PCR 1 Tr. p. 260. Mr. Tisius was under the substantial domination of Vance and was naive, immature, and needed a father figure. PCR 2 Ex. 102 p. 95; PCR 1 Tr. pp. 279-80. Reasonably effective counsel would have moved pretrial and presented supporting evidence to prohibit death on the grounds that Mr. Tisius' mental age was less than 18 at the time of the offense, and if that motion was denied, then alternatively would have requested an instruction that the jury must affirmatively find Mr. Tisius' mental age was at least 18 years at the time of the offense to impose death. *See Strickland; Simmons; Graham v. Florida*, 560 U.S. 48 (2010); *Miller v. Alabama*, 567 U.S. 460 (2012). Mr. Tisius was prejudiced because had counsel taken these actions there is a reasonable probability that Mr. Tisius would not have been death sentenced.

The state court's treatment of Mr. Tisius' claim is contrary to and/or an unreasonable application of the clearly established Supreme Court law of *Strickland*. *See* 28 U.S.C. § 2254(d)(1). It is also based on an unreasonable determination of the evidence presented in state court under 28 U.S.C. §§ 2254 (d)(2) and (e)(1). The writ must issue. Mr. Tisius is entitled to a new penalty phase. In the alternative, since the evidence that Mr. Tisius' mental age is under 18 is uncontroverted, this Court should direct a sentence of life or life without parole.

**Mr. Tisius was denied his constitutional rights to due process of law and confrontation of witnesses when documents concerning his prison contraband conviction were admitted into evidence at his resentencing.**

During Mr. Tisius' resentencing, the trial court admitted into evidence over objection the judgment convicting Mr. Tisius of possession of a prohibited article in prison, a docket entry indicating that Mr. Tisius had entered a plea of guilty pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970), to that offense, and the complaint filed in the circuit court. Mr. Tisius acknowledged that the judgment and sentence were admissible as evidence of the conviction. However, he objected to the admission of the complaint, which stated that "the Defendant knowingly possessed a metal object commonly known as a boot shank." Trial 2 Tr. p. 897.

Mr. Tisius did not dispute that the state could have presented a witness who seized or was present during the seizure of the item to testify about the seizure and describe the article. But the use of the complaint (which was not the charging instrument) to adduce this evidence was hearsay, and deprived Mr. Tisius of the ability to confront a witness with actual knowledge. The prosecutor used the allegation that the item in question was a "boot shank" to argue in closing that Mr. Tisius was a dangerous man who should be sentenced to death. *Id.* pp. 1189-1190.

The Sixth Amendment's Confrontation Clause provides that "In all criminal prosecutions, the accused shall enjoy the right. . . to be confronted with the witnesses against him." *Crawford v. Washington*, 541 U.S. 36, 42 (2004); Sixth Amendment. The right to confront one's accusers is "an essential and fundamental requirement for a fair trial" and a bedrock procedural guarantee that applies to both federal and state

prosecutions. *Pointer v. Texas*, 380 U.S. 400, 404, 406 (1965); Fourth and Sixth Amendments.

The Missouri Supreme Court rejected this contention on direct appeal, holding that the complaint was not "testimonial" (within the meaning of *Crawford*) because it was not "created to preserve evidence." *State v. Tisius*, 362 S.W.3d 398, 406 (Mo. banc 2012). Tellingly, the court cited no authority whatsoever for this proposition. Instead, the court went on, "If Tisius wanted to confront the evidence against him in the complaint, he would have needed to not plead guilty to the charge." *Id.* The court then applied a "manifest injustice" standard in affirming, rather than the constitutional standard, which required reversal unless the error was harmless beyond a reasonable doubt. *Id.*; *see Chapman v. California*, 386 U.S. 18 (1967).

Of course, Mr. Tisius did not admit the truth of the facts in the complaint. Instead, he entered an *Alford* plea of guilty that did not require that he admit the truth of the accusation against him. While he waived his right to confront the evidence in the prohibited weapons case itself, he never did so for the purposes of the death penalty case. The error here was not harmless beyond a reasonable doubt, and the Missouri Supreme Court's contrary conclusion was an unreasonable application of federal constitutional law.

The state court's treatment of the claim is contrary to and/or an unreasonable application of clearly established Supreme Court law, including *Pointer, Crawford* and *Chapman. See* 28 U.S.C. § 2254(d)(1). Thus, the writ must issue, and Mr. Tisius is entitled to a new sentencing phase.

## Habeas Ground for Relief No. 15

**Mr. Tisius was denied his constitutional right to effective assistance of counsel when trial counsel failed to investigate and present evidence concerning Mr. Tisius' conviction for possession of a prohibited object in prison at his resentencing.**

Mr. Tisius' second post-conviction motion alleged the ineffective assistance of counsel in connection with his prohibited weapon conviction. Specifically, he alleged that counsel should have presented evidence that: inmate Charles Hurt put the boot shank in Mr. Tisius' radio; that Hurt had a history of setting up other inmates by snitching on them; that Hurt had brutally stabbed to death his Missouri Department of Corrections cellmate; and, that Mr. Tisius was afraid to remove the shank because of Hurt's history of having killed Hurt's cellmate. PCR 2 LF pp. 50-51. The motion further alleged that counsel should have informed the jury that Mr. Tisius had entered an *Alford* plea to the boot shank charge and that an *Alford* plea meant that Mr. Tisius did not admit to having committed the charged act. *Id.* Finally, the motion alleged that counsel should have presented picture evidence of the boot shank conclusively showing that it was unsharpened. PCR 2 LF p. 52.

Prior to the resentencing, Mr. Tisius' counsel received photos of the alleged prohibited item. The photo did not reflect any evidence that the item, which was a metal stem or stiffener taken from the inside of a boot, had been altered in any way beyond removing it from the boot. PCR 2 Ex. 70-72. Due to resentencing counsel's shortcomings, the jury never considered these photos. In his post-conviction deposition, Mr. Slusher admitted that he was aware that Mr. Tisius had asserted that Charles Hurt put the item in his radio. PCR 2 Ex. 102, pp. 53-58. Mr. Slusher also knew that Mr. Tisius had requested protective custody several times as a result of his fear of

145

other inmates. *Id.* at 56-57. Counsel did not investigate Mr. Hurt. *Id.* at 58. Nor did

counsel present any evidence that someone put the item in Mr. Tisius' radio and he was

afraid to take it out. *Id.* at 57. Mr. Slusher was not aware that Mr. Hurt had been

convicted of capital murder for stabbing his cellmate to death. *Id.* at 58, PCR 2 Ex. 73.

Mr. Slusher did not request a copy of Mr. Tisius' corrections property records,

which reflected that Mr. Tisius never owned a pair of boots. PCR 2 Ex. 102, p. 59. Mr.

Slusher offered no strategic reason for this failure. *Id.*

Mr. Slusher was not aware of an April 13, 2006 Corrections memo (PCR 2 Ex.

69), which prohibited inmates at all institutions from wearing boots effective June 1,

2006. PCR 2 Ex. 102, p. 60. The shank was found in Mr. Tisius' radio on June 6, 2006.

*Id.* pp. 60-61.

Mr. Slusher observed that the photos of the boot shank were not as bad as he

had thought because he was expecting the shank to be sharpened into a weapon-

looking instrument and that was not the case. *Id.* at p. 62. Mr. Slusher thought the

jurors' mental image of the shank would have been the same as his – sharpened into a

weapon. *Id.*

On cross-examination, Mr. Slusher was asked whether the report about how the

shank came to be in Mr. Tisius' radio was based on Mr. Tisius' statements to

corrections officials, and therefore, constituted hearsay. *Id.* at pp.113-14. Mr. Slusher

indicated those statements possibly could be objectionable as hearsay without Mr.

Tisius' testifying, but Slusher believed that Assistant Attorney General Zoellner, who

tried the case for respondent, would have worked with them to allow Mr. Tisius'

reporting of why the shank was found in his radio without needing to call Mr. Tisius as

a witness. *Id.* On direct examination, Slusher testified that in their dealings with Mr.
Zoellner on Mr. Tisius' case that Mr. Zoellner had indicated that he was "going to be
unusually loose with us in my experience as to allowing us to do things." *Id.* at p. 15.

Also on cross-examination, Mr. Slusher testified that he believed that informing
the jury that Mr. Tisius' plea had been an *Alford* plea would have been helpful
information for the jury to have. *Id.* at p. 115. Mr. Slusher indicated that jurors would
have understood the significance of an *Alford* plea in the more common terminology
that is used of being a plea of "nolo contendere." *Id.*

Counsel McBride indicated they knew the state intended to rely on Mr. Tisius'
shank conviction as aggravating evidence. PCR 2 Tr. p. 366. However, they did not
consider educating the jury as to the meaning of an *Alford* plea. *Id.* at 366-67. Mr.
McBride acknowledged that they conducted no investigation of the circumstances
surrounding the boot shank. *Id.* He thought they were "stuck" with Mr. Tisius' plea.

Mr. McBride was unaware that Mr. Tisius' corrections records reflected he never
owned a pair of boots. *Id.* at pp. 369-70. Mr. McBride knew from either Mr. Tisius
himself or from corrections records that Mr. Tisius had requested protective custody
and had reported that someone else put the shank in his radio. *Id.* at pp. 369-70.

Ms. Tami Miller, the mitigation specialist assigned to assist in the re-
sentencing, echoed the above. She testified that neither Mr. Slusher nor Mr. McBride
requested her to investigate anything about the boot shank incident. PCR 2 LF pp.
193-194.

Mr. Timothy O'Hara, a DOC inmate who was serving sentences for involuntary
manslaughter and armed criminal action at Potosi in 2006, also testified at the post-

conviction Hearing. PCR 2 Tr. p. 222. Mr. O'Hara knew that Mr. Tisius was charged with possession of a boot shank found in a radio. *Id.* Mr. O'Hara said that Charles Hurt was confined at Potosi at the time the shank was found and that he believed that Mr. Hurt put the item in Mr. Tisius' radio. Because he had no personal knowledge, a hearsay objection was sustained to this testimony. *Id.* at pp. 223-225.

Mr. O'Hara confirmed that Mr. Hurt was serving time for killing his prison cellmate. Mr. Hurt had a reputation for violence within the prison system and for setting up other inmates for charges. *Id.* at pp. 226-227. Mr. O'Hara testified that he was familiar with boot shanks as a metal support in the bottom of a boot, which could be torn out. He knew that boot shanks were modified in prison and turned into weapons by sharpening. *Id.* at pp. 227-28. If trial counsel had contacted Mr. O'Hara, he would have provided the same testimony at trial. *Id.* at 230.

The records of Mr. Hurt's 1982 conviction for capital murder for killing his cellmate were presented to the post-conviction court. PCR 2 Ex. 73. Mr. Hurt was sentenced to life in prison without eligibility for parole for 50 years. *Id.*

The Missouri Supreme Court denied relief. First, the court found that Mr. O'Hara's testimony as to his belief that Mr. Hurt put the item in the radio was hearsay. Next, the court found that the plea transcript "would have revealed information favorable to the state." Finally, the photographs were described by the court as showing "a long piece of rough-looking metal with sharp corners." The court concluded,

> It follows that the plea transcript and the photographs would not have rebutted the impression that Mr. Tisius was a risk to correctional staff or other inmates sufficient to create a reasonable probability that the jury would not have imposed the death penalty had such evidence been

148

presented.

*Tisius v. State*, 519 S.W.3d 413, 422-423 (Mo. banc 2017).

Because the state court did not analyze the performance prong of *Strickland*, this Court must review that aspect of the claim *de novo*. Trial counsel offered no strategic basis for failing to obtain this readily available evidence. Mr. Tisius established the performance prong. As to prejudice, the Missouri court's decision was an unreasonable interpretation of established federal constitutional law and an unreasonable determination of fact. *See* 28 U.S.C. § 2254(d)(1) and (2). Trial counsel themselves acknowledged the deficiencies in their investigation, and opined that some of the omitted evidence would have been helpful to Mr. Tisius. The Missouri court simply rejected this testimony from the people who, presumably, knew the case best. Moreover, the fact that mitigating evidence might have had a possible downside does not automatically preclude a finding of ineffective assistance for failing to present it. The prosecutor strongly emphasized this evidence in his closing, and trial counsel had an obligation to meet it.

Thus, the writ must issue, and Mr. Tisius is entitled to a new sentencing phase.

# Habeas Ground for Relief No. 16

**First trial counsel's failure to adequately investigate and present a diminished capacity or involuntary intoxication defense violated Mr. Tisius' constitutional rights to effective assistance of counsel, due process, and freedom from cruel and unusual punishment.**

Trial counsel were ineffective for failing to adequately investigate and present a defense based on Mr. Tisius' diminished capacity, due to a mental disease or defect, to form the requisite mental state for first-degree murder. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690-91.

The primary issue in this case was whether Mr. Tisius deliberated as required for a first-degree murder conviction. Trial counsel recognized this primary issue and employed a trial strategy designed to cast reasonable doubt on the question of whether Mr. Tisius deliberated. However, despite (1) being aware of red flags such as poor performance on school standardized testing, communication deficits, traumatic childhood including neglect and physical abuse, concussions, functional deficits, panic attacks, mental health treatment involving medication both before and after the offense; (2) knowing that Tracie Bulington described Mr. Tisius as being in a trance-like state at the time of the crime; and (3) knowing that Mr. Tisius said that he could not speak at the time of crime and that all of it seemed like a dream; trial counsel did not adequately investigate whether Mr. Tisius' intellectual impairments and brain dysfunction diminished his ability to deliberate.

Counsel's failure to adequately investigate Mr. Tisius' intellectual impairments constituted deficient performance. Given what counsel knew about Mr. Tisius' intellectual impairments and medical treatment of psychiatric symptoms with

150

medication, reasonable counsel would have obtained the services of a neuropsychiatrist or similarly qualified medical doctor(s) to investigate whether (1) Mr. Tisius suffered from a mental disease or defect and (2) whether—at the time of the offense—such disease or defect diminished Mr. Tisius' ability to deliberate and form the requisite mental state for first-degree murder. *See Richard C. Taylor v. State*, No. 01C01-9709-CC-00384, 1999 WL 512149, at \*17, \*22 (Tenn. Crim. App. July 21, 1999) (concluding that counsel's failure to investigate adequately the petitioner's background and medical history, which reflected a family history of mental problems, a difficult upbringing, and a long history of diagnosed mental problems constituted deficient performance); *Wolfs v. Britton*, 509 F.2d. 304, 310-11 (noting the "critical interrelation between expert psychiatric assistance and minimally effective representation of counsel" and concluding that counsel's limited investigation of a psychiatric defense was inadequate).

Had counsel conducted the appropriate investigation, counsel would have learned that not only does Mr. Tisius suffer from a comorbid neurological disorder, frontal striatal temporal syndrome, and severe mental illnesses of post-traumatic stress disorder and dependent personality disorder, but he suffered from them at the time of the crime. Furthermore, at the time of the crime, this mental disease and defect diminished his ability to deliberate such that he did not form the requisite mental state for first-degree murder. App Exh 05 p. 32. Had counsel presented this evidence, Mr. Tisius would have been entitled to a jury instruction on the defense of diminished capacity. *State v. Walkup,* 220 S.W.3d 748, 754 (Mo. banc. 2007) (citing *State v. Anderson,* 515 S.W. 2d 534, 540 (Mo. banc. 1974)).

Counsel's deficient performance prejudiced Mr. Tisius. A reasonable probability exists that the omitted evidence and instruction would have made a difference to at least one juror. As courts have recognized, particularly when the only issue at trial is the defendant's mental state, the failure to investigate and present an available, meaningful defense prejudices the defendant. *See*, *e.g.*, *Wolfs*, 509 F.2d. at 311 (holding that where principal issue was the defendant's mental state, counsel's failure to investigate a mental state defense prejudiced the defendant); *Keats v. State*, 115 P.3d 1110, 1120 (Wyo. 2005) (where only issue at trial was the defendant's intent, counsel's failure to properly investigate and present the only true defense challenging the existence of the requisite mental state prejudiced the defendant); *Taylor*, 1999 WL 512149, at *22 (affirming lower court's finding of prejudice due to counsel's inadequate investigation because "a substantially different mental defense would have been available.").

As in these cases, counsel's failure to adequately investigate Mr. Tisius' intellectual impairments and present a diminished capacity claim prejudiced Mr. Tisius. Counsel's deficient performance rendered the proceedings fundamentally unfair.

Trial counsel also were ineffective for failing to adequately investigate and present an involuntary intoxication defense under Mo. Rev. Stat. § 562.076. Had counsel done so, they would have learned that Mr. Tisius at the time of the offense was in an involuntarily produced intoxicated or drugged condition that deprived him of the capacity to know or appreciate the nature, quality or wrongfulness of his conduct. Evidence supporting this defense was available in pretrial discovery where Randolph

County jailers Whisenand and Shill wrote reports concerning the apparent intoxication of Mr. Tisius and Ms. Bulington when they visited the jail in the days leading up the attempted jail-break. Inmates Thomas Antle, Gerardo Arteaga, and Shawn Reese would have told resentencing counsel that Mr. Tisius appeared "high" when they saw him that evening. Other witnesses reported similar descriptions.

Counsel's failure to adequately investigate and present this defense constituted deficient performance. Particularly because the only issue at trial was Mr. Tisius' mental state, the failure to investigate and present this available, meaningful defense prejudiced Mr. Tisius. *Cf. Wolfs*, 509 F.2d. at 311; *Keats*, 115 P.3d at 1120; *Taylor*, 1999 WL 512149, at *22. Counsel's deficient performance rendered the proceedings fundamentally unfair.

These claims have not been raised in state court. This failure occurred because of the ineffective assistance of Mr. Tisius' post-conviction counsel. Should the state assert that this ground is not available for review, Mr. Tisius will argue that under *Martinez v. Ryan*, 1566 U.S. 1 (2012), he is entitled to develop and present this ground for relief in this Court.[14]

---

[14] As of the filing of this petition, Mr. Tisius is unaware of any Missouri remedy that will now permit him to exhaust this ground for relief, or the other grounds in this petition that are available under *Martinez* if the state asserts a procedural defense. Should the Missouri Supreme Court later authorize such a remedy, Mr. Tisius reserves the right to move for stay and abeyance to allow him to return to state court to raise these grounds there.

**Trial counsel were ineffective for not investigating and calling a handwriting expert to testify that Roy Vance had written a letter addressed to "Karl" to support an asserted defense in violation of the Sixth and Fourteenth Amendments.**

Mr. Tisius' defense theory was that Vance and Ms. Bulington hatched the jail-break plan, with Mr. Tisius as their stooge, and that the plan never included harming or killing the jailers. Trial counsel's failure to have the letter properly authenticated caused the trial court to reject its admission, which left counsel without critical evidence that would have shown the jury, from the pen of a co-defendant, Mr. Tisius' relative role in the offenses and his lack of deliberation.

As argued by defense counsel to the jury, Mr. Tisius' defense was that Vance and Ms. Bulington, with Mr. Tisius, as their dupe, hatched "a plan. And there was deliberation with regards to the plan. Cool reflection with regards to the plan. But the plan was for a jail break. The plan was not to shoot anyone." Trial 1 Tr. p. 922. However, at the guilt phase, the jury only heard this theory through Mr. Tisius' statement, which the state effectively discounted, and no other evidence.

As argued by the prosecution to the jury, "they were prepared to do that by force of arms because he brought the weapon hidden in his clothing. Is that deliberation? That's planning, friends. That's more than deliberation. He planned to use whatever force was necessary." *Id.* p. 941. The jury never heard the defense theory from the one person who could have explained the plan and should have taken responsibility for his actions but never did—Roy Vance. This evidence was readily available yet counsel could not present it due to their ineffectiveness. Thus, the jury lacked critical evidence to support Mr. Tisius' defense theory and rebut the state's argument.

154

As previously noted, to establish ineffective assistance of counsel, Mr. Tisius must show that counsel's performance was deficient and that there was prejudice. *Strickland*, 466 U.S. 668 (1984); *Williams*, 529 U.S. 362, 390-91. To prove prejudice, Mr. Tisius must show "a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Williams*, 529 U.S. at 405-06. This is not an outcome-determinative standard.

The state courts reasonably concluded that counsel's failure to consult a handwriting expert to determine who authored the "Karl" letter was deficient. PCR 1 LF 533; *Tisius*, 183 S.W.3d 207, 214. The trial court excluded the document precisely because counsel failed to establish its authorship.

Had counsel established authorship, the trial court would have admitted it. Thus, prejudice resulted from counsel's deficient performance.

The state called Officer Platte, who testified that Mr. Tisius made a statement to him shortly after his arrest in Kansas. Trial 1 Tr. pp. 826-34. Mr. Tisius stated that the plan, made with Vance, was for Mr. Tisius and Ms. Bulington to enter the jail, lock the jailers in another cell, hand the gun to Vance and let Vance take over from there. *Id.* p. 835. Mr. Platte read portions of Mr. Tisius' written statements to the jury. Mr. Tisius accepted responsibility and expressed remorse. The prosecutor commented that it was "somewhat different from what he told you verbally?" *Id.* p. 843.

On cross-examination, Mr. Estes elicited that Mr. Tisius had told Mr. Platte that the plan was to put the guards in the holding cell and free Vance, but that the plan did not include killing the guards. *Id.* p. 855. Mr. Tisius told Mr. Platte that he was at fault but that Vance had planned the break-out. *Id.* p. 860.

Mr. Estes also asked Mr. Platte to identify a letter and envelope found in Ms. Bulington's car in Kansas. *Id.* p. 870. The letter, addressed to Karl and signed "Roy," read:

> Karl,
>
> I know what Tracie is talking to you about sounds crazy but if done right it could be really simple with atleast [sic] an hour or two to get away. There's no button for help and the cameras don't record anything so they wouldn't even have a clue who did it. Under normal circumstances I would never ask but we're family me, you, and Tracie and need to be together as one. There isn't any of them that work here with enough heart to play hero as long as it's done right. I hate to even ask but it isn't anything that I wouldn't do for you and Carl with your situation with Betty they wouldn't give you any warning. You'd just be arrested and never see daylight again. Why let that happen when we could all be together. Think about it and if you decide to Tracie will explain the lay out.
>
> Love ya my brother,
>
> Roy
>
> P.S. Keep your head up and your heart strong.

PCR 1 Ex 83 at 12. Mr. Estes sought to introduce the letter as statements of a co-conspirator in furtherance of the conspiracy, as Vance attempted to enlist another person into his escape plot. Trial 1 Tr. p. 871.

The trial court sustained the state's hearsay objection. He noted "there's a signature here but there's no proof that's who wrote the document. That's the reason I'm not letting the exhibit in. I don't have the faintest idea who wrote that document . . . And I don't think you do either. It's signed and you have an envelope that's addressed to Roy Vance or typewritten name Roy Vance. But I don't know where either of these documents, who created either of these documents at this point . . . If you have somebody that will say I recognize that's Roy Vance's signature then we'll see where we

are." *Id.* p. 873-74. The state ultimately confirmed that Vance was the author. PCR 1 Ex. 83 at 2.

The trial court was correct – defense counsel did not know who wrote the document. This establishes that defense counsel were ineffective for not investigating and calling a handwriting expert who could have identified the handwriting as Vance's so that the letter could be admitted. The letter would have supported the defense theory that they had not planned to kill because Vance did not believe any of the jailers had "enough heart to play hero." Further, the letter would have rebutted the state's theory that Mr. Tisius deliberated.

Mr. Estes acknowledged that the letter was not admitted because he had not demonstrated its authorship. PCR 1 Tr. p. 608. He admitted that he erred by not making an offer of proof and by not having a handwriting expert testify that Vance wrote the letter. *Id.* pp. 609-10. Post-conviction counsel and the state stipulated that in December 2001, Robin Russell, a handwriting examiner with the Highway Patrol Crime Lab, examined the letter to "Karl" and "concluded that Roy Dale Vance wrote the questioned writing of 33Q3 [letter to "Karl"]." PCR 1 Ex. 83 at 2. The parties also stipulated that the state called Ms. Russell to testify about this information in Vance's trial in 2002. *Id.* at 3.

The state's closing argument demonstrates the importance of the letter to Mr. Tisius' defense. In the state's closing, the prosecutor argued at length that the jury could find deliberation because

> first, . . . they talked about a plan. And this was a plan that was formulated by Roy Vance and Mr. Tisius . . . Now as I said they're going on a mission. And that mission is to get Roy out. And what they know is they have to go into the jail where there's always the risk of armed

157

guards. And we know that in any jail there are going to be weapons because you don't know which deputies are going to be in and out . . . So they know the patterns of the officers. They know they have guns in there. In fact, they've been able to size up many things now about the way this system works . . . Because after all, Mr. Tisius also spent a considerable amount of time inside that facility. And he knows when things are slow. When is the least likelihood of other opposition being there so he can get in and get his boy out.

Trial 1 Tr. pp. 915-16. The prosecutor presented a concerted and substantial argument about what constituted deliberation. Thus, it was critically important for counsel to rebut a known theory of guilt being pursued by the state. *See Rompilla v. Beard*, 545 U.S. 374 (2005). And that rebuttal could have occurred through Vance's own expression of his thoughts in the letter to Karl.

The letter explained Vance's plan. It explained—to a potential co- conspirator—that their purpose was to break Vance out **without** causing any loss of life, **without** even alerting the authorities about who had done the jail-break until they were long gone. PCR 1 Ex. 83. It further explained that they had analyzed the situation and did not believe the risk was great, as long as it "was done right." *Id.* Contrary to the state's argument, their plan, their deliberation, was to accomplish a jail-break, not to commit a murder. The letter would have helped to prove this. But, since counsel did not properly authenticate it, the trial court would not admit it.

The state focused, in its guilt phase opening argument, on Vance and Mr. Tisius' "plan" and argued that their plan encompassed shooting the officers. Vance's letter directly refutes this. Their true desire was to avoid confrontation and to break Vance out of jail. Contrary to the motion court's findings, the letter also demonstrates that the plan was Vance and Ms. Bulington's, not Vance and Mr. Tisius'. After all, the letter to Karl, one of Vance's friends, expressed that **Ms. Bulington,** not Mr. Tisius, had been

158

discussing the plan with Karl and that, if Karl would help, he should consult **Ms. Bulington**, not Mr. Tisius. The letter, therefore, would have helped to establish that Mr. Tisius was a follower; that he acted as Vance and Ms. Bulington's instrument, not as one of the planners of the jailbreak. Given the bright light the state shone on the planning of the jailbreak, and its argument that the planning established deliberation, counsel's failure to ensure that the jury saw the letter had devastating consequences.

The state court's treatment of the prejudice prong is contrary to and/or an unreasonable application of the clearly established Supreme Court law of *Strickland*. *See* 28 U.S.C. § 2254(d)(1). It is also based on an unreasonable determination of the evidence presented in state court, under 28 U.S.C. § 2254(d)(2). Mr. Tisius intends to challenge any factual findings pursuant to § 2254 (e)(1). Thus, the writ must issue, and this Court should reverse Mr. Tisius' conviction and remand for a new trial.

**Mr. Tisius was denied his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution to present a defense when the trial court sustained an objection excluding a letter from the co-defendant Vance soliciting assistance in breaking Vance out of jail at Mr. Tisius' first trial.**

At his guilt phase, Mr. Tisius offered a letter that codefendant Vance had written to "Karl" that was seized from Ms. Bulington's car after her and Mr. Tisius' arrest. Trial 1 Tr. pp. 869-74; Def. Trial 1 Ex. 9. The letter stated:

> Karl,
>
> I know what Tracie is talking to you about sounds crazy but if done right it could be really simple with at least an hour or two to get away. There's no button for help and the cameras don't record anything so they wouldn't even have a clue who did it. Under normal circumstances I would never ask but we're family me, you, and Tracie and need to be together as one. There isn't any of them that work here with enough heart to play hero as long as it's done right. I hate to even ask but it isn't anything that I wouldn't do for you and Carl with your situation with Betty they wouldn't give you any warning. You'd just be arrested and never see daylight again. Why let that happen when we could all be together. Think about it and if you decide to Tracie will explain the lay out.
>
> Love Ya My Brother,
>
> Roy
>
> P.S. Keep your head up and your heart strong.

Def. Trial 1 Ex. 9.

During the guilt phase testimony of Mr. Platte, the trial court reviewed the letter and sustained the state's "hearsay" objection. Trial 1 Tr. pp. 870-71. The defense argued that the letter fell within the "statement by a co-conspirator in furtherance of the conspiracy" exception. *Id.* The trial court concluded that the defense had not established that Mr. Platte had knowledge that Vance had actually written the letter.

160

*Id.* pp. 873-74; *see Napue v. Illinois*, 360 U.S. 264 (1959).

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the state's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). "The Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984). Defendants have "the right to put before a jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987). The exclusion of evidence violates that constitutional right when it "significantly undermine[s] fundamental elements of the defendant's defense." *United States v. Scheffer*, 523 U.S. 303, 315 (1998). Excluding this evidence relevant and vital to the defense violates the Sixth, Eighth, and Fourteenth Amendments.[15]

The Supreme Court described this holding as necessary to protect the opportunity to be heard that is an essential component of procedural fairness. As the Court explained:

> That opportunity [to be heard] would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. *In the absence of any valid state justification*, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and "survive the crucible of meaningful adversarial testing."

*Id.* at 690-91 (*quoting U.S. v. Cronic*, 466 U.S. 648, 656 (1984)) (emphasis added).

---

[15] There is no doubt that this is a statement by a co-conspirator, Vance, in furtherance of a conspiracy – to break Vance out of jail. As such, it was admissible as an exception to the hearsay rule. "The statement of one conspirator is admissible against another under the coconspirator exception to the hearsay rule even when, as here, the defendants have not been charged with conspiracy." *State v. Pizzella*, 723 S.W.2d 384, 388 (Mo. Banc 1987). "[C]onclusive evidence' of a conspiracy is not required "to invoke the co-conspirator exception to the hearsay rule." *State v. Clay*, 975 S.W.2d 121, 131 (Mo. banc 1998).

The Supreme Court later reaffirmed that the central inquiry should be whether there is a legitimate state interest in excluding the defense's exculpatory evidence, holding that a defendant's constitutional right to present a complete defense is "abridged by evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998) and *Rock v. Arkansas*, 483 U.S. 44, 58 (1987)). The Court explained that "arbitrary rules" were "rules that excluded important defense evidence but that did not serve any legitimate interests." *Id. Crane* provided an illustration of such an unconstitutional "arbitrary" rule because there, the state had failed to advance "'any rational justification'" for excluding evidence about the circumstances of the confession. *Id.* at 326 (citing *Crane*, 476 U.S. at 691).

Excluding the letter prejudiced Mr. Tisius because it was relevant to defend against and rebut the state's case as to: 1) the critical issue of intent/deliberation, i.e., whether there was a plan to kill the jailers or whether the plan was to intimidate them and put them in a cell to effect Vance's escape; and, 2) the relative culpabilities of the codefendants, Vance as the mastermind of the plan directing both Ms. Bulington and Mr. Tisius. Excluding the letter prejudiced Mr. Tisius because he admitted shooting the jailers, and the letter was critical to his degree of deliberation. The letter would have demonstrated that Vance and Ms. Bulington were involved in the planning, that Vance was directing the operation, and that Mr. Tisius was doing what Vance told him.

Significantly, the jury did not hear that the plan to break Vance out of jail would be really simple "if done right." Def. Trial 1 Ex. 9. The real contest at the guilt

stage of trial was whether the offense was first degree, "deliberated" murder, or second-degree, "knowing" murder. Trial 1 Tr. pp. 912-13, 921, 940. The "if done right" phrase in the letter supported the defense that there was no plan to kill the jailers. Because the state argued that Mr. Tisius planned to kill the jailers and therefore deliberated (e.g., *id.* pp. 916-18, 919, 940-41, 943) the letter was important at the guilt phase to rebut this evidence and argument and to establish the defense of the plan to confine – not kill – the jailers.

Vance wrote the letter prior to any arrest and, therefore, its substance bore further indicia of reliability. His letter corroborated not only Mr. Tisius' written statement (St. Trial 1 Ex. 61) and his statement to Mr. Platte (Trial 1 Tr. p. 855), but also Ms. Bulington's post-arrest, plea-bargain testimony (*id.* p. 1018), that the plan for breaking Vance out of jail was not to kill the jailers but to do it "right" – meaning, to use a gun to put them in a cell.

Direct evidence of a particular culpable mental state is rarely available. When it is, and if the state is allowed to introduce evidence of a plan to break Vance out of jail, the defense should be allowed to adduce further evidence of that plan. Without a full and complete consideration of relevant and available evidence, the jury receives an incomplete, inaccurate presentation, and Mr. Tisius is denied his opportunity to present a defense.

The Constitution empowered Mr. Tisius to present all evidence bearing on intent not just that helpful to the state. Evidence of a letter written by Vance, the beneficiary of and a mastermind for a plan, represented a key piece of evidence bearing on purpose, intent, and who was in control of the plan, that the jury did not get to see.

163

The trial court's ruling deprived Mr. Tisius of a meaningful opportunity to present a colorable defense. This violates *Crane*. In addition, the exclusion of this evidence had a substantial and injurious effect on Mr. Tisius' guilt determination. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).

The state court's treatment of the claim is contrary to and/or an unreasonable application of clearly established Supreme Court law, including *Crane*. *See* 28 U.S.C. § 2254(d)(1). It is also based on an unreasonable determination of the evidence presented in state court under 28 U.S.C. § 2254(d)(2). Thus, the writ must issue and this Court should reverse Mr. Tisius' conviction and remand for a new trial.

**Mr. Tisius was denied due process of law when the trial court at his first trial permitted cameras in the courtroom.**

Mr. Tisius and his lawyers first learned that cameras would be permitted in the courtroom when they walked in on the first day of trial. Under Missouri's rules, before court proceedings are video-recorded by news media, the media seeking to do so must request permission from the court. The court must then give notice to the parties prior to ruling on the request. Mo. Sup. Ct. Operating Rule 16.03(b). While the media representatives made a proper request, the court failed to notify defense counsel of it. Nor did the court notify defense counsel that an order permitting video-recording had been entered. Trial 1 Tr. pp 545-546.

When they learned of the presence of cameras and reporters, defense counsel objected that the presence of cameras would put pressure on the jury to convict Mr. Tisius and sentence him to death. The trial court overruled the objection. Trial 1 Tr. p. 544-546. Later in the trial, Mr. Tisius objected when the prosecutor announced in open court that one of his witnesses did not want to be videotaped, pointing out that this remark drew the jury's attention to the presence of cameras, and moved for a mistrial. The motion was overruled. *Id.* pp. 762-763. During the defense case, out of the presence of the jury, Mr. Tisius' counsel brought the judge's attention to the fact that one of the defense witnesses was uncomfortable with being videotaped, but the judge refused to intervene. *Id.* p. 1163.

Mr. Tisius raised the issue of cameras in the courtroom on direct appeal. The Missouri Supreme Court denied relief, finding that Mr. Tisius had not met his burden

165

to show that the video coverage was prejudicial to him:

> In this case, the two incidents cited by Appellant do not rise to the level of a due process violation. The first incident was brief and does not indicate prolonged or substantial attention to the cameras. The second incident took place entirely at the bench. Appellant has not shown that the presence of the camera compromised the ability of the jury to render a fair verdict.

*State v. Tisius*, 92 S.W.3d 751, 769 (Mo. banc 2002).

In *Estes v. Texas*, 381 U.S. 532, 535 (1965), the Supreme Court recognized the potential for prejudice to the defendant from the presence of cameras in the courtroom and reversed the conviction:

> The conscious or unconscious effect that this may have on the juror's judgment cannot be evaluated, but experience indicates that it is not only possible but highly probable that it will have a direct bearing on his vote as to guilt or innocence. Where pretrial publicity of all kinds has created intense public feeling which is aggravated by the telecasting or picturing of the trial the televised jurors cannot help but feel the pressures of knowing that friends and neighbors have their eyes upon them. If the community be hostile to an accused a televised juror, realizing that he must return to neighbors who saw the trial themselves, may well be led 'not to hold the balance nice, clear and true between the state and the accused.'

*Estes*, at 543 (*citing Tumey v. Ohio*, 273 U.S. 510, 532 (1927)).

Another problem identified by the *Estes* court was the effect of cameras on the witnesses: "The quality of the testimony in criminal trials will often be impaired." *Id.* at 547. "The impact upon a witness of the knowledge that he is being viewed by a vast audience is simply incalculable." Revisiting the issue in *Chandler v. Florida*, 449 U.S. 560 (1981), the Court held that the use of cameras in the courtroom was not absolutely prohibited, but the burden was on the defendant to show "that the media's coverage of his case—be it printed or broadcast— compromised the ability of the particular jury that heard the case to adjudicate fairly." *Id.* at 575. A defendant can accomplish this by

166

showing "that broadcast coverage of his particular case had an adverse impact on the trial participants sufficient to constitute a denial of due process." *Id.* at 581.

Because Mr. Tisius had no advance notice of the presence of the cameras, the record is not particularly well developed. However, the two incidents described above do, in fact, establish a due process violation. First, the jury heard that a witness did not want to be video-recorded. This not only brought the presence of cameras to the jury's attention but also likely affected the jury's view of the witness. Second, the trial court forced a defense witness to testify while being video-recorded despite his strong preference not to do so. The *Estes* court recognized that the effect of such recording on a witness is "incalculable," but the witness' preference strongly suggests that his testimony was impaired. No reasonable explanation exists for the trial court's disparate treatment of the witnesses.

The Missouri Supreme Court focused exclusively on the perceptions of the jury and did not consider the effect on witness testimony. Thus, the state court's treatment of the claim is contrary to and/or an unreasonable application of clearly established Supreme Court law, including *Estes. See* 28 U.S.C. § 2254(d)(1). It is also based on an unreasonable determination of the evidence presented in state court, under 28 U.S.C. § 2254(d)(2). Thus, the writ must issue, and Mr. Tisius is entitled to a new trial.

**Counsel's failure to object properly to the state's knowing presentation of false and misleading guilt-phase argument suggesting that Mr. Tisius obtained the gun by stealth and therefore deliberated violated Mr. Tisius' constitutional rights to effective assistance of counsel, due process, and freedom from cruel and unusual punishment.**

The principal contested issue in the guilt phase was whether Mr. Tisius deliberated and thereby committed first-degree murder. In alleging that Mr. Tisius deliberated, the state encouraged the jury to infer that Mr. Tisius stole the gun from Patsy Bulington's house. However, the state knew that Ms. Bulington — not Mr. Tisius — stole the gun from Patsy Bulington's house, and the state intended to and did present such testimony during the sentencing phase of the trial. Thus, the state's argument in the guilt phase encouraging the jury to infer that Mr. Tisius stole the gun was misleading and improper.

Despite knowing that this argument was misleading and improper, trial counsel failed to object on those grounds. Trial counsel's failure to object to this misleading testimony constituted ineffective assistance of counsel.

The state's presentation of false and misleading evidence and argument is improper. *Giglio v. United States*, 405 U.S. 150, 153 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Miller v. Pate,* 386 U.S. 1, 7 (1967). Counsel's failure to object to such improper comments constitutes deficient performance. *Cf. Baer v. Neal*, 879 F.3d 769, 785 (7th Cir. 2018). Courts must remand for a new trial when the prosecutor's conduct in the context of the trial was 'so inflammatory and prejudicial to the defendant . . . as to deprive him of a fair trial . . . .'" *United States v. Chaimson*, 760 F.2d 798, 809 (7th Cir. 1985) (quoting *United States v. Zylstra*, 713 F.2d 1332, 1339 (7th Cir. 1983)). As in

all ineffective of assistance of counsel cases, a petitioner need only demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Giglio*, 405 U.S. at 154 (holding that when the jury hears and considers misleading evidence and argument that in any reasonable likelihood could have affected a juror's judgment, courts must order that a new trial occur).

In this case, the state called Patsy Bulington during the guilt phase. On direct examination, Patsy testified that, two to three days before the homicides, she and Ms. Bulington left the house to pick up child support money and left Mr. Tisius in the house alone. Trial 1 Tr. pp. 697-99. Defense counsel did not object. Patsy said that she and her husband kept a .22 pistol in their bedroom and, after the homicides, she looked for it but could not find it. *Id.* pp. 699-700. She further stated that a box of .22 ammunition also was missing. *Id.* p. 700.

The state knew that during Ms. Bulington's pre-trial deposition, Ms. Bulington acknowledged that she took the gun from her parents' house at Vance's direction. PCR 1 Tr. pp. 470-71; PCR 1 Exs. 13 at p. 9, 43, 49-50. The state knew that this testimony was consistent with statements Ms. Bulington made to the state. On June 22, 2001, she told investigators that she, not Mr. Tisius, had obtained the gun from her parents' bedroom and had put it in a bag while Mr. Tisius slept. PCR 1 Ex. 13 at p. 9. The prosecution also knew that they intended to present Ms. Bulington's testimony regarding the gun during the sentencing phase. In fact, Ms. Bulington was testifying pursuant to a plea agreement with the state, (Trial 1 Tr. p. l015), and in the penalty

phase, the state elicited that Ms. Bulington, not Mr. Tisius, stole the gun from her parents' house. *Id.* pp. l018-19.

However, during closing argument at the conclusion of the guilt phase, the state argued that the jury should infer from Patsy Bulington's testimony that Mr. Tisius took the gun as evidence of his deliberation. In the initial portion of its closing, the prosecutor argued that the state established deliberation because "they also were looking for a gun." *Id.* p. 9l7. Thereafter, in his final closing, the prosecutor argued as follows:

> Let's talk about deliberation since that is the only difference. And they admit, they admit that he did everything else. Let's talk just about deliberation. This weapon was taken by stealth. We know that because Patsy Bulington told us that.
> [Defense Counsel]: I'm going to object, Your Honor. Again a misstatement of the evidence.
> [Prosecutor]: Reasonable inference.
> THE COURT: The objection will be overruled. Let's proceed please.
> [Prosecutor]: He took the weapon out and fired it in the air to make sure it worked.

*Id.* p. 940.

Again, the only issue before the jury was whether Mr. Tisius deliberated as required for first-degree murder; defense counsel conceded that Mr. Tisius committed second-degree murder. *Id.* To prove that Mr. Tisius deliberated, the state wanted the jury to believe that Mr. Tisius stole the gun. But the state knew Ms. Bulington, had taken the gun. PCR 1 Ex. 13 at pp. 9, 43, 49-50; Trial 1 Tr. pp. l018-19. Rather than presenting this testimony to the jury during the guilt phase or informing the jury that the state later was going to present evidence establishing that Ms. Bulington took the gun, the state instead asked the jury to infer from Patsy's testimony that Mr. Tisius stole the gun. By suggesting to the jury that Patsy Bulington told them that the

weapon "was taken by stealth," the state argued that because (a) Patsy and her husband owned a pistol, (b) Mr. Tisius was alone in the house before the homicides, and (c) after the homicides the pistol was missing, the jury should infer that Mr. Tisius took it.

Given what the prosecutors knew and what they intended to present at sentencing, the prosecution's argument suggesting that Mr. Tisius took the gun as part of his deliberation was false and misleading. Defense counsel knew that it was misleading and wanted to object to that on all possible grounds. PCR 1 Tr. p. 533. Counsel's failure to object on the basis that the argument was misleading constituted deficient performance.

Counsel's deficient performance prejudiced Mr. Tisius. A reasonable probability exits that had the jury not been misled to believe that Mr. Tisius took the gun, at least one juror would have had a reasonable doubt as to whether Mr. Tisius deliberated. Even with the misleading testimony, the jury still deliberated for approximately six hours on this issue. During their deliberations, they underlined the portion of the reasonable doubt instruction stating that the law "does not require proof that overcomes every possible doubt." Trial 1 Tr. p. 953. Thus, the question of whether Mr. Tisius deliberated was a close one for the jury.

The prosecutor compounded the prejudice by erroneously stating that Mr. Tisius **said** that he "test-fired" the gun. Trial 1 Tr. p. 917. Later, the prosecutor again stated "He test-fired by his own words." *Id.* p. 942. But Mr. Tisius' "words" never included any statement that he "test-fired" the gun. *Id.* p. 888. Although Officer Platte did testify that Mr. Tisius had said that "earlier in the day" of June 21 Mr. Tisius had "shot [the

171

gun] in the air[,]" (*id.*), the written statement Mr. Platte read to the jury did not mention test-firing any gun, any concern about a gun operating properly, or any reason why the gun purportedly was shot in the air. *Id.* pp. 842-43.

For all of the above reasons and in combination with other errors in the record and other errors presented in this case (particularly those relating to improper evidence and argument regarding deliberation), counsel's deficient performance rendered the result of the proceedings fundamentally unfair.

In the event that this Court finds that trial counsel appropriately objected to the prosecutor's misleading argument, then Mr. Tisius contends in the alternative that appellate counsel's failure to raise this claim on direct appeal constituted ineffective assistance of counsel. *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985) (recognizing the right to effective assistance of appellate counsel); *Roe v. Delo*, 160 F.3d 416, 419-20 (8th Cir. 1998) (holding that counsel's failure to raise viable claim on appeal constitutes ineffective assistance of counsel).

Mr. Tisius was entitled to effective assistance on his first appeal of right. *Evitts,* 469 U.S. 387. The standard for effectiveness of appellate counsel is the same as that for trial counsel: Mr. Tisius must show that counsel's performance was deficient and that counsel's deficient performance prejudiced his case. *Strickland v. Washington,* 466 U.S. 668 (1984); *see Smith v. Robbins,* 528 U.S. 259, 285 (2000) (explaining that the proper standard for evaluating a petitioner's claim of ineffective assistance for not filing a merits brief is *Strickland)*. This analysis requires the Court to determine whether counsel ignored issues clearly stronger than those presented. *Smith,* 528 U.S. at 288 (citing *Gray v. Greer,* 800 F.2d. 644, 646 (7th Cir. 1986)). *Strickland* does not require that the issue be a "dead-bang winner," *Neill v. Gibson,* 278 F.3d 1044, 1057 (10th Cir.

172

2001), because that requirement would be more onerous than *Strickland's* reasonable probability standard.

Moreover, in death penalty cases, appellate counsel should not winnow claims. Death penalty appeals differ from non-capital appeals: "Although not every imperfection in the deliberative process is sufficient, even in a capital case, to set aside a state court judgment, the severity of the sentence *mandates careful scrutiny in the review of every colorable claim of error.*" *Zant v. Stephens,* 462 U.S. 862, 885 (1983) (emphasis added). The American Bar Association advocates raising "all arguably meritorious issues." 1989 ABA Guidelines § l l.9.2D. The Commentary regarding direct appeal counsel's duty reveals the danger of "winnowing" claims:

> "Winnowing" issues in a capital appeal can have fatal consequences. Issues abandoned by counsel in one case, pursued by different counsel in another case and ultimately successful, cannot necessarily be reclaimed later. When a client will be killed if the case is lost, counsel should not let any possible ground for relief go unexplored or unexploited.

2003 ABA Guideline 10.15.1.C. (internal citations omitted).

This Court's "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Burger v. Kemp,* 483 U.S. 776, 785 (1987). Here, to obtain a conviction and death sentence, the prosecutor ignored the truth and presented false and misleading evidence and argument. He misled the jury by suggesting to them that it was Mr. Tisius who stole the gun when he knew the truth was something entirely different. The prosecutor knew about Ms. Bulington's pretrial statement and deposition and intended to later present testimony consistent with Ms. Bulington's earlier statement and testimony. From this information and testimony, the prosecutor knew and believed that Ms. Bulington, not Mr. Tisius, had stolen the gun. Yet he encouraged the jury to believe otherwise so that the case for deliberation would

173

appear stronger than it really was.

This action was subtle but nonetheless effective and damaging to Mr. Tisius' case. For the reasons explained above, a reasonable probability exists that the outcome of Mr. Tisius' appeal would have been different had this issue been raised.

Appellate counsel's decision to winnow this claim and present weaker ones was unreasonable, and the failure to present this case prejudiced Mr. Tisius. Thus, appellate counsel's failure to raise the claim constituted ineffective assistance of counsel. *Roe*, 160 F.3d at 419-20.

The state court's treatment of the claim is contrary to and/or an unreasonable application of clearly established Supreme Court law. *See* 28 U.S.C. § 2254(d)(1). It is also based on an unreasonable determination of the evidence presented in state court, under 28 U.S.C. § 2254(d)(2). Thus, the writ must issue and this Court should reverse Mr. Tisius' conviction and remand for a new trial.

**Mr. Tisius was denied due process of law because he was convicted upon legally insufficient evidence of deliberation, an element of first- degree murder under Missouri law.**

Under Missouri law, the difference between first and second-degree murder is the element of deliberation. An intentional killing is second-degree murder. To elevate the offense to first-degree murder, the jury must find that the intentional killing occurred after deliberation. "Deliberation" is defined by statute as a period of "cool reflection." Mo. Rev. Stat. § 565.002(3).[16]

The evidence at Mr. Tisius' first trial, the proceeding at which guilt was established, fell short with respect to this element. Mr. Tisius told Officer Platte, the officer who interviewed him about the killings, that the plan was not to kill the guards. Rather, it was to intimidate them into giving up the keys. Asked why he began shooting, Mr. Tisius told Mr. Platte, "Nobody said nothing. I couldn't talk. I just started shooting." Trial 1 Tr. p. 860. He continued, "I don't know why. I don't know why I did it. I know why I went in there. I didn't tell them to do nothing. *Id.* pp. 876-877.

This evidence fails to establish a deliberated murder. Rather, the evidence posits an impulsive, spontaneous, botched plan to effect the escape of Vance from jail by intimidating the jailers with a gun and using the gun to put them into a cell. There is evidence that Mr. Tisius shot the guards but not evidence of even a brief period of cool reflection on shooting the guards. The offense Mr. Tisius committed may have been a felony murder, murder that occurred in the course of helping Vance to escape, and it may have been a conventional second-degree murder for knowingly shooting the

---

[16] The version of the statute cited is that in effect at the time of the offense.

guards. However, it was not a cool, reflective, deliberated, first-degree murder.

Conviction upon legally insufficient evidence is a violation of the right to due process of law guaranteed by the Fourteenth Amendment. Considering the evidence in the light most favorable to the verdict, this Court must determine whether any rational jury could find Mr. Tisius guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979).

Mr. Tisius raised this issue on direct appeal after his first trial. The Missouri Supreme Court denied relief, citing the fact that there were multiple shots and multiple victims. *Tisius*, 92 S.W.3d 751, 765. The court also cited the fact that after the occurrence, Mr. Tisius disposed of the gun and the keys. This analysis is a clearly erroneous view of the facts of Mr. Tisius' case. The jury heard two versions of the offense, one from co-defendant Ms. Bulington and one from Mr. Tisius itself. Neither supports any conclusion other than a brief, totally inexplicable episode of violence that ended with the deaths of two men. There was no pause for deliberation at any point. And the fact that, *after* the episode, Mr. Tisius sought to destroy evidence simply does not establish his state of mind at the time the fatal shots were fired.

The state court's treatment of the claim is contrary to and/or an unreasonable application of clearly established Supreme Court law, including *Jackson*. *See* 28 U.S.C. § 2254(d)(1). It is also based on an unreasonable determination of the evidence presented in state court, under 28 U.S.C. § 2254(d)(2). Thus, the writ must issue, and Mr. Tisius is entitled to a judgment of acquittal of the offense of first- degree murder.

**Mr. Tisius was denied effective assistance of counsel in his first trial when trial counsel failed to failed to question prospective jurors about the distinction between first- and second-degree murder and failed to object to the verdict directors for first- and second-degree murder.**

The contested issue in Mr. Tisius' case was whether he was guilty of first or second-degree murder. This is not on easy distinction under Missouri law. Mr. Tisius' lawyers made it impossible for him to receive a fair trial on this issue by failing to question prospective jurors and failing to object to jury instructions.

### Failure to question prospective jurors

Mr. Jeff Estes, Mr. Tisius' first trial attorney bearing responsibility for guilt phase, and Ms. Deborah Wafer, his first appellate attorney, acknowledged that the guilt phase theory was that Mr. Tisius had not deliberated and thus, was guilty of second, not first, degree murder. PCR 1 Tr. pp. 374, 526. Despite this theory, and despite the fact that case involved the homicides of two law enforcement officers, counsel did not question the venire about whether they could fairly and impartially consider the different mental states required for first and second-degree murder and whether they would automatically convict of first-degree murder because of the circumstances of the crime.

Mr. Estes acknowledged his failure to raise this issue during jury selection, and stated that he did not know why he had not done so. He thus did not advance any strategic reason for omitting questions regarding this aspect of the case. PCR 1 Tr. pp. 634-635. The Missouri Supreme Court rejected this ground because Mr. Tisius had not established that any juror actually failed to follow the law regarding first and second-

degree murder. "The jury was instructed on the difference between first and second-degree murder. Tisius' speculative allegations do not overcome the presumption that the jury followed the instructions. The motion court did not clearly err in denying relief on this claim." *Tisius v. State*, 183 S.W.3d 207, 216 (Mo. banc 2006).

This conclusion misapplies the law concerning the right to effective assistance of counsel. Clearly existing federal law entitled Mr. Tisius to both a properly instructed jury and a jury that would apply the law without bias. The voir dire process explores, develops and exposes the prospective jurors' biases, to permit the elimination of those who are unable to apply the law impartially. *Rosales-Lopez v. United States*, 451 U.S. 182 (1981). Because that did not happen here, the court cannot conclude that the jurors *correctly* applied the law.

Without an adequate voir dire, the trial court cannot fulfill its responsibility to remove prospective jurors who may be biased and defense counsel cannot intelligently exercise peremptory challenges. *Roberts v. Bowersox*, 61 F.Supp.2d 896, 922 (E.D. Mo. 1999); *see also Morgan v. Illinois*, 504 U.S. 719 (1992) (error to prohibit defense counsel from asking jurors if they would automatically impose the death penalty). Counsel must question prospective jurors about pertinent legal issues to determine whether they can fairly and impartially consider evidence. Here, since counsel did not ask if the prospective jurors could fairly and impartially consider second-degree murder when law enforcement officers were killed, counsel did not discover whether they were biased against the lesser-included offense. Thus, counsel could not intelligently exercise his peremptory and cause strikes. *See Rosales-Lopez*, 451 U.S. at 188.

Because whether Mr. Tisius deliberated constituted the sole issue at the guilt phase, and that issue would be presented in light of the homicides of two law

178

enforcement officers, counsel should have ensured that the jurors could adequately consider the issue, in light of those specific circumstances. As in *Morgan*, where the death sentence was reversed because defense counsel was not permitted to question jurors about a critical issue, no further prejudice need be shown. Further, the Missouri Supreme Court improperly required Mr. Tisius to present evidence regarding deliberations, which is prohibited.

The state court's treatment of the claim is contrary to and/or an unreasonable application of clearly established Supreme Court law. *See* 28 U.S.C. § 2254(d)(1). It is also based on an unreasonable determination of the evidence presented in state court, under 28 U.S.C. § 2254(d)(2). Thus, the writ must issue, and Mr. Tisius is entitled to a new guilt phase.

### Failure to object to verdict directors

The trial court submitted verdict directors to the jury covering first-degree murder and conventional second-degree murder. The only difference between these two offenses is that a first-degree murder conviction requires a finding of "deliberation," while a second-degree murder conviction requires only a finding of intentional killing. Missouri's statute defines "deliberation" as "cool reflection upon the matter for any length of time no matter how brief." Mo. Rev. Stat. § 565.002(3).

Because of this definition, there is really no distinction between first and second-degree murders. The prosecutor decides which to charge, and as long as the facts show that the defendant had the ***opportunity*** to think about the crime for an instant, the jury may convict. The jury was instructed as to the statutory definition of deliberation. Trial 1 Supp. LF pp. 5, 10.

Trial counsel failed to object to this instruction, and therefore failed to preserve the issue that first-degree and second-degree murder are indistinguishable under Missouri law and that the defendant is therefore denied notice of the crime with which he can be charged.

The Missouri Supreme Court pointed out that the issue had previously been rejected. *State v. Tisius*, 92 S.W.3d 751, 766 (2002). But trial counsel may not simply rely on established law to reject a due process challenge. Were that the case, such cases as *Batson v. Kentucky*, 476 U.S. 79 (1986), and *Atkins v. Virginia*, 536 U.S. 304 (2002), would never have come before the Supreme Court. The law would never change. Rather, as a noted legal scholar puts it, "One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post- conviction review." Stephen B. Bright, *Preserving Error at Capital Trials*, THE CHAMPION, Apr. 1997, at 42-43. "Because of the possibility that the client will be sentenced to death, counsel must be significantly more vigilant about litigating all potential issues at all levels in a capital case than in any other case." American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Revised 2003, *Guideline 10.8, Commentary.*

Trial counsel clearly recognized this issue. Prior to trial, they filed a Motion to Dismiss Charge of Murder First Degree and Objections to MAI-Cr3d 313.02 and a Motion to Dismiss Charge of Murder First Degree and Objections to MAI-Cr3d 310.50 and 313.02. In those motions, counsel attacked the pattern instructions, because they eliminate the distinction between first and second-degree murder by defining

"deliberation" in terms of passage of time and not "cool reflection." Counsel included the challenge in the new trial motion. Trial 1 LF pp. 235-36. But at the instruction conference, counsel failed to object to the verdict directors. Trial 1 Tr. pp. 904-05.

Under Missouri law, the failure to object to the instruction before it was given waived Mr. Tisius' right to have this ground for relief considered by the Missouri Supreme Court. Mo. Sup. Ct. R. 28.03. Due to counsel's failure to follow this rule, Mr. Tisius was denied his state and federal constitutional rights to due process of law, a fundamentally fair trial before a properly instructed jury and effective assistance of counsel.

While the issue of the lack of distinction between first and second-degree murder has not been *successfully* raised in Missouri, it has certainly been raised with some regularity. The Missouri Supreme Court recognized this in denying relief: "Similar attacks on MAI–CR 3d 302.04 have been repeatedly rejected by this Court. *State v. Brown*, 998 S.W.2d 531, 552 (Mo. banc 1999); S*tate v. Harris*, 870 S.W.2d 798, 811[28] (Mo. banc 1994), *State v. Debler*, 856 S.W.2d 641, 652 (Mo. banc 1993)." *Tisius v. State*, 183 S.W.3d 207, 215 (Mo. banc 2006). The issue is therefore one which, in a death penalty case, should be raised by constitutionally effective counsel. The argument counsel *should* have made is as follows.

When a homicide occurs in Missouri, without more, it is presumed to be second-degree murder. *State v. Gassert*, 65 Mo. 352 (Mo. 1877); *Love v. State*, 670 S.W.2d 499,505 (Mo. bane 1984); *State v. Little*, 601 S.W.2d 642 (Mo. App. 1980). To elevate a homicide charge to first-degree murder, the state must also prove the murder was deliberate. Mo. Rev. Stat. §§565.020 and 565.030. "Deliberation [is] the distinctive quality which separates murder in the first degree from murder in the second degree. .

181

. .” *State v. Garrett*, 207 S.W. 784 (Mo. 1918).

Despite the requirement of proof of deliberation, deliberation has been legislatively defined and interpreted by the Missouri courts to render meaningless any rational distinction between first- and second-degree murder. That is especially true in Mr. Tisius case, where the jury's instructions told them that deliberation could be calculated in terms of time and the prosecutor posited numerous different periods during which Mr. Tisius *could* have deliberated: “if you decide that this defendant over here did not deliberate during that ten minutes or so that he was exchanging pleasantries with Mr. Acton before he took the gun he brought into that jail and pointed it at his forehead. . . .” (Trial 1 Tr. p. 913); “in mid-June, at least a couple weeks before the death of these two deputies. . . .” (*Id.* p. 915); “So we're still involved within that next week. . . .” (*Id.*); “and over the next couple of days. . . .” (*Id.*); “Now he's sitting here looking at Mr. Acton exchanging pleasantries. And then he takes that shot and then as he says it, about I0 to 20 seconds passed and then he shoots Mr. Egley. . . .” (*Id.* p. 918); “was it the first time that he shot Mr. Egley after 20 seconds of cooling and calming [sic] reflecting on what he had done to Mr. Acton. . . .” *Id.* These arguments reinforced the instruction that the determinative factor for deliberation was the passage of time and NOT cool reflection. This eliminates any distinction between first and second-degree murder, and relieves the state of its burden on that element.

“Both second degree murder and first degree murder require that the act be intentionally done. Only first degree murder requires the cold blood, the unimpassioned premeditation that the law calls deliberation.” *State v. O'Brien*, 857

S.W.2d 212, 218 (Mo. banc 1993); *State v. Black*, 50 S.W.3d 778, 797 (Mo. banc 2001) (Wolff, J., dissenting). Yet, Missouri, through its opinions and Approved Instructions, has repeatedly found deliberation by focusing on the temporal component, rather than the mental process inherent in the word's definition. *See*, e.g., *Black*, at 788; *State v. Tisius*, 92 S.W.3d 751, 764 (Mo. banc 2002); *State v. Clemmons*, 753 S.W.2d 901, 906 (Mo. banc 1988); *State v. Ervin*, 979 S.W.2d 149, 159 (Mo. banc 1998); *State v. Feltrop*, 803 S.W.2d 1, 11 (Mo. banc 1991); *State v.Ingram,* 607 S.W.2d 438, 443 (Mo. 1980); *see also State v. Samuels*, 965 S.W.2d 913, 922 (Mo. App. 1998) ("The deliberation necessary to support a conviction of murder in the first degree need only be momentary; it is only necessary that the Appellant considered taking the victim's life in a deliberate state of mind."). This focus misdirects the jury and blurs the distinction between first and second-degree murder. Since for the statute to be constitutional, the definition of deliberation must provide a meaningful distinction between first and second-degree murder, the legislative and judicial definitions violate due process. *Giaccio v. Pennsylvania*, 382 U.S. 399, 402-03 (1966).

Because the instruction permits a conviction if there is *time to deliberate*, rather than requiring a finding that the defendant actually used that time to deliberated, the court here relied on evidence of multiple gunshots to support a finding of deliberation. *Tisius*, 92 S.W.3d 751, 764. However, as the Supreme Court of Tennessee explained: "Logically, of course, the fact that repeated blows (or shots) were inflicted on the victim is not sufficient, by itself, to establish first-degree murder. Repeated blows can be delivered in the heat of passion, with no design or reflection. Only if such blows are inflicted as the result of premeditation and deliberation can they be said to prove first-

degree murder." *State v. Brown*, 836 S.W.2d 530, 542 (Tenn. 1992).

In *State v. Guthrie*, 461 S.E.2d 163 (W.Va. 1995), the West Virginia Supreme Court addressed these issues and modified its definitions of premeditation and deliberation to clarify the difference between first and second-degree murder. The court concluded that instantaneous premeditation and momentary deliberation is not satisfactory to prove first-degree murder. *Id.* at 181.

In part, *Guthrie* relied upon the analysis from *Bullock v. United States*, 122 2d 213, 214 (D.D.C. 1941). There, the court stated:

> To speak of premeditation and deliberation which are instantaneous, or which take no appreciable time, is a contradiction in terms. It deprives the statutory requirement of all meaning and destroys the statutory distinction between first and second degree murder. At common law there were no degrees of murder. If the accused had no overwhelming provocation to kill, he was equally guilty whether he carried out his murderous intent at once or after mature reflection. Statutes. . . which distinguish deliberate and premeditated murder from other murder, reflect a belief that one who meditates an intent to kill and then deliberately executes it is more dangerous, more culpable or less capable of reformation than one who kills on sudden impulse; or that the prospect of the death penalty is more likely to deter men from deliberate than from impulsive murder. The deliberate killer is guilty of first degree murder; the impulsive killer is not.

*Bullock*, 122 2d at 214; *see also* W. Lafave and A. Scott, *Criminal Law* (1986) § 7.7 ("The mere fact that the killing was attended by much violence or that a great many wounds were inflicted is not relevant in this regard, as such a killing is just as likely (or perhaps more likely) to have been on impulse.").

This authority, while not controlling, was certainly available to trial counsel at the time of Mr. Tisius' trial. Trial counsel should have objected to the verdict directors on this basis as well as filing their pretrial motions and including the issue in the

motion for new trial. The Missouri Supreme Court's finding that the failure to preserve this issue was not ineffective is an unreasonable interpretation of *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), and its progeny.

The state court's treatment of the claim is contrary to and/or an unreasonable application of clearly established Supreme Court law, including *Strickland. See* 28 U.S.C. § 2254(d)(1). It is also based on an unreasonable determination of the evidence presented in state court under 28 U.S.C. § 2254(d)(2). Thus, the writ must issue, and Mr. Tisius is entitled to a new trial.

**Mr. Tisius was denied his constitutional right to the effective assistance of counsel, due process of law, and to be free from cruel and unusual punishment when trial counsel failed to object to improper prosecutorial closing arguments during Mr. Tisius' first trial.**

Trial counsel failed to object, object timely, or properly preserve objection the following improper closing arguments:

1. That the jurors could convict Mr. Tisius of second-degree murder only if they first found him not guilty of first-degree murder, (Trial 1 Tr. pp. 913, 940) and suggesting that second-degree murder need not even be considered because it was included in any finding of first degree murder, (*Id.* pp. 939-40);

2. That Mr. Tisius told Tracie Bulington to "get" Officer White, who was outside, (*Id.* p. 919), suggesting that Mr. White was another intended victim;

3. That the jurors should consider the photos and an x-ray of the victims' bodies in death in making their guilt phase decisions, (*Id.* pp. 920-21);

4. That the defense argument about deliberation was an "attempt to fool you" and was "incredible sophistry," (*Id.* p. 943); and,

5. That Mr. Tisius' statements that he was sorry only came after he was caught and were "precious little consolation" to the victims. *Id.* pp. 938, 943.

"The touchstone of due process analysis is the fairness of the trial." *Smith v. Phillips,* 455 U.S. 209, 219 (1982); *Wilkins v. Bowersox,* 933 F.Supp. 1496, 1524 (W.D. Mo. 1996), *aff'd,* 145 F.3d 1006 (8th Cir. 1998). The accused is entitled to a fair trial and a prosecutor must not deprive him of one or obtain a wrongful conviction. *Berger v. United States,* 295 U.S. 78, 88 (1935).

Prosecutorial misconduct in argument is unconstitutional when it "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process."

*Donnelly v. DeChristoforo,* 416 U.S. 637 (1974). Such argument may be so outrageous that it violates due process and the Eighth Amendment. *Newlon v. Armontrout,* 885 F.2d 1328, 1337 (8th Cir. 1989); *Antwine v. Delo,* 54 F.3d 1357, 1364 (8th Cir. 1995).

Trial counsel's failure to object to improper argument can constitute ineffective assistance of counsel. *Baer v. Neal*, 879 F.3d 769, 782-88 (7th Cir. 2018). Moreover, counsel's failure to properly preserve a claim for appellate review constitutes ineffective assistance when the failure substantially deprives the defendant of his right to a fair trial. *Davis v. Secretary, Dept. of Corrections*, 341 F.3d 1310 (11th Cir. 2003).

The failure to object to improper prosecutorial arguments constitutes deficient performance under *Strickland. See Baer*, 879 F.3d at 782-88. Regarding prejudice, courts must remand for a new trial when the prosecutor's conduct in the context of the trial was "'so inflammatory and prejudicial to the defendant . . . as to deprive him of a fair trial . . . .'" *United States v. Chaimson*, 760 F.2d 798, 809 (7th Cir. 1985) (quoting *United States v. Zylstra*, 713 F.2d 1332, 1339 (7th Cir. 1983)). As in all ineffective of assistance of counsel cases, a petitioner need only demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Here, the prosecutor committed repeated misconduct in his arguments in guilt phase closing, yet counsel inexplicably did virtually nothing to stop the onslaught. Thus, the jury heard the improper statements unabated. The prosecutor's repeated, intentional misconduct and counsel's repeated failure to object properly to that misconduct deprived Mr. Tisius of constitutional right to effective assistance of counsel.

**Acquittal-First Argument.**

In *Beck v Alabama*, 447 U.S. 625, 627 (1980) the Supreme Court held that the death penalty may not be imposed "when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." (internal quotation marks omitted). Under *Beck*, "the jury must be given a meaningful opportunity to consider and embrace the equivalent of a life sentence when the evidence supports such an option." *Smith v. Spisak*, 558 U.S. 139, 159-60, (2010) (Stevens, J., concurring).

> Here, the prosecutor argued as follows:

> The other two instructions [on second degree murder] are what we call alternative and lesser-included counts **which means only if after you** look at Instruction 10 [on first degree murder] if you decide that this defendant over here did not deliberate . . . if you believe that he did not coolly reflect upon that matter for any length of time no matter how brief before he pulled that gun and shot him, then you will go to these other two instructions that we have that talk about alternative counts.

Trial 1 Tr. p. 913 (emphasis added). Later he argued, again without objection, as follows:

> Murder in the second degree. Did the defendant commit murder in the second degree? Yes. Because murder in the second degree is a lesser-included offense. What does that mean? That means that if you commit murder in the first degree, murder in the second degree has also been committed.

*Id.* pp. 939-40. Finally, he argued, again without objection: "You look at murder second degree **if and only if** you do not believe that we proved those things [deliberation] beyond a reasonable doubt." *Id.* p. 940 (emphasis added).

Because the prosecutor told the jurors that they could consider second-degree murder "only if after" and "if and only if" they first acquitted Mr. Tisius of first- degree

murder, the prosecutor's argument was improper. *Beck*, 447 U.S. at 627. This acquittal-first argument interposed before the jury the false choice that *Beck* prohibits. By telling the jury that they could not consider a lesser offense until they first unanimously acquitted Mr. Tisius of first-degree murder, the argument deprived the jury of a meaningful opportunity to consider an option that was before it: whether Mr. Tisius committed second-degree murder.

The argument led individual jurors to believe (falsely) that their failure to agree might have resulted in a new trial and that, in any event, they could not give effect to their determination that second-degree murder was the appropriate conviction unless and until they had first convinced each of their peers on the jury to find that Mr. Tisius did not deliberate. Thus, the argument created the untenable risk that those who otherwise would vote in the minority would be coerced to vote with the majority. *State v. Allen,* 717 P.2d 1178, 1179 (Or. 1986).

Trial counsel's failure to object to the improper argument constituted deficient performance. *Baer*, 879 F.3d at 785. Furthermore, as will be explained below, counsel's deficient performance prejudiced Mr. Tisius.

### False and Misleading Evidence Regarding Deliberation.

The State's presentation of false and misleading argument is improper. *Miller v. Pate*, 386 U.S. 1, 7 (1967). Counsel's failure to object to such improper comments constitutes deficient performance. *Cf. Baer*, 879 F.3d at 782-88. When the jury hears and considers misleading argument that in any reasonable likelihood could have affected a juror's judgment, courts must order that a new trial occur. *United States v. Valentine*, 820 F.2d 565 (2nd Cir. 1987).

189

In this case, the state argued that as proof of Mr. Tisius' deliberation that Mr. Tisius made statements indicating that he intended to kill Officer Willie White in addition to Officers Acton and Egley. The prosecutor argued in closing that "[Mr. Tisius] gave [Ms. Bulington] the directions for Willie White who's outside at that point watching, saying 'Get him. Get him. Get him.'" Trial 1 Tr. p. 9l9.

However, the evidence in both phases demonstrated that any "get him" statements referred to one of the charged victims—Officer Egley—who had grabbed Ms. Bulington's legs, causing her to scream, and that Mr. Tisius did not see Mr. White, who was outside. *Id.* pp. 606, 6ll, 836, 843, 1036-37. No evidence indicates that Mr. Tisius saw Mr. White. And given that it was dark outside and the lights were on inside, the suggestion that Mr. Tisius could see Mr. White is a not a reasonable inference from the evidence adduced at trial.

Despite this evidence, the prosecutor nonetheless argued that Mr. Tisius (a) knew Mr. White was there, (b) made the purported "get him" statements, and (c) intended to kill Mr. White. This argument misstated the evidence and was false and misleading. *Tucker v. Kemp* 762 F.2d 1496, 1507 (11th Cir. 1985); *Storey,* 901 S.W.2d at 900-03; *State v. Delaney,* 973 S.W.2d 152, 155 (Mo. App., W.D. 1998).

Mr. Estes acknowledged that he had erred in failing to object. PCR 1 Tr. p. 620. Counsel's failure to object constituted deficient performance. *Cf. Baer*, 879 F.3d at 782-88. Furthermore, as will be explained below, counsel's deficient performance prejudiced Mr. Tisius.

**Inflammatory Evidence Displayed in Argument.**

"It is of vital importance to the defendant and to the community that any

decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 358 (1977). When a fact is not disputed by the parties, additional evidence supporting that fact has no probative value. Thus, if the evidence is prejudicial, the prejudicial effect certainly will outweigh its probative value. If the prejudicial effect outweighs the probative value of a piece of evidence, then courts should not admit that evidence or allow references to it in closing argument. *See* Fed. R. Evid. 403.

Here, the primary question at issue was whether Mr. Tisius deliberated as required for first-degree murder. Trial 1 Tr. p. 921. Because defense counsel conceded that Mr. Tisius shot the officers, the nature of the victims' anatomical injuries were not at issue.

Nonetheless, the prosecutor in closing argument displayed an x-ray and photographs of the victims' bodies in death. St. Trial 1 Exs. 22, 24, 25, 30. The exhibits graphically displayed the victims' anatomical injuries from gunshots. Trial counsel did not renew a continuing objection to the exhibits. Trial 1 Tr. pp. 920-21.

Counsel's failure to object to this prejudicial evidence constituted deficient performance. *Cf. Baer*, 879 F.3d at 782-88. Furthermore, as will be explained below, counsel's deficient performance prejudiced Mr. Tisius.

**Attacks on Defense Counsel.**

Prosecutors have the duty to prosecute cases with vigor, but they may not strike foul blows. *Berger v. U.S*, 295 U.S. 78, 88 (1935). Attacks on defense counsel, particularly those that suggest defense counsel is lying to the jury, are improper. *United States v. Holmes*, 413 F.3d 770 (8th Cir. 2005). Counsel's failure to object to such

improper comments constitutes deficient performance. *Cf. Baer*, 879 F.3d at 782-88.

In this case, the prosecutor argued as follows:

Did you hear, were you listening when it was suggested to you that if this had been deliberation then Leon Egley would not have been moving after the first shot? Well, if that's true, then since Jason Acton was shot dead with the first shot and never moved, does that mean there must have been deliberation there? Do you see the inconsistency in the argument? *See the attempt to fool you?*

Trial 1 Tr. p. 943 (emphasis added). The prosecutor then stated, "Cool, been cool reflection, it would have been successful. *What incredible sophistry is that?*" *Id.* (emphasis added).

Although defense counsel objected at the end of closing argument and moved for a mistrial, (*id.* pp. 946-48), counsel did not object at the time the prosecutor made the argument. This failure constituted deficient performance. *Cf. Baer*, 879 F.3d at 782-88. Furthermore, as will be explained below, counsel's deficient performance prejudiced Mr. Tisius.

### Ad Hominem Attacks on Mr. Tisius.

Again, "[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner*, 430 U.S. at 358. Counsel's failure to object to such improper comments constitutes deficient performance. *Cf. Baer*, 879 F.3d at 782-88.

Here, the prosecutor also argued, without timely objection, as follows: "He said he was sorry. I think that's going to be precious little consolation to deputy Acton and deputy Egley. He said he was sorry after he got caught." Trial 1 Tr. p. 938. The prosecution further argued: "[S]omehow because he shows remorse there's no deliberation? Well, he didn't show remorse until he got caught." *Id.* p. 943.

The argument was improper because it was inflammatory. By telling the jury that Mr. Tisius' expressions of remorse were "precious little consolation" to the victims, the prosecutor encouraged the jurors to ignore reason and common sense and appealed to their passions and prejudices. *See United State v. Ayala-Garcia,* 574 F.3d 5 (1st Cir. 2009). The argument also improperly told the jury to consider Mr. Tisus' failure to come forward and to express remorse "until he got caught." Trial 1 Tr. p. 943. Thus, the argument constituted an impermissible comment on Mr. Tisius' right to remain silent. *Doyle v. Ohio,* 426 U.S. 610, 617 (1976).

Counsel did object to this argument but the objection was late. Counsel's failure to object timely constituted deficient performance. *Cf. Baer*, 879 F.3d at 782-88. Furthermore, as will be explained below, counsel's deficient performance prejudiced Mr. Tisius.

### Prejudice

The cumulative effect of the prosecutor's remarks likely hampered at least one juror's ability to decide dispassionately whether Mr. Tisius should be convicted of first or second-degree murder. *Cf. Baer*, 879 F.3d at 788-89. Thus, the state's improper arguments and defense counsel's repeated, unreasonable failures to prevent the jury from considering improper argument denied Mr. Tisius a fair trial.

Regarding the acquittal-first argument, even though the jury later received an instruction that tracked MAI-Cr3d 313.04, a reasonable probability exists that the improper argument affected the jury's verdict. In fact, during voir dire, one venireperson specifically raised the concerns addressed in *Beck*: "I know you explained this at the very get-go. But let's say you think he's guilty but you don't think he's guilty

in the first degree murder, right, so are we done and you guys say, okay, the crime is going to be on the second degree or does it go to another court or how does that work?" Trial 1 Tr. pp. 512-13. The Court's instructions to that venireperson merely referred him back to the instructions, but the instructions caused the initial confusion and contain the acquittal-first and unanimity provisions. *Id.* p. 513. The state's argument exacerbated the likelihood that the jurors, one of whom had already indicated his confusion about this very point, would ignore their justifiable concerns about whether second-degree murder was the appropriate conviction and instead vote to convict Mr. Tisius of first-degree murder.

In conjunction with this improper argument, the jurors considered other evidence that is highly prejudicial. No evidence is more prejudicial than uncharged conduct similar to one at issue. And here, the state's argument directly invoked that prejudice by implying that Mr. Tisius had actually tried to kill—with deliberation— another officer who was not a victim in this case. And even though there was no dispute that Mr. Tisius shot the officers, the state nonetheless displayed an x-ray and autopsy photos during closing, a tactic that encouraged the jury to rest their conviction upon improper emotional considerations instead of the facts.

Moreover, the suggestion that defense counsel lied to the jury is inherently prejudicial. This is especially so because the prosecutor's argument implied that he had special, personal knowledge of Mr. Tisius' guilt. *Berger*, 295 U.S. at 88 (explaining that because the average juror trusts a prosecutor, as the representative of an impartial sovereignty, to uphold the duty to refrain from using improper methods calculated to secure a conviction, "assertions of personal knowledge [of the prosecutor] are apt to

194

carry much weight against the accused when they should properly carry none."). Likewise, the likely effect of the prosecutor's comments regarding Mr. Tisius' expressions of remorse and his right to remain silent was inflammation.

All of these arguments made it more likely that the jury would convict Mr. Tisius of first-degree murder as opposed to second-degree murder. Even with the misleading testimony, the jury still deliberated for approximately six hours on the issue of whether Mr. Tisius was guilty. During their deliberations, the jurors underlined the portion of the reasonable doubt instruction stating that the law "does not require proof that overcomes every possible doubt." Trial 1 Tr. p. 953. Thus, the question of whether Mr. Tisius deliberated was a close one for the jury.

Given the presence of other errors in the record stemming from improper evidence and deliberation, that this was a close case, and that the strength of the state's case regarding deliberation rested on improper evidence and argument, a reasonable probability exists that the arguments in question improperly affected at least one juror's determination of guilt. Thus, counsel's deficient performance rendered the result of the proceedings fundamentally unfair.

The state court's treatment of the claim is contrary to and/or an unreasonable application of clearly established Supreme Court law. *See* 28 U.S.C. § 2254(d)(1). It is also based on an unreasonable determination of the evidence presented in state court under 28 U.S.C. § 2254(d)(2). Thus, the writ must issue and this Court should reverse Mr. Tisius' conviction and remand for a new trial.

**Mr. Tisius was denied effective assistance of counsel when trial counsel failed to object to the assistant attorney general's statement that Mr. Fusselman, the elected prosecutor, had requested his assistance because "Randolph County has not had the misfortune of having that many murders so it is not something with which he comes into contact with [sic] regularly." Trial 1 Tr. p. 187.**

This statement, at the beginning of the prosecutor's voir dire, stated facts outside the record. Further, it served to emphasize the seriousness of the offense in a way not supported by any evidence offered at trial. Trial counsel failed to object. He testified at the post-conviction hearing that he did not believe the statement was objectionable. PCR 1 Tr. p. 628. The Missouri Supreme Court denied relief, finding that "[t]he prosecutor's explanation did not suggest a qualitative difference between Tisius' case and other murder cases. The motion court did not clearly err in finding that Tisius was not prejudiced by the comment and that trial counsel was not ineffective for failing to object." *Tisius*, 183 S.W.3d at 216.

The Missouri Supreme Court's ruling was an unreasonable interpretation of the facts of Mr. Tisius' case. 28 U.S.C. §§ 2254(d)(2), (e)(1). Read in context and giving effect to the plain language of the statement, the clear intent of this initial statement focused the jury on the fact that the peaceful county of Randolph had suffered an unparalled tragedy. Since there was no basis in the record for it, the comment was improper. *See State v. Storey,* 901 S.W.2d 886, 900 (Mo. banc 1995); Mo. Sup. Ct. R. 4.3.4; *Berger v. United States*, 295 U.S. 78 (1935). Had trial counsel made a proper objection, there is a reasonable probability of a different outcome. The writ must issue, and Mr. Tisius is entitled to a new trial.

**Counsel's failure to prevent the jury from seeing inflammatory evidence of brain matter of the victims on the floor of the scene of the crime—which the jury otherwise would not have seen and considered— violated Mr. Tisius' constitutional rights to effective assistance of counsel, due process, and freedom from cruel and unusual punishment.**

During Mr. Tisius' trial, the state presented a crime scene video. Trial 1 p. 662. After the state showed the portion of the crime scene video — displaying the victim's body — to the jury, the state requested to fast-forward the tape to show the jail area. Trial 1 p. 667. Defense counsel objected and requested that the state show the entire tape. Trial 1 p. 668. The next portion of the tape—which the state was not going to show—displayed brain matter on the floor. Trial 1 p. 668. Thus, due to counsel's action, the jury viewed brain matter of the victims on the floor of the scene that they otherwise would not have seen.

Counsel's failure to prevent the jury from seeing the brain matter was unreasonable. Counsel had a duty to investigate the case, and that duty included reviewing the state's evidence. *See Strickland*, 466 U.S. at 688-91. Counsel knew or should have known that the brain matter images were on the video. Counsel also had a duty of loyalty to Mr. Tisius and a duty to advocate for him. *Id.* at 688. Counsel gained nothing from this display of the video and exposed the jury to inflammatory images of brain matter that they otherwise would not have seen. Thus, counsel's failure to prevent the jury from seeing and considering the images of the victims' brain matter constituted deficient performance.

Due to the inflammatory nature of these images, a reasonable probability existed that the images affected the decision of at least one juror. Counsel's deficient

performance rendered the result of the proceedings fundamentally unfair.

This issue has not been raised in state court. This failure occurred because of the ineffective assistance of Mr. Tisius' post-conviction counsel. Should the state assert that this ground is not available for review, Mr. Tisius will argue that under *Martinez v. Ryan*, 1566 U.S. 1 (2012), he is entitled to develop and present this ground for relief in this Court.[17]

The writ must issue, and Mr. Tisius is entitled to a new trial.

---

[17] As of the filing of this petition, Mr. Tisius is unaware of any Missouri remedy that will now permit him to exhaust this ground for relief, or the other grounds in this petition that are available under *Martinez* if the state asserts a procedural defense. Should the Missouri Supreme Court later authorize such a remedy, Mr. Tisius reserves the right to move for stay and abeyance to allow him to return to state court to raise these grounds there.

**Appellate counsel was constitutionally ineffective for not challenging on appeal the admission and display on a movie-screen of autopsy photos of the deceased men thereby denying Mr. Tisius due process, a fundamentally fair trial, and effective assistance of counsel, guaranteed by the Sixth and Fourteenth Amendments.**

The state admitted autopsy photographs for the jury's consideration. St's Trial 1 Ex. 19-21, 23-29. However, irrelevant to any issue in the case, the state enlarged and projected those identical images onto a movie screen. In the guilt phase and during his guilt phase closing argument, the prosecutor displayed to the jury, on a movie-type screen, autopsy photos and an x-ray of Mr. Acton and Mr. Egley's bodies. Trial 1 Tr. pp. 584, 920-21. The prejudicial effect far exceeded any probative value the actual photos may have had, and the state's display on a movie- size screen amplified prejudice.

According to both the trial prosecutor and Mr. Tisius' trial counsel, the sole issue in guilt phase was whether Mr. Tisius acted with deliberation. *Id.* p. 912; PCR 1 Tr. p. 526. Mr. Tisius' appellate counsel knew this to be the case. *Id.* p. 374. Mr. Tisius' trial defense did not contest that he shot the two officers. After reminding the court and the state of their pre-trial motion *in limine* on photographs, (LF 140- 43), and that no dispute existed as to cause of death or identity, the defense offered to stipulate to the cause of death and objected to any display of the ten autopsy photographs. Trial 1 Tr. pp. 580-81; Ex. 20-22, 24-30. These photographs depicted the officers on the gurney from various angles and showed the intubation tubes still inserted in the nose and throat of one of the officers. Ex. 24-29. Two of the photographs (Ex. 22, 30) are of x-rays taken of the officers' heads. The court overruled the objection. Trial 1 Tr. p. 581.

Counsel thereafter objected to the display of these photographs on a movie-size screen. *Id.* p. 584. Counsel preserved his objection in the new trial motion. Trial 1 LF 246-47. However, appellate counsel failed to raise the claim on direct appeal.

The Sixth Amendment protects the "fundamental right to a fair trial." *Strickland*, 466 U.S. at 684. It entitles a defendant to the effective assistance of counsel both at trial and during his first appeal as of right. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). The standard of review for claiming ineffective appellate counsel is the same as trial counsel: the movant must show deficient performance and resulting prejudice. *Strickland*, at 687-88; *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (proper standard for evaluating Mr. Tisius' claim of ineffective assistance for not filing a merits brief is *Strickland*).

*Strickland* does not require that the issue be a "dead-bang winner." *Neill v. Gibson*, 278 F.3d 1044, 1057 (10th Cir. 2001) (requires a showing of a reasonable probability that the omitted claim would have resulted in a reversal on appeal). That requirement would be more onerous than *Strickland's* reasonable probability standard. *Id.*

Furthermore, in death penalty cases, counsel should not winnow claims. Death penalty appeals differ from non-capital appeals. "Although not every imperfection in the deliberative process is sufficient, even in a capital case, to set aside a state court judgment, the severity of the sentence *mandates careful scrutiny in the review of every colorable claim of error.*" *Zant v. Stephens*, 462 U.S. 862, 885 (1983) (emphasis added). "Our duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Burger v. Kemp*, 483 U.S. 776, 785 (1987). The

American Bar Association advocates raising "all arguably meritorious issues." 1989 ABA Guidelines §11.9.2.D. These Guidelines form the standard of practice in death penalty cases and are constitutionally required. *Wiggins*, 539 U.S. at 524; *see also* 2003 ABA Guideline 10.15.1.C. The Commentary regarding direct appellate counsel's duty reveals the danger of "winnowing" claims:

> "Winnowing" issues in a capital appeal can have fatal consequences. Issues abandoned by counsel in one case, pursued by different counsel in another case and ultimately successful, cannot necessarily be reclaimed later. When a client will be killed if the case is lost, counsel should not let any possible ground for relief go unexplored or unexploited.

*Id.*

Appellate Counsel Wafer was aware of the issue regarding the display and admission of the autopsy photographs. PCR 1 Tr. pp. 496-97. She stated that, while she understood the state's need to prove its case and that it was not required to stipulate to facts, she also recognized there was no issue about cause of death. Further, "I've started to rethink gruesome photos, and I—I really do think maybe we should all be paying more attention to them. I don't know if I would reach the same decision again or not." *Id.* p. 498.

In Missouri, trial courts have broad, but not unfettered, discretion in admitting evidence. *State v. Bernard*, 849 S.W.2d 10,13 (Mo. banc 1993). Evidence must be relevant to be admissible. Relevance is two-pronged: logical relevance means the evidence tends to make the existence of a material fact more or less probable. *State v. Smith*, 32 S.W.3d 532, 546 (Mo. banc 2000); *State v. Anderson*, 76 S.W.3d 275, 276 (Mo. banc 2002). Legal relevance means the probative value of the evidence outweighs its prejudicial effect. *Id.* Prejudicial effect encompasses unfair prejudice, issue

confusion, misleading the jury, undue delay, wasted time, or cumulativeness. *Id.; State v. Sladek*, 835 S.W.2d 308, 314 (Mo. banc 1992) (Thomas, J., concurring).

If a trial court abuses its discretion in admitting photographs, its decision may be overturned. *State v. Kincade*, 677 S.W.2d 361, 366 (Mo. App. E.D. 1984); *State v. McMillin*, 783 S.W.2d 82,100 (Mo. banc 1990). If photographs of a victim's body are used solely to arouse the jury's emotions and prejudice the defendant, *State v. Wood*, 596 S.W.2d 394 (Mo. banc 1980), or their probative value is outweighed by their needlessly inflammatory nature, they should be excluded.
*State v. Robinson*, 328 S.W.2d 667 (Mo. 1959). After all, prosecutors "have a greater responsibility than to assure the conviction of a defendant. It is their responsibility to assist the trial court in assuring that both the state and the defendants get a fair trial." *State v. Stevenson*, 852 S.W.2d 858,865 (Mo. App. S.D. 1993) (Parrish, J.,concurring).

In no fashion does the enlargement and projection of ten autopsy photographs have any logical relevance. Indeed, the prosecution informed the jury in his guilt phase closing that the sole issue before them in guilt phase was whether Mr. Tisius deliberated. Trial 1 Tr. p. 912. The enlargement and projection of ten autopsy photographs did not prove this element and were just prejudicial enhancements of matters already in evidence. In short, the state presented the cumulative and repetitive projections for the purpose of prejudicial effect, and they are not logically relevant.

Especially prejudicial were the projected photographs depicting the intubation apparatus since the focus of those photographs was not the wounds inflicted but the potential for suffering that the officer may have endured as a result of those injuries –

an inappropriate issue in guilt phase. The prosecutor's use of the projection system at closing demonstrates that his purpose was to prejudice the jury against Mr. Tisius, because the actual photos were already in evidence and there is no reasonable alternative explanation for blowing them up on a movie-size screen.

These cumulative images tended "to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). They encouraged the jury to convict based on raw emotion, not proof beyond a reasonable doubt.

The prejudice created was substantial. The movie-size screen projections asked the jury to return a verdict more likely grounded in sympathy than on a dispassionate evaluation of the evidence. The movie-size screen projections tip the evidentiary scale from items that are merely useful to those that are aimed directly at the jury's sympathies, or intended to elicit jury outrage.

Here, the cause of death was not at issue. Because the issue, as even the prosecutor framed it, was whether Mr. Tisius deliberated, the images projected by these photographs did not assist the jury in that determination. Appellate counsel's failure to challenge the movie-size screen projections was deficient and prejudiced Mr. Tisius. That Appellate counsel's failure to raise an issue that undermines reliability of the guilt finding is further established by Mr. Tisius' jury being out for over six hours at guilt phase. Given that the sole issue was whether Mr. Tisius had deliberated, there is a reasonable probability that the presentation of these irrelevant movie-size screen projections undermines the reliability of the guilt finding. This Court should reverse and remand for a new trial.

The state court's treatment of Mr. Tisius' claim is contrary to and/or an unreasonable application of the clearly established Supreme Court law of *Strickland*. *See* 28 U.S.C. § 2254(d)(1). It is also based on an unreasonable determination of the evidence presented in state court, under 28 U.S.C.§ 2254(d)(2). Mr. Tisius requests the opportunity to challenge any factual findings under 28 U.S.C. § 2254(e)(1). Thus, the writ must issue and this Court should reverse Mr. Tisius' conviction and remand for a new trial.

**Trial counsel were ineffective for failing to object at the instruction conference to Instruction No. 4, the reasonable doubt instruction, in violation of the Sixth and Fourteenth Amendments provided to the jury at the first trial.**

The instruction given Mr. Tisius' jury improperly lowered the state's burden of proof below that required by due process and equated its "firmly convinced" standard with a clear and convincing evidence standard. In state criminal trials, the Fourteenth Amendment's Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *Cage v. Louisiana*, 498 U.S. 39 (1990); *see also Jackson v. Virginia*, 443 U.S. 307, 315-316 (1979). This reasonable doubt standard "plays a vital role in the American scheme of criminal procedure." *Winship*, 397 U.S. at 363; *Cage*, 498 U.S. at 40. In *Winship,* the Supreme Court spoke to the fundamental nature of the concept of reasonable doubt. The Court noted that "[t]here is always in litigation a margin of error" and stressed that "[i]t is critical that the moral force of the criminal law not be diluted by standard of proof that leaves people in doubt whether innocent men are being condemned." *Id.* at 364.

In order for the public to maintain confidence in our system of laws, the Court continued, proof beyond a reasonable doubt must be held to be proof of guilt "with utmost certainty." *Id.* The beyond a reasonable doubt standard "plays a vital role in the American scheme of criminal procedure" because it (1) operates to give "concrete substance" to the presumption of innocence ensuring against unjust convictions and (2) reduces the risk of factual error in a criminal proceeding. *Id.* at 363.

If the jury is mis-instructed about the state's burden of proof and counsel does not move to rectify the error, the accused's state and federal constitutional rights to due process, a fundamentally fair trial before a properly instructed jury and effective assistance of counsel are denied. That occurred here.

Pre-trial, the defense challenged the reasonable doubt instruction, through motions to modify and objecting to the current instruction. PCR 1 Exs. 77, 78, 125 at 24; PCR 1 Tr. p. 44. At the instruction conference, trial counsel failed to renew their objection. This objection was required, under Missouri law, to preserve the issue for appeal Mo. Sup. Ct. R. 28.03. Trial 1 Tr. pp. 904-905. The trial court provided the improper reasonable doubt instruction reading:

> The charge of any offense is not evidence, and it creates no inference that any offense was committed or that the defendant is guilty of an offense.
> The defendant is presumed to be innocent, unless and until, during your deliberations upon your verdict, you find him guilty. This presumption of innocence places upon the state the burden of proving beyond a reasonable doubt that the defendant is guilty.
> A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case.
> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. The law does not require proof that overcomes every possible doubt. If, after your consideration of all the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you will find him guilty. If you are not so convinced, you must give him the benefit of the doubt and find him not guilty.

PCR 1 Ex. 69 at A-4.

After the guilt phase verdicts were rendered after six hours of deliberation (Trial 1 Tr. pp. 945-49), the trial court informed the parties:

> On Instruction 4, the definition of burden of proof in the third paragraph a reasonable doubt is, based upon reason and common

sense, the words common sense have been underlined. In paragraph four, proof beyond a reasonable doubt that leaves you firmly convinced, the words, the sentence beginning the law does not require proof that overcomes every possible doubt has been bracketed.

*Id.* p. 953. Both the state and Mr. Tisius' trial counsel declined to make a further record. *Id.*

The jury's notation highlights the merit and prejudice to Mr. Tisius. In *Victor v. Nebraska*, 511 U.S. 1 (1994), the Supreme Court addressed whether California's and Nebraska's pattern instructions on reasonable doubt violated due process by allowing a finding of guilt based upon a quantum of proof less than that required by the Due Process Clause. Justice O'Connor, writing for the Court, noted that, in *Estelle v. McGuire*, 502 U.S. 62,72 n.4 (1991), the Court had "made clear that the proper inquiry is not whether the instruction 'could have' been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it." *Victor*, 511 U.S. at 6. Justice O'Connor further stated that, "The constitutional question in the present cases, therefore, is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard." *Id.* Justice O'Connor concluded that the phrase at issue—proof to a moral certainty—was not reasonably likely to have been understood by the jury as suggesting a standard lower than that guaranteed by due process. Nonetheless, the Court did not condone its use because of the change in meaning of the phrase. *Id.* at 16. Justice O'Connor also wrote that, while the phrase "substantial doubt" was problematic, in light of the explication given in the rest of the instruction, it did not unconstitutionally lessen the state's burden of proof. *Id.* at 20-21. "Taken as a whole," Justice O'Connor concluded, the

instructions did not violate due process. *Id.* at 22-23.

Justice Ginsburg, in her concurring opinion, noted that the language used in the instructions could appear "circular" and "less [than] enlightening." *Id.* at 23-26. She suggested that the Federal Judicial Center, Pattern Criminal Jury Instructions, at 17-18, offered "clear, straightforward, and accurate" language.
Victor, 511 U.S. at 26-27 (Ginsburg, J., concurring).

As Justice O'Connor noted in *Victor*, the question is "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard." *Id.* at 6. Given the jury's notations upon the instruction itself, that the "firmly convinced" language is not reasonable doubt language; rather, it represents a clear and convincing standard, such a likelihood exists, and trial counsel were ineffective is not re-raising their objection at the instruction conference to prohibit its usage. This Court should grant relief of a new trial before a properly instructed jury.

The state court's treatment of Mr. Tisius' claim is contrary to and/or unreasonable application of the clearly established Supreme Court law of *Strickland*. *See* 28 U.S.C. § 2254(d)(1). It is also based on an unreasonable determination of the evidence presented in state court, under 28 U.S.C. § 2254(d)(2).

Thus, the writ must issue, and this Court should reverse Mr. Tisius' conviction and remand for a new trial.

**Trial counsel were ineffective for not objecting to references to and the admission of Mr. Tisius' t-shirt, which depicted and bore the legend "Guardians of Paradise," because this denied Mr. Tisius' due process, freedom of speech and association, a fundamentally fair trial, and effective assistance of counsel, guaranteed by the First, Sixth, and Fourteenth Amendments.**

The state elicited in guilt phase that, when he was arrested, Mr. Tisius was wearing a t-shirt that bore the legend "Guardians of Paradise" with a graphic design on the back. Trial 1 Tr. p. 708; Trial 1 Ex. 52. Counsel did not object to the testimony or to the admission of the shirt. Trial 1 Tr. pp. 708, 710. By denying Mr. Tisius' assertion of resulting error, the motion court violated Mr. Tisius' state and federal constitutional rights to due process, freedom of speech and association, a fundamentally fair trial, and effective assistance of counsel.





As previously noted, to establish ineffective assistance of counsel, Mr. Tisius must show that counsel's performance was deficient and that Mr. Tisius was prejudiced. *Strickland*, 466 U.S. 668; *Williams*, 529 U.S. at 390-91.

The prosecutor asked Officer Hall, a criminal investigator with the Highway Patrol, what clothing he had recovered from Mr. Tisius upon his arrest. Trial 1 Tr. p. 707. Hall stated that he had recovered a black t-shirt that said "Guardians of Paradise" on both back and front. *Id.* p. 708. Counsel did not object to the description and only objected to the t-shirt's admission as a product of a warrantless arrest and seizure without probable cause. *Id.* p. 710. The court overruled the objection. *Id.*

Trial counsel were ineffective for not objecting to the reference to the image and slogan and to the admission of the t-shirt on that basis as irrelevant to any issue before the jury and as inflammatory and highly prejudicial. That item of evidence presented by the state suggested that Mr. Tisius was a member of or endorsed an anti-social group and that its prejudicial effect outweighed any probative value it might have had. Further, the state's use of the image and slogan encouraged the jury to convict, based on his association with or endorsement of that

group and its purported beliefs.

Mr. Estes did not believe the slogan and image were objectionable and thus did not object. PCR 1 Tr. p. 594. The images are overwhelmingly prejudicial. The front of Trial 1 Ex. 52 bears the slogan "Guardians of Paradise." On the back, this image is joined with the image of a snarling winged tiger-like animal, his talons extended over the yin and yang sign, and his taloned wings encircling his body. The yin and yang sign is superimposed upon red flames. Any notion the jury could not possibly have considered this evidence to mean that Mr. Tisius was part of or supported some anti-social group is belied by the image itself, which contains violent, demonic figures.

In *Dawson v. Delaware*, 503 U.S. 159 (1992), the Supreme Court held that the First and Fourteenth Amendments prohibit the introduction in a capital sentencing proceeding of the fact that the defendant was a member of the Aryan Brotherhood, where the evidence has no relevance to the issues being decided in the proceeding. *Id.* at 1095. In *Dawson,* in exchange for the prosecution's agreement not to call any expert to testify about the Aryan Brotherhood, the defense agreed to the following stipulation: "The Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities. Separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons including Delaware." *Id.* at 1096.

In *Dawson*, the prosecutor read the stipulation to the jury and introduced evidence that Dawson had tattooed the words "Aryan Brotherhood" on his hand. *Id.* The Delaware Supreme Court stated that "punishing a person for expressing his views or for associating with certain people is substantially different from allowing evidence

of [the defendant's] character [to be considered] where that character is a relevant inquiry." *Id.* Therefore, the state court concluded, because the evidence relating to the Aryan Brotherhood focused the jury's attention on Dawson's character and did not appeal to the jury's prejudices concerning race, religion, or political affiliation, it was properly admitted. *Id.*

The Supreme Court reversed. The Court found that that the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment, the Court found that the admitted evidence was totally without relevance to Dawson's sentencing proceeding and without relevance to proving the existence of any aggravating factor. *Id.* at 1097-98.

In *State v. Driscoll*, 55 S.W.3d 350 (Mo. banc 2001), the Missouri Supreme Court reasonably applied *Dawson* to the guilt phase: "the holding of *Dawson*—that mere evidence of a defendant's membership in a racist prison gang is a First Amendment violation if not otherwise relevant—appears equally applicable to guilt phase." *Id.* As to guilt phase, Driscoll contended that the evidence was adduced to show his propensity to commit crimes. The Missouri Supreme Court concluded that the logical relevance of the evidence was "tenuous at best" and that it had no legal relevance since its prejudicial effect "far outweighed its probative value." *Id.*

Here, there is a reasonable probability of a different result without the jury's improper consideration of the improper shirt. The jury was out for six hours in guilt phase, (Trial 1 Tr. pp. 945-49), deciding the sole issue before them—whether Mr. Tisius deliberated. Although the evidence poignantly pointed to Mr. Tisius, the jury clearly

must have been struggling on the question of deliberation. The slogan and image of the snarling, taloned, winged beast proved no issue before the jury in guilt phase; rather, it only caused prejudice. As in *Driscoll*, the Guardians of Paradise evidence here "may well have been sufficient to convince one or more of the jurors to convict rather than acquit." *Id.* at 358. It is only because of the violence of the image that the t-shirt bore that the prosecutor wanted that image firmly in the mind's eye of the jurors.

Given the nature of the image, counsel's failure to object to the admission of the Guardians of Paradise shirt had impactful consequences. The state court's treatment of Mr. Tisius' claim is contrary to and/or an unreasonable application of the clearly established Supreme Court law of *Strickland*. *See* 28 U.S.C. § 2254(d)(1). It is also based on an unreasonable determination of the evidence presented in state court, under 28 U.S.C. § 2254(d)(2). Mr. Tisius intends to challenge any factual findings pursuant to 2254 (e)(1). Thus, the writ must issue and this Court should reverse Mr. Tisius' conviction and remand for a new trial.

**Habeas Ground for Relief No. 29**

**The state suppressed favorable exculpatory evidence in violation of Mr. Tisius' right to due process of law.**

After their arrest, Ms. Bulington and Mr. Tisius were interviewed in Kansas. While a microcassette of Ms. Bulington's interview, occurring hours before Mr. Tisius' interrogation, was provided to trial counsel (*see* App Exh 13.), the state never produced a microcassette of Mr. Tisius' interrogation. Curiously, the police report provided contains four pages of transcript like reportage, which could only have reasonably been prepared from either an audio tape or a transcript of the audio tape. *See* App Exh 12. pp. 3-6.

Had evidence favorable to Mr. Tisius existed and the police refused to turn it over to defense counsel, it would have been in violation of *Brady v. Maryland*, 373 83, 87 (1963). Evidence will be considered material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). This does not require that disclosure results in acquittal. *United States v. Agurs*, 427 U.S. 97, 111 (1976). As defined in *Bagley*, 473 U.S. at 682, evidence is material, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

To the extent the audio recordings no longer exist, the "Due Process Clause requires a different result when we deal with the failure of the state to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Arizona*

*v. Youngblood*, 488 U.S. 51, 57 (1988). When the police fail to preserve material evidence, it violates the defendant's due process rights. The audio recordings of the complete interrogation would have been material and offered the potential ability to challenge the both the admissibility and the reliability of Mr. Tisius' statements pursuant to *Crane v. Kentucky*, 476 U.S. 683 (1986).

This substantial *Brady* claim was not reviewed by the Missouri Supreme Court because of ineffective assistance of initial post-conviction counsel, and must be reviewed *de novo* by this Court. *Martinez v. Ryan*, 566 U.S. 1 (2012). Discovery and an evidentiary hearing will be required.

**Mr. Tisius was denied proper proportionality review as required by Missouri law in violation of his constitutional right to due process of law under the Fourteenth Amendment.**

The Missouri Supreme Court shirked its duty under Mo. Rev. Stat. § 565.035.3(1) and (3) to determine:

> (1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and
>
> . . .
>
> (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

Although Mr. Tisius' right to proper proportionality review is based on state law, this right is not merely a matter of state concern, but a liberty interest protected against arbitrary deprivation by the Due Process Clause of the Fourteenth Amendment. *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980); *Rust v. Hopkins*, 984 F.2d 1486, 1493 (8th Cir. 1993).

Relating to the first prong of the required review of a death sentence, Mr. Tisius' attorneys argued that the death sentences were the result of "passion, prejudice, or any other arbitrary factor" because they used hearsay evidence concerning Mr. Tisius' conviction for possession of a prohibited object in prison, misrepresented a study concerning recidivism, improperly used David Pelzer's memoir, *A Child Called "It*," thereby asking the jury to compare Mr. Tisius to a hero in a book; told the jury that Mr. Tisius did not plead guilty when he knew he was guilty; argued to the jurors that they had an obligation to impose death to prevent future harm to others; suggested to the jury that the victims' families wanted Mr. Tisius to be killed; and suggested to the jury

that Mr. Tisius had forfeited his right to ask for mercy. Trial 2 Tr. pp. 897, 1129-30, 1140-1, 1154-8, 1176-7, 1184-5, 1189-90, 1192, 1212, 1219; St. Trial 2 Ex. 53. The Missouri Supreme Court found that because it had rejected all of these claims of trial court error, it could not invalidate the death sentence on that basis.

Missouri's proportionality review statute requires the court to review all cases in which the death penalty is submitted, including cases in which a life sentence was imposed, in determining whether a death sentence was proportionate. In his direct appeal brief, Mr. Tisius first pointed out that he received the death penalty when Vance, the driving force behind the escape plan, did not. The evidence presented by the state and the defense demonstrated that Michael, 19, was encouraged by 27-year-old Vance, to participate in an ill-fated escape plan that would only benefit Vance. Trial 2 Tr. pp. 630, 809, 848-9, 851. Anyone with any amount of maturity would have seen through Vance. Unfortunately, Michael was a very lost and misguided teenager, who could be easily taken advantage of by a con man. *Id.* pp. 991-2, 995, 1035, 1115, 111; PCR 1 Tr. 235, 248-9, 251-2, 258,260,270.

Mr. Tisius identified *State v. McIlvoy,* 629 S.W.2d 333 (Mo. banc 1982), a case in which the Missouri Supreme Court found the death sentence disproportionate, as precedent requiring a similar finding in Mr. Tisius' case. Like Mr. Tisius, Mr. McIlvoy surrendered and confessed. Mr. Tisius' case was extremely similar to that of Mr. McIlvoy. However, the court found the death sentence to be proportionate in Mr. Tisius' case. *State v. Tisius,* 362 S.W.3d 308, 414-15 (Mo. Banc. 2012)

This sort of grasping at straws does not meet the requirements of due process. The writ must issue, and Mr. Tisius is entitled to a sentence of LWOP.

**Mr. Tisius was denied his right to effective assistance of counsel by trial counsel's failure to adequately question prospective jurors pertaining to the death penalty.**

Resentencing counsel deferred to the state's questioning of many prospective jurors on death penalty topics. While counsel questioned the prospective jurors about their ability to consider mitigation, they did not further explore the jurors' answers concerning their lack of bias in favor of the death penalty. Nor did they seek to examine the prospective jurors privately to determine their bias.

In capital cases, "jury selection is literally a matter of life or death," and possibly the most important part of the trial. John H. Blume, Sheri Lynn Johnson & A. Brian Threlkeld, *Probing "Life Qualification" Through Expanded Voir Dire*, 29 HOFSTRA L. REV. 1209, 1210-11 (2001). The Sixth Amendment guarantees the right to trial by impartial jurors. Accordingly, the right to trial by jury necessarily includes the use of "methods . . . to secure independent and disinterested jurors." *Paducah, T., & A.RR. v. Muzzell*, 95 Tenn. 200, 201, 31 S.W. 999, 999 (1895). The primary method of securing independent and disinterested jurors is a thorough, competent voir dire. *Miller v. Francis*, 269 F.3d 609, 615 (6th Cir. 2001) ("Among the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury by using *voir dire* to identify and ferret out jurors who are biased against the defense." The Supreme Court has explained that:

> *Voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored.

> Without an adequate *voir dire* the trial judge's responsibility to
> remove prospective jurors who will not be able impartially to follow
> the court's instructions and evaluate the evidence cannot be
> fulfilled. Similarly, lack of adequate *voir dire* impairs the
> defendant's right to exercise peremptory challenges.

*Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (citations omitted).

Prevailing professional norms require that counsel in capital cases master sophisticated jury selection techniques to conduct competent voir dire. "Trial attorneys in death penalty cases must be able to apply sophisticated jury selection techniques, including . . . demonstration of bias on the part of prospective jurors who will automatically vote to impose the death penalty if the defendant is convicted on the capital charge." Commentary to § 1.1, 2003 ABA Guidelines. The ABA Guidelines explain counsel's duties as follows:

> Counsel should be familiar with the precedents relating to
> questioning and challenging of potential jurors, including the
> procedures surrounding "death qualification" concerning any
> potential juror's beliefs about the death penalty. Counsel should be
> familiar with techniques: (1) for exposing those prospective jurors
> who would automatically impose the death penalty following a
> murder conviction or finding that the defendant is death-eligible,
> regardless of the individual circumstances of the case; [and] (2) for
> uncovering those prospective jurors who are unable to give
> meaningful consideration to mitigating evidence.

2003 ABA Guidelines § 10.10.2.B. Social science researchers have found that jurors are most likely to admit biases when voir dire is conducted individually and prefaced by a relaxed interview. *See, e.g.*, Sheri Lynn Johnson, *Black Innocence and the White Jury*, 83 MICH. L. REV. 1611, 1675 (1985).

The circumstances of this case—specifically that the victims were law enforcement officers and respected members of the community—are those in which juror bias against the defense is common, yet pervasive. One study, involving jurors

who actually sat in death penalty cases, has shown that juror bias against the defendant due to these factors substantially impairs a juror's ability to consider a sentence other than death:

> Astonishingly, more than half of the jurors said that they personally felt death is the only appropriate punishment for repeat murder, premeditated murder and multiple murder. **Nearly half believed that the death penalty was the only acceptable punishment for the killing of a police officer or prison guard**, or for murder by a drug dealer. Almost a quarter of the jurors said that death is the only acceptable punishment when an outsider kills an admired and respected member of the community for a killing that occurs during the commission of another crime, and for a rape with permanent injury to the victim.

Bowers, 83 CORNELL L. REV. at 1504.

Here, resentencing counsel did not request or conduct individual, sequestered voir dire to probe adequately the potential biases of the jurors such as biases regarding the appropriate punishment for the killing of a police officer. Although some questions addressing this potential bias were asked in group voir dire, some prospective jurors likely did not feel comfortable discussing his or her own personal biases in front of the group. *See* Johnson, 83 MICH. L. REV. at 1675. By failing to probe adequately the jurors' beliefs regarding killings of a police officer or guard, trial counsel rendered ineffective assistance of counsel and denied Mr. Tisius a fair jury selection process and trial in violation of the Sixth, Eighth, and Fourteenth Amendments.

This issue has not been raised in state court. This failure occurred because of the ineffective assistance of Mr. Tisius' post-conviction counsel. Should the state assert that this ground is not available for review, Mr. Tisius will argue that under *Martinez v. Ryan*, 1566 U.S. 1 (2012), he is entitled to develop and present this

ground for relief in this Court.[18]

The writ must issue, and Mr. Tisius is entitled to a new trial.

---

[18] As of the filing of this petition, Mr. Tisius is unaware of any Missouri remedy that will not permit him to exhaust this ground for relief, or the other grounds in this petition which are available under *Martinez* if the state asserts a procedural defense. Should the Missouri Supreme Court later authorize such a remedy, Mr. Tisius reserves the right to move for stay and abeyance to allow him to return to state court to raise these grounds there.

## CONCLUSION

I declare under the penalty of perjury under the laws of the United States of America that the statements made herein are true and correct.

/s/ Laurence E. Komp
LAURENCE E. KOMP

## CERTIFICATE REGARDING SERVICE

I hereby certify that on November 2, 2018, the foregoing was served by this Court's electronic filing system on all counsel of record.

/s/ Laurence E. Komp
LAURENCE E. KOMP